1  BRUCE ISAACS (Bar No. 100296)
2  Email:  bruceisaacs@dwt.com
   DAVIS WRIGHT TREMAINE LLP
3  865 S. Figueroa Street, Suite 2400
   Los Angeles, CA  90017
4  Telephone:  (213) 633-6808
5  Facsimile:  (213) 633-6899

6
   JAMES W. QUINN (*pro hac vice*)
7  Email: james.quinn@weil.com
   YEHUDAH L. BUCHWEITZ (*pro hac vice*)
8  Email: yehudah.buchweitz@weil.com
9  WEIL, GOTSHAL & MANGES LLP
   767 Fifth Avenue
10 New York, NY 10153
11 Telephone:  (212) 310-8000
   Facsimile:  (212) 310-8007
12
13 Attorneys for Defendant
   CBS INTERACTIVE INC.
14
15          UNITED STATES DISTRICT COURT

16         CENTRAL DISTRICT OF CALIFORNIA

17
18 YAHCHAAROAH LIGHTBOURNE,       NO. SACV13-00876 JLS (RNBX)
   on behalf of himself and all others
19 similarly situated,            **DECLARATION OF YEHUDAH L.
                                  BUCHWEITZ IN SUPPORT OF
20              Plaintiff,        DEFENDANT CBS INTERACTIVE
                                  INC.'S, OPPOSITION TO
21      v.                        PLAINTIFF'S MOTION FOR
                                  CLASS CERTIFICATION**
22 PRINTROOM, INC., PROFESSIONAL
23 PHOTO STOREFRONTS, INC.,
   BRAND AFFINITY                 Date:  June 19, 2015
24 TECHNOLOGIES, INC. and CBS     Time: 2:30 p.m.
   INTERACTIVE, INC.,             Ctrm:  10A
25                                Judge: Hon. Josephine L. Staton
26              Defendants.
27

28

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the following is true and correct.

1.      I am an attorney admitted pro hac vice to practice before this Court and a partner of the law firm Weil, Gotshal & Manges LLP, which represents Defendant CBS Interactive ("CBSI") in the above-captioned litigation.  I submit this declaration in support of Defendant's Opposition to Plaintiff's Motion for Class Certification.

2.      Annexed hereto as Exhibit 1 is a 50 State Right of Publicity Law Survey.

3.      Annexed hereto as Exhibit 2 is a true and correct copy of excerpts from the transcript of the deposition of Plaintiff Yahchaaroah Lightbourne, taken on April 14, 2015.

4.      Annexed hereto as Exhibit 3 is a true and correct copy of excerpts from the transcript of the deposition of Robert Stull, taken on April 16, 2015.

5.      Annexed hereto as Exhibit 4 is a true and correct copy of an email from Nich DeCapio to Ernest A. Larossa, dated April 30, 2013. (CBSI021158).

6.      Annexed hereto as Exhibit 5 is a true and correct copy of the Supplemental Declaration of Mydung Tran Regarding CBS Interactive Inc.'s First Set of Document Requests to Brand Affinity Technologies, Inc., dated May 27, 2015.

7.      Annexed hereto as Exhibit 6 is a true and correct copy of an email from Ernest A. Larossa to Nich DeCapio, dated September 7, 2012. (CBSI017249).

8.      Annexed hereto as Exhibit 7 is a true and correct copy of excerpts from the transcript of Oral Argument in *Lightbourne v. Printroom, Inc.*, No. 13-00876-JLS (C.D. Cal. Dec. 5, 2014).

9.      Annexed hereto as Exhibit 8 is a true and correct copy of the 2010 UTEP Miners Football Schedule, which was marked as Lightbourne – Exhibit 10 at the deposition of Yahchaaroah Lightbourne.

10.      Annexed hereto as Exhibit 9 is a true and correct copy of the 2011 UTEP Miners Football Schedule, which was marked as Lightbourne – Exhibit 11 at the deposition of Yahchaaroah Lightbourne.

11.      Annexed hereto as Exhibit 10 is a true and correct copy of a photo dated September 5, 2010 with description "Yahchaaroah Stuart (95). Photo by Ivan Pierre Aguirre" and its related metadata (CBSI-Lightbourne0160238), which was sold on April 15, 2013 (CBSI009935) and marked as Lightbourne – Exhibits 5 and 6 at the deposition of Yahchaaroah Lightbourne.

12.      Annexed hereto as Exhibit 11 is a true and correct copy of a photo dated September 25, 2010 with description "Yahchaaroah Stuart (95)" and its related metadata. (CBSI-Lightbourne0169741).

13.      Annexed hereto as Exhibit 12 is a true and correct copy of a photo dated September 26, 2010 with description "Yahchaaroah Stuart (95). Photo by Ivan Pierre Aguirre" and its related metadata. (CBSI-Lightbourne0170155).

14.      Annexed hereto as Exhibit 13 is a true and correct copy of a photo dated October 2, 2010 with description "Yahchaaroah Stuart (95). Photo by Ivan Pierre Aguirre" and its related metadata. (CBSI-Lightbourne0172574).

15.      Annexed hereto as Exhibit 14 is a true and correct copy of a photo dated October 3, 2010 with description "Yahchaaroah Stuart (95), Brandon Miller (25), Ruben Munoz (76)" and its related metadata. (CBSI-Lightbourne0173084).

16.      Annexed hereto as Exhibit 15 is a true and correct copy of a photo dated October 3, 2010 with description "Greg Watkins (44), Yahchaaroah Stuart (95). Photo by Ivan Pierre Aguirre" and its related metadata. (CBSI-Lightbourne0173229).

17.     Annexed hereto as Exhibit 16 is a true and correct copy of a photo dated October 23, 2010 with description "Yahchaaroah Stuart (95). Photo by Ivan Pierre Aguirre" and its related metadata. (CBSI-Lightbourne0183082).

18.     Annexed hereto as Exhibit 17 is a true and correct copy of a photo dated August 5, 2011 with description "Yahchaaroah Lightbourne (97)" and its related metadata. (CBSI-Lightbourne0268420).

19.     Annexed hereto as Exhibit 18 is a true and correct copy of a photo dated December 2, 2011 with description "Yahchaaroah Lightbourne (97). Photo by Ivan Pierre Aguirre" and its related metadata. (CBSI-Lightbourne0316960).

20.     Annexed hereto as Exhibit 19 is a true and correct copy of a University of Texas at El Paso Student-Athlete Authorization Form, signed by Yahchaaroah Lightbourne, dated September 16, 2009, which was produced by the University of Texas at El Paso ("UTEP") on September 26, 2014 and marked as Lightbourne – Exhibit 2 at the deposition of Yahchaaroah Lightbourne.

21.     Annexed hereto as Exhibit 20 is a true and correct copy of a University of Texas at El Paso Student-Athlete Authorization Form, signed by Yahchaaroah Lightbourne, dated August 4, 2010, which was produced by UTEP on September 26, 2014 and marked as Lightbourne – Exhibit 3 at the deposition of Yahchaaroah Lightbourne.

22.     Annexed hereto as Exhibit 21 is a true and correct copy of a University of Texas at El Paso Student-Athlete Authorization Form, signed by Yahchaaroah Lightbourne, dated August 3, 2011, which was produced by UTEP on September 26, 2014 and marked as Lightbourne – Exhibit 4 at the deposition of Yahchaaroah Lightbourne.

23.     Annexed hereto as Exhibit 22 is a true and correct copy of an email from Ernest A. Larossa to Christina Hettel, dated October 8, 2012. (CBSI047314).

24.     Annexed hereto as Exhibit 23 is a true and correct copy of an email from Ernest A. Larossa to Nich DeCapio, dated October 23, 2012. (CBSI013548).

25.     Annexed hereto as Exhibit 24 is a true and correct copy of a photo dated September 15, 2009 with description "Zeke Riser forces a fumble by Oklahoma State quarterback Zac Robinson during the second half in Stillwater, Okla. Saturday, Sept. 12, 2009. The ball went out of bounds, and Oklahoma State retained possession. Houston defeated No. 5 Oklahoma State 45-35. (AP Photo/Brody Schmidt)" and its related metadata (CBSI-Lightbourne0000900), which was sold on September 22, 2012 (CBSI009935) and marked as Lighbourne – Exhibit 15 at the deposition of Yahchaaroah Lightbourne.

26.     Annexed hereto as Exhibit 25 is a true and correct copy of a photo dated August 31, 2012 with description "Jennie Krauser" and its related metadata (CBSI-Lightbourne0058197), which was sold on September 6, 2012 (CBSI009935) and marked as Lightbourne – Exhibit 16 at the deposition of Yahchaaroah Lightbourne.

27.     Annexed hereto as Exhibit 26 is a true and correct copy of a photo dated April 24, 2010 with description "Collin Taylor makes an attempt at 7-1 in the high jump at the 2010 Drake Relays, April 24, 2010 (Brian Mason photo)" and its related metadata (CBSI-Lightbourne0145201), which was sold on September 11, 2012 (CBSI009935).

28.     Annexed hereto as Exhibit 27 is a true and correct copy of a photo dated September 15, 2012 with description "Zack Wagenmann (58) Zack Wagenmann (58), Alex Bienemann (92)" and its related metadata (CBSI-Lightbourne0068094), which was sold on October 14, 2012 (CBSI009935).

29.     Annexed hereto as Exhibit 28 is a true and correct copy of a photo dated September 6, 2012 with description "K-State's Lilla Porubek celebrates an ace serve against Saint Mary's at Ahearn Field House in Manhattan, Kansas on

September 6, 2012. (Scott D. Weaver/K-State Athletics)" and its related metadata (CBSI-Lightbourne0062018), which was sold on September 28, 2012 to Lilla Porubek (CBSI009935).

30.     Annexed hereto as Exhibit 29 is a true and correct copy of The Big Ten Conference Student Athlete Name and Likeness Release. (CBSI142644).

31.     Annexed hereto as Exhibit 30 is a true and correct copy of the Johns Hopkins University Athletics Student-Athlete Questionnaire.  (CBSI111106).

32.     Annexed hereto as Exhibit 31 is a true and correct copy of the Purdue University Student-Athlete Information & Publicity Release Waiver. (CBSI111160).

33.     Annexed hereto as Exhibit 32 is a true and correct copy of the Texas Christian University Student-Athlete's Photographic Release Agreement: 2013-2014. (CBSI111177).

34.     Attached hereto as Exhibit 33 is a true and correct copy of a photo dated October 9, 2011 with description "Chris Cua" and its related metadata (CBSI-Lightbourne0284521), which was sold on September 18, 2012 (CBSI009935).

35.     Annexed hereto as Exhibit 34 is a true and correct copy of a photo dated October 27, 2012 with description "David Nwabuisi, Brian Mulroe, Brian Arnfelt_Northwestern University against University Iowa during their game on Saturday, October 27, 2012 in Evanston, Ill" and its related metadata (CBSI-Lightbourne0095091), which was sold on October 28, 2012 (CBSI009935).

36.     Annexed hereto as Exhibit 35 is a true and correct copy of a photo dated September 30, 2012 with description "Knoxville, TN - Alexis Owens #23 during the 2nd half of the match between the University of Tennessee Lady Volunteers and the Missouri Tigers. Photo By Andrew Bruckse/Tennessee

Athletics" and its related metadata (CBSI-Lightbourne0077842), which was sold on November 3, 2012 (CBSI009935).

37.     Annexed hereto as Exhibit 36 is a true and correct copy of a photo dated February 5, 2013 with description "Mike Rhoads" and its related metadata (CBSI-Lightbourne0441901), which was sold on May 19, 2013 (CBSI009935).

38.     Annexed hereto as Exhibit 37 is a true and correct copy of excerpts from Assembly Commitee on Judiciary, Analysis of A.B. 826.

39.     Annexed hereto as Exhibit 38 is a true and correct copy of an email from Christina Hettel to Greg Greenwell and DePaul Editorial, dated November 20, 2013.  (CBSI132710).

40.     Annexed hereto as Exhibit 39 is a true and correct copy of an email from James Daves to Bo Rottenborn, dated October 2, 2013.  (CBSI071787).

41.     Annexed hereto as Exhibit 40 is a true and correct copy of an email from Joel Heineman to Nevadawolfpack@cbs.com, dated April 25, 2013. (CBSI009381).

42.     Annexed hereto as Exhibit 41 is a true and correct copy of a photo dated March 8, 2012 with description "Missouri Women's Basketball vs. Oklahoma - March 8, 2012" and its related metadata (CBSI-Lightbourne0366191), which was sold on August 21, 2012 (CBSI009935).

43.     Annexed hereto as Exhibit 42 is a true and correct copy of a photo dated January 12, 2013 with description "Ole Miss defeated #10 Missouri 64-49 in front of a packed house Saturday, January 12th, 2013 at the Tad Pad in Oxford, MS__Photo by Joshua McCoy/Ole Miss Athletics" and its related metadata (CBSI-Lightbourne0428108), which was sold on January 14, 2013 (CBSI009935).

44.     Annexed hereto as Exhibit 43 is a true and correct copy of the Expert Report of Catherine Tucker, dated May 28, 2015.

Date:  May 29, 2015

_/s/ Yehudah L. Buchweitz_
Yehudah L. Buchweitz

# EXHIBIT 1

*Lightbourne v. Printroom et al.*, No. SACV 13-00876 JLS (RNBX), (C.D. Cal.)

## 50 State Right of Publicity Law Survey[1]

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| Alabama | None. | None. | Yes. *Allison v. Vintage Sports Plaques*, 136 F.3d 1443 (11th Cir. 1998).[2] | n/a | 2 years<br><br>Ala. Code § 6-2-38(1) (2005). | n/a | - Legitimate public interest.[3] |
| Alaska | None. | None. | Likely yes.[4] | n/a | Unclear. | n/a | No applicable statute or case law at this time. |
| Arizona | Statutes are only applicable to <u>soldiers</u>. A.R.S. §§ 12-761 (living), 13-3726 (deceased). | Yes. *Pooley v. Nat'l Hole-In-One Ass'n*, 89 F. Supp. 2d 1108 (D. Ariz. 2000).[5] | n/a | None. | 2 years<br><br>A.R.S. § 12-542. | None. | - News reporting.[6] |
| Arkansas | None. | None. | Yes. *Olan Mills, Inc. of Tex. v. Dodd*, 234 Ark. 495, 498 (1962).[7] | n/a | 3 years.<br><br>Ark. Code Ann. § 15-56-105 (applied in *Norris v. Bakker*, 320 Ark. 629, 634 (1995)). | n/a | No applicable statute or case law at this time. |

---

[1] The following chart is not intended to represent an exhaustive survey of the law in every state.

[2] Alabama recognizes the tort of commercial appropriation invasion of privacy, which federal courts have found consistent with the right of publicity tort recognized in other states. *Id.* at 1447; *see also Schifano v. Green Cnty. Greyhound Park, Inc.*, 624 So.2d 178, 181 (Ala. 1993) (citing Restatement (Second) of Torts § 652C).

[3] *Minnifield v. Ashcraft*, 903 So. 2d 818, 822 (Ala. Civ. App. 2004) (finding that publication of plaintiff's photograph in magazine was protected under legitimate-public-interest exception to the right to privacy).

[4] Alaska courts have not applied the right of publicity, but have referred to the right as one of the four privacy torts adopted in the Restatement. *See Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123, 1127 (Alaska 1989); *State v. Page*, 911 P.2d 513, 516 (Ak. App. 1996).

[5] Federal district court in *Pooley* found that Arizona would recognize a right of publicity, with elements based on the California common law elements listed in *Eastwood v. Superior Court*, 198 Cal. Rptr. 342, 346 (Cal. Ct. App. 1983).

[6] *In re Estate of Reynolds*, 327 P.3d 213, 217-18 (Ariz. Ct. App. 2014) (finding that news reporting is exempted from "purposes of trade").

[7] Arkansas courts have recognized the tort of appropriation of likeness as one of the four types of invasion of privacy torts. *See Dunlap v. McCarty*, 678 S.W.2d 361, 363-64 (Ark. 1984).

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| California | Cal. Civ. Code § 3344.[8] | Yes. *Eastwood v. Superior Court*, 149 Cal. App. 3d 409 (1983).[9] | n/a | The greater of $750 and actual damages. Cal. Civ. Code § 3344(a). | 2 years. *Christoff v. Nestle USA*, Inc., 213 P.3d 132, 135 (Cal. 2009). | None. | - Sports broadcast/account.[10] - Public interest/ affairs.[11] - Newsworthy.[12] - Member of definable group.[13] |
| Colorado | None. | No. Has not been explicitly recognized by the Colorado Supreme Court. *Donchez v. Coors Brewing Co.*, 392 F.3d | Yes. *Dickerson & Assoc. LLC v. Dittmar*, 34 P.3d 995, 999 (Colo. 2001).[14] | n/a | 2 years Colo. Rev. Stat. § 13-80-102(1)(a). | n/a | - Newsworthy - Matter of legitimate public concern.[15] |

[8] "Any person who knowingly uses another's name, voice, ... photograph, or likeness, in any manner, on or in products, merchandise, or goods, ... without such person's prior consent, ... shall be liable for any damages sustained by the person or persons injured as a result thereof. Cal. Civ. Code § 3344(a).

[9] Common law elements are: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Eastwood*, 149 Cal. App. 3d at at 417.

[10] Cal. Civ. Code. § 3344(d) (use in connection with "sports broadcast or account...shall not constitute a use for which consent is required...").

[11] *See id.*; *Dora v. Frontline Videos, Inc.*, 18 Cal. Rptr. 2d 790 (Ct. App. 1993).

[12] Cal. Civ. Code. § 3344(d) (exempting news accounts from liability); *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 639, 641 (1995).

[13] Cal. Civ. Code. § 3344(b)(2) (person depicted in photograph as member of a "definable group" such as a "baseball team" has no statutory claim). The intent of the legislature in enacting this subsection was to avoid class actions by persons photographed in a crowd. *See Commercial Appropriation of an Individual's Name, Photograph or Likeness: A New Remedy for Californians*, 3 Pac. L.J. 651, 665 (1972) (citing A.B. 826, 1971 Regular Session, as amended June 16, 1971). The legislature specifically contemplated class actions, but struck that provision in the drafting process. *Compare* A. Comm. on Judiciary, Analysis of A.B. 826, at 2 (May 3, 1971) ("This bill sets up right of class action"), *with* A. Comm. on Judiciary, Analysis of A.B. 826, at 1 (June 14, 1971) (invasion of one's ROP not "proper subject for class action").

[14] The elements of the tort of invasion of privacy by misappropriation in Colorado are: (1) the defendant used the plaintiff's name or likeness; (2) the use of the plaintiff's name or likeness was for the defendant's own purposes or benefit, commercially or otherwise; (3) the plaintiff suffered damages; and (4) the defendant caused the damages incurred. *Dickerson*, 34 P.3d at 1002.

[15] *Dickerson*, 34 P.3d at 997.

WEIL:\95281615\6\80758.0311

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| | | 1211, 1220 (10th Cir. 2004). | | | | | |
| Connecticut | None. | None. | Yes. *Herring v. Radding Signs*, No. CV 990427523, 2000 WL 192959, at *3 (Conn. 2000).[16] | n/a | 3 years<br><br>Conn. Gen. Stat. § 52-577; *Daoust v. McWilliams*, 49 Conn. App. 715 (1998). | n/a | - Newsworthy.[17] |
| Delaware | None. | None. | Yes. *Slibech v. Union Oil Co. of California*, 1986 WL 111542 (Del. 1986).[18] | n/a | 2 years<br><br>10 Del. C. § 8119. | n/a | No applicable statute or case law at this time. |
| Dist. Columbia | None. | None. | Right of publicity and misappropriation claims are "indistinguishable as a legal matter" and must be treated as a single cause of action for misappropriation. *Polsby v. Spruill*, 1997 WL 680550, at *4 (D.D.C. 1997) (citing *Lane v. Random House, Inc.*, 985 F. Supp. 141, 145-46 (D.D.C. 1995)).[19] | n/a | 1 year.<br><br>D.C. Code § 12-301(4).[20] | n/a | - Newsworthy, matter of public interest.[21] |

---

[16] Citing Restatement (Second) of Torts § 652C, which provides that "one who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." *Id.*

[17] *Goodrich v. Waterbury Republican-American, Inc.*, 448 A.2d 1317, 1329-30 (Conn. 1982) (applying newsworthiness defense to false light invasion of privacy claim).

[18] Citing Restatement (Second) of Torts § 652C and finding that "one who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other. . . ." and that "[i]n order for there to be liability, the defendant must have appropriated to his own use or benefit the reputation, prestige, social or commercial standing or some other value of plaintiff's name or likeness." *Id.* at *2.

[19] To prove either infringement of the right to publicity or misappropriation, "[t]he plaintiff must demonstrate that her name or likeness was used for the value associated with it, that she can be identified from the publication, that the defendants received a benefit from the use of the name or likeness, and that it wasn't used incidentally or for newsworthy purposes." *Polsby*, 1997 WL 680550, at *4 (citing Restatement (Second) of Torts § 652C).

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| Florida | Fla. Stat. Ann. § 540.08(1)[22] | *Gridiron.com v. Nat'l Football Player's Ass'n, Inc.*, 106 F. Supp. 2d 1309, 1315 (S.D. Fla. 2000). | Yes. The common law appropriation invasion of privacy claim is "substantially identical" to the statutory right of publicity claim. *Fuentes v. Mega Media Holdings*, Inc., 721 F. Supp. 2d 1255, 1260 (S.D. Fla. 2010). | "Up to $1000 per violation in addition to" actual damages." Fla. Stat. Ann. § 540.08(3). | 4 years<br><br>Fla. Stat. § 540.08, per Fla. Stat. § 95.11(3)(p) | Requires "express written or oral consent." Fla. Stat. Ann. 540.08(1). | - Newsworthy or matter of public interest.[23]<br>- Member of the public.[24] |
| Georgia | None. | *Martin Luther King, Jr. Ctr. For Social Change v. Am. Heritage Prods., Inc.*, 250 Ga. 135, 141 (1982).[25] | n/a | n/a | 2 years<br><br>O.G.C.A. § 9-3-33.[26] | n/a | - Newsworthy; matter of public interest.[27] |
| Hawaii | Haw Rev .Stat. § 482P-5 (prohibits uses on or in goods or merchandise or for purposes of | None. | *Fergerstrom v. Hawaiian Ocean View Estates*, 441 P.2d 141 (Haw. 1968).[29] | Haw Rev .Stat. § 482P-6(b) (the greater of $10,000 and actual damages). | Unclear-potentially 2 years.<br><br>Haw Rev .Stat.. | None. | - Sports broadcast or account.[30]<br>- Public interest or public affairs report.[31] |

[20] *See Grunseth v. Marriott Corp.*, 872 F. Supp. 1069, 1074-75 (D.D.C. 1995) (one-year statute of limitations applicable for libel, slander, assault, and other similar intentional torts has been applied to privacy torts).

[21] *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 39 (D.D.C. 2012) (First Amendment protection for invasion of privacy because the subject matter is newsworthy).

[22] "No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without" their consent." Fla. Stat. Ann. § 540.08(1).

[23] Fla. Stat. § 540.08(4)(a) (exemption for noncommercial uses in a "news medium or publication as part of any bona fide news report or presentation having a current and legitimate public interest").

[24] Fla. Stat. tit. 31, § 540.08(3)(c) (exempting "[a]ny photograph of a person solely as a member of the public and where such person is not named or otherwise identified in or in connection with the use of such photograph"); *see also Epic Metals Corp. v. CONDEC*, Inc., 867 F. Supp. 1009, 1017 (M.D. Fla. 1994) (applying exemption to photo of plaintiff where plaintiff's face was not visible and he was depicted as one of three unidentifiable individuals).

[25] "[A]ppropriation of another's name and likeness, whether such likeness be a photograph or sculpture, without consent and for the financial gain of the appropriator is a tort in Georgia…" *Id.*; *Pierson v. News Group Publ'ns, Inc.*, 549 F. Supp. 635, 642 (S.D. Ga. 1982) ("the right has been viewed not as one of privacy, but as one of publicity").

[26] *Rivell v. Private Health Care Sys. Inc.*, 887 F. Supp. 2d 1277, 1285 (S.D. Ga. 2012).

[27] *Somerson v. World Wrestling Entm't, Inc.*, 956 F. Supp. 2d 1360, 1369 (N.D. Ga. 2013).

WEIL:\95281615\6\80758.0311

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| | advertising merchandise).[28] | | | | § 657-7. | | - Newsworthy.[32] |
| Idaho | None. | Not explicitly recognized. *Meyer v. Rodex Sales & Servs., L.L.C.*, No. CV 05-176-S-MHW, 2006 WL 3355004 (D. Idaho Nov. 16, 2006). | Yes, Idaho recognizes a tort of commercial misappropriation.[33] | n/a | Unclear- potentially 2 or 3 years.<br><br>Idaho Code § 5-219 or 5-218. | n/a | No applicable statute or case law at this time. |
| Illinois | 765 Ill. Comp. Stat. Ann. 1075/30 (applies to use on or in products, product advertisements, or for fundraising purposes).[34] | No- exclusively statutory right. *See* 765 Ill. Comp. Stat. 1075/60; *see also Blair v. Nevada Landing P'ship.*, 859 N.E.2d 1188, 1192 (Ill. 2006)). | n/a | "(a) either (1) actual damages or (2) statutory damages of $1000, whichever is greater." 765 Ill. Comp. Stat. Ann. 1075/40(a). | 1 year<br><br>735 ILCS 5/13-210;<br>*Berry v. Ford Modeling Agency*, 2012 WL 5470289 | 765 Ill. Comp. Stat. Ann. 1075/30(a) (prior written consent required). | - News, public affairs, sports broadcast or account.[35]<br>- Photographer exemption.[36] |

[29] Elements of right of privacy/appropriation cause of action are (1) use of name or picture (2) without permission (3) for advertising/commercial purposes. *Fergerstrom*, 441 P.2d 141.

[30] Haw. Rev. Stat. § 482P-7(b)(2).

[31] *Id.*; Haw. Rev. Stat. § 482P-7(a).

[28] Prohibits the "use of a living or deceased individual's or personality's name, voice, signature, or likeness, on or in goods, merchandise, or services entered into commerce in [Hawaii], or for purposes of advertising products, merchandise, goods, or services, or for purposes of fund-raising or solicitation of donations," or the dissemination or publishing of advertisements without the consent of the owner of the right. Haw Rev .Stat. § 482P-5 (enacted 2010). Under the statute, prevailing party may recover reasonable attorney's fees. Haw. Rev. Stat. § 482P-6(e).

[32] Haw. Rev. Stat. § 482P-7(a); *see also Chapman v. Journal Concepts, Inc.*, 528 F. Supp. 2d 1081 (D. Haw. 2007) (exempting from liability publication of newsworthy materials that concern a matter of public interest).

[33] Common law commercial misappropriation of privacy claim elements: "(1) defendant's use of plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) a lack of consent and (4) resulting injury". *Meyer,* 2006 WL 3355004, at *12 (citing *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1088 (9th Cir. 2002)).

[34] The statute prohibits only "the use of an individual's image to promote or entice the purchase of some other product than [a] photograph itself." *Thompson v. Getty Images (US), Inc.*, 2013 WL 3321612, at *2 (N.D. Ill. July 1, 2013). Prevailing party may recover attorney's fees. 765 Ill. Comp. Stat. Ann. 1075/55.

[35] 765 Ill. Comp. Stat. Ann. 1075/35(b)(2).

[36] 765 Ill. Comp. Stat. Ann. 1075/35(b)(5) (Act does not apply to the "use of photographs, videotapes, and images by a person, firm, or corporation practicing the profession of photography ("professional photographer") to exhibit in or about the professional photographer's place of business or portfolio, specimens of the professional photographer's work, unless the exhibition is continued by the professional photographer after written notice objecting to the exhibition has been given by the individual portrayed." (emphasis added)).

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| | | | | | (N.D. Ill. Nov. 9, 2012). | | |
| Indiana | Ind. Code Ann. § 32-36-1-8 (applies to use on or in products, product advertisements, or for fundraising purposes per § 3 2-36-1-2).[37] | None. | Yes. *Felsher v. University of Evansville*, 755 N.E.2d 589, 601 (Ind. 2001).[38] | $1,000 or actual damages, whichever is greater. Ind. Code 23-26-1-10. | 2 years  Ind. Code Ann. § 32-36-1-7, per § 32-36-1-16. | Ind. Code Ann. § 32-36-1-8(a) (requires written consent). | - Newsworthy.[39]  - Broadcast or reporting of event of "general public interest"[40] |
| Iowa | None. | None. | Recognized in dicta but has not been applied. *Winegard v. Larsen*, 260 N.W.2d 816 (Iowa 1978). | n/a | Unclear. | n/a | No applicable statute or case law at this time. |
| Kansas | None. | None. | Yes. *Froelich v. Adair*, 213 Kan. 357 (1973).[41] | n/a | Unclear-potentially 2 years.  K.S.A. 60-513(a)(4). | n/a | - Newsworthy, matter of public interest.[42] |
| Kentucky | Ky. Rev. Stat. Ann. § 391.170.[43] | *Montgomery v. Montgomery*, 60 | n/a | None. | 1 year.[45] | None. | - Newsworthy.[46] |

---

[37] Prohibits the use of "an aspect of a personality's right of publicity for a commercial purpose during the personality's lifetime or for one hundred (100) years after the date of the personality's death" without that person's consent. Ind. Code. Ann. § 32-36-1-8(a).  A "personality" is someone whose name image or likeness "has commercial value." Ind. Code. Ann. § 32-36-1-6. Prevailing party entitled to attorney's fees. § 32-36-1-12.

[38] A person's name or likeness "embraces the concept of a person's character, which is legally protected against appropriation by another for his own use or benefit." *Felsher*, 755 N.E.2d at 601.

[39] Ind. Code. Ann. § 32-36-1-1(c)(1)(B).

[40] Ind. Code. Ann. § 32-36-1-1(c)(3).

[41] Adopting Restatement (Second) of Torts §652C for definition of appropriation of likeness claim.

[42] *Haskell v. Stauffer Comm'ns, Inc*., 990 P.2d 163, 166 (Kan. App. 1999).

[43] "[A] person has property rights in his name and likeness which are entitled to protection from commercial exploitation." Ky. Rev. Stat. Ann. § 391.170(1).

WEIL:\95281615\6\80758.0311

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| | | S.W.3d 524, 527 (Ky. 2001).[44] | | | | | |
| Louisiana | None. | None. | Yes. *Jaubert v. Crowley Post-Signal, Inc.*, 375 So. 2d 1386 (La. 1979).[47] | n/a | 1 year.[48] | n/a | No applicable statute or case law at this time. |
| Maine | None. | None. | Yes . *Nelson v. Times*, 373 A.2d 1221, 1223-24 (Me. 1977).[49] | n/a | Unclear- potentially 2 or 6 years. 14 M.R.S. § 752 (civil actions- 6 years); 14 M.R.S. 753 (2 years for libel/slander). | n/a | - Newsworthy.[50] |
| Maryland | None. | None. | Yes . *Lawrence v. A.S. Abell Co.*, 299 Md. 697, 702 (1984); *Barnhart v. Paisano Pub., LLC*, 457 F. Supp. 2d 590, 596 (D. Md. 2006).[51] | n/a | 3 year general civil tort limitations period.[52] | n/a | - Newsworthy, public interest.[53] |

[45] Ky. Rev. Stat. § 413.140 (1 year for personal injury cases).

[46] *Cheatham v. Paisano Pub., Inc.*, 891 F. Supp. 381, 386 n.5 (W.D. Ky. 1995).

[44] Right of publicity protects the "right to control the commercial value of one's identity," and the interests protected by the common law rights of publicity and privacy are "nearly identical." *Montgomery*, 60 W.S.3d at at 528.

[47] Louisiana courts recognize the invasion of privacy tort, which includes the appropriation of an individual's name or likeness (appropriation invasion of privacy tort).

[48] La. Civ. Code art. 3492; *Sharif v. New Orleans Metro. Convention & Visitors Bureau, Inc.*, 2009 WL 701731 (E.D. La. March 17, 2009).

[49] Citing to Restatement (Second) of Torts §652C for appropriation of likeness tort.

[50] *Nelson v. Maine Times*, 373 A.2d 1221, 1224 (Maine 1977) (in right of privacy case).

[51] Elements of the tort of appropriation include the taking of another's name or likeness, without that person's consent, for use as an advertisement or other similar commercial purposes. *Lawrence v. A.S. Abell Co.*, 299 Md. at 702-03.

[52] Md. Code Ann., Cts & Jud. Proc. § 5-101; *see also Allen v. Bethlehem Steel Corp.*, 76 Md. App. 642, 649 (1988) (applying 3-year statute of limitations to action for false light invasion of privacy).

[53] *Lawrence*, 299 Md. at 706 (finding that because the plaintiff's picture was taken while they were in a public place at a newsworthy event, an action for appropriation of likeness could not lie).

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| Massachusetts | Mass. Gen. Laws Ann. ch. 214, § 3A (makes unlawful the use of a person's name, portrait, or picture "for advertising purposes or for purposes of trade"). | None. | n/a | None. | 3 year general statute of limitations.[54] | Mass. Gen. L. ch. 214, § 3A (requires written consent). | - Photographer exemption.[55] <br> - Newsworthy, matter of public interest.[56] |
| Michigan | None. | Yes. *Carson v. Here's Johnny Portable Toilets*, 698 F.2d 831, 834 (6th Cir. 1983).[57] | n/a | n/a | 3 years for torts. <br> M.C.L.A. 600.5805(8). | n/a | - Newsworthy.[58] <br> - Legitimate public concern.[59] |
| Minnesota | None. | Federal courts have concluded that the Minnesota Supreme court *would* recognize a right of publicity.[60] | Yes. *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 234 (Minn. 1998).[61] | n/a | 6 years <br> Minn. Stat. §541.05. | n/a | - Newsworthy. <br> - Matter of public interest.[62] |
| Mississippi | None. | None. | Yes. *Harbin v. Jennings*, 734 So. 2d | n/a | 1 year | n/a | - Newsworthy; public interest.[64] |

[54] Mass. Gen. Laws c. 260, §2A.

[55] Mass. Gen. L. ch. 214, § 3A ("Nothing in this section shall be so construed as to prevent any person practicing the profession of photography from exhibiting in or about his or its establishment specimens of the work of such person or establishment, unless the exhibiting of any such specimen is continued after written notice objecting thereto has been given by the person portrayed.").

[56] *See Old Colony Donuts, Inc. v. Am. Broad. Cos., Inc.*, 368 F. Supp. 785, 788-89 (D. Mass. 1974) (declining to extent liability for appropriation of likeness because use was newsworthy and subject to First amendment protection).

[57] Right of publicity is invaded if an individual's "identity is commercially exploited," whether or not his "name or likeness" is used. *Carson*, 698 F.2d at 835.

[58] *Ruffin-Steinback v. dePasse*, 82 F. Supp. 2d 723, 730-31 (E.D. Mich. 2000) (citing Restatement (Third) of Unfair Competition § 47).

[59] *Nichols v. Moore*, 334 F. Supp. 2d 944, 956 (E.D. Mich. 2004).

[60] *See Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 730 (8th Cir. 1995); *Hillerich & Bradsby Co. v. Christian Bros., Inc.*, 943 F. Supp. 1136, 1141 (D. Minn. 1996).

[61] Citing the Restatement and finding that Minnesota's tort of appropriation "is committed when one appropriates to his own use or benefit the name or likeness of another." *See also Dryer v. Nat'l Football League*, 55 F. Supp. 3d 1181 (D. Minn. 2014), *appeal docketed*, No. 14-3428 (8th Cir. Oct. 28, 2014).

[62] *Dryer*, 55 F. Supp. 3d at *14 (finding publicity claims under Minnesota law barred when the use was "a matter of public interest and was for the purpose of giving information to the public").

WEIL:\95281615\6\80758.0311

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| | | | 269, 272 (Miss. Ct. App. 1999).[63] | | Miss. Code Ann. § 15-1-35. | | |
| Missouri | None. | Yes. *Bear Foot, Inc. v. Chandler*, 965 S.W.2d 386, 389 (Mo. Ct. App. 1998).[65] | n/a | n/a | Unclear- potentially general 5 year statute of limitations. Mo. Rev. Stat. § 516.120(4). | n/a | - Public interest.[66] |
| Montana | None. | None. | Federal court has implied that Montana would recognize misappropriation of likeness tort. *Gilham v. Burlington N. Inc.*, 514 F.2d 660 (9th Cir. 1975). | n/a | Unclear- potentially 3 years.  Mont. Code Ann. § 27-2-204(1). | n/a | No applicable statute or case law at this time. |
| Nebraska | Neb. Rev. Stat. § 20-202.[67] | None. | None. | None. | 1 year  Neb. Rev. Stat. § 20-211. | None. | - Newsworthy, public interest.[68] - Member of the public.[69] |
| Nevada | Nev. Rev. Stat. §§ 597.770-597.810 (applies to use on | None- exclusively statutory right.[70] | n/a | "Actual damages, but not less than $750." Nev. Rev. | Unclear- potentially either 3 or 4 years.[71] | Nev. Rev. Stat. § 597.790(2) (requires written | - News, public affairs or sports broadcast or |

---

[64] *Deaton v. Delta Democrat Pub. Co.*, 326 So. 2d 471, 473 (Miss. 1976) ("It is well established that factual reporting of 'newsworthy persons and events is in the public interest and is protected.'").

[63] "One of the classic forms of such invasion of privacy is the appropriation, without consent, of the likeness of another for use in a commercial enterprise." *Harbin*, 734 So. 2d at 272.

[65] "The right of publicity allows a person to recover damages for pecuniary gain from misappropriation of their likeness… It protects a person from losing the benefit of their work in creating a publicly recognizable persona." *Bear Foot*, 965 S.W.2d at 389 (finding distinction between right of publicity and right of privacy).

[66] *C.B.C Dist. & Marketing, Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 823 (2007) (finding that the use of the names, images, likenesses, and biographical data players in a fantasy baseball game was protected by the First Amendment).

[67] Exploitation of a person for advertising or commercial purposes constitutes an invasion of privacy. Neb. Rev. Stat. § 20-202.

[68] Neb. Rev. Stat. § 20-202(1) (section does not apply to uses "in any printed, broadcast, telecast, or other news medium or publication as part of any bona fide news report or presentation or noncommercial advertisement having a current or historical public interest and when such name or likeness is not used for commercial advertising purposes").

[69] *See* Neb. Rev. Stat. § 20-202(3) (exempting "[a]ny photograph of a person solely as a member of the public when such person is not named or otherwise identified in or in connection with the use of such photograph").

WEIL:\95281615\6\80758.0311

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|-------|---------|---------|---------|---------|---------|---------|---------|
| | or in products, product advertisements, or for fundraising purposes). | | | Stat. § 597.810(1)(a)(1). | | consent). | publication.[72] |
| New Hampshire | None. | None. | Yes. *Ramsberg v. Docusearch, Inc.*, 149 N.H. 148 (2003).[73] | n/a | 3 years. N.H. Rev. Stat. Ann. § 508:4). | n/a | No applicable statute or case law at this time. |
| New Jersey | None. | Yes. *Hart v. Electronic Arts*, 717 F.3d 141, 151 (3d Cir. 2013) (citing *McFarland v. Miller*, 14 F.3d 912, 919, 923 (3d Cir.1994).[74] | n/a | n/a | 6 years<br><br>N.J.S.A. 2A:14-1. | n/a | - Newsworthy.[75] |
| New Mexico | None. | New Mexico considers the appropriation privacy tort as synonymous with the right of publicity. *See Moore v. Sun Publ'g Corp.*, 881 P.2d 735 (N.M. Ct. App. 1994). | n/a | n/a | 4 years from date of discovery.[76] | n/a | No applicable statute or case law at this time. |

---

[70] *PETA v. Bobby Berosini, Ltd.*, 895 P.2d 1269 (Nev. 1995) ("The [Nevada] statute provides a complete and exclusive remedy for right of publicity torts.").

[71] *See* Nev. Rev. State. 11.190(4)(c); *Turner v. County of Washoe*, 759 F. Supp. 630, 637 (D. Nev. 1991).

[72] Nev. Rev. Stat. § 597.790(2)(c).

[73] Citing Restatement (Second) of Torts § 652C and recognizing misappropriation of likeness tort. *Ramsberg*, 149 N.H. at 158.

[74] "New Jersey law therefore recognizes that '[t]he right to exploit the value of [an individual's] notoriety or fame belongs to the individual with whom it is associated,' for an individual's '[name, likeness, and endorsement carry value and an unauthorized use harms the person both by diluting the value of the name and depriving that individual of compensation.'" *Hart*, 717 F.3d at 151.

[75] *Bisbee v. John C. Conover Agency, Inc.*, 452 A.2d 689, 693-94 (N.J. Super. Ct. App. Div. 1982) (applied in right of privacy case).

[76] M.M. Stat. Ann. § 37-1-4; *Benally v. Hundred Arrows Press, Inc.*, 614 F. Supp. 969 (D.N.M. 1985) (granting defendant's motion for summary judgment), *rev'd on other grounds sub nom Benally v. Amon Carter Museum of W. Art*, 858 F.2d 618 (10th Cir. 1988).

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| New York | N.Y. Civil Rights Law §§ 50-51. Proscribes uses "within this state for advertising purposes or for the purposes of trade."[77] | None- exclusively statutory. *Stephano v. News Group Publ'ns, Inc.*, 474 N.E.2d 580 (N.Y. 1984). | n/a | None. | 1 year<br><br>C.P.L.R. § 215(3). | N.Y. Civ. Rights Law § 50; 51 (written consent required prior to use, of parent if minor). | - Photographer exemption.[78]<br>- Newsworthy and matters of public interest.[79] |
| North Carolina | None. | None. | Yes. *Flake v. Greensboro News Co.*, 195 S.E. 55, 63-64 (N.C. 1938).[80] | n/a | 3 years for personal injury. N.C. Gen. Stat. § 1-56(16). | n/a | No applicable statute or case law at this time. |
| North Dakota | ** North Dakota does not recognize a right of publicity. *See City of Grand Forks v. Grand Forks Herald*, 307 N.W.2d 572, 578 n.3 (N.D. 1981); Volk v. Auto-Dine Corp., 177 N.W.2d 525 (N.D. 1970)** | | | | | | |
| Ohio | Ohio Rev. Code Ann. § 2741.02.[81] | *Bosley v. Wildwett.com*, 310 F. Supp. 2d 914, 919-20 (N.D. Ohio 2004) (citing *Zacchini v. Scripps–Howard Broadcasting Co.*, 47 Ohio St. 2d 224, 229-30 (1976), *rev'd on other grounds*, 433 U.S. 562 (1977)).[82] | | "At the election of the plaintiff and in lieu of actual damages, statutory damages in the amount of at least [$2,500] and not more than [$10,000], as determined in the discretion of the | 4 years<br><br>Ohio Rev. Code Ann. § 2741.07(C). | None. | - Sports broadcast or account.[83]<br>- Newsworthy, public interest.[84]<br>- Member of the public.[85] |

[77] *See also Foster v. Svenson,* Case, No. 651826/13 (1st Dept. Apr. 9, 2015) (photographer's surreptitious photos of neighbors exhibited and sold in galleries was not for "use for advertising or trade purposes"). Statute provides that " the court may award reasonable attorney's fees to a prevailing plaintiff." N.Y. Civil Rights Law § 50-c.

[78] N.Y. Civil Rights Law § 51.

[79] *E.g., Finger v. Omni Publ'ns Int'l, Ltd.*, 566 N.E.2d 141, 143 (N.Y. 1990) (finding that newsworthiness exception should be "liberally applied"); *Messenger v. Gruner + Jahr Printing*, 94 N.Y. 2d 436, 441-42 (N.Y. 2000) (includes "a wide variety of articles on matters of public interest).

[80] North Carolina recognizes a common law right of privacy for the unauthorized appropriation of likeness for commercial advantage. *Id.* if plaintiff cannot allege and prove special damages, a Plaintiff may recover "nominal damages" and the court may enter an injunction if the appropriation is ongoing. *Flake*, 195 S.E. at 63-64.

[81] Applies only to individuals "whose domicile or residence is in [Ohio] on or after the effective date of" the statute. Ohio Rev. Code Ann. § 2741.03(A). The statute provides that the prevailing party may be awarded attorney's fees. Ohio Rev. Code Ann. § 2741.07(D)(1).

[82] "Ohio law prohibits the publication of another's name or likeness in a commercial use that draws from that persons "'reputation, prestige, or other value associated with him, for purposes of publicity.'" *Bosley*, 310 F. Supp. 2d at 919-20..

[83] Ohio Rev. Code Ann. § 2741.02(D)(1).

WEIL:\95281615\6\80758.0311

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| | | | | trier of fact…." Ohio Rev. Code Ann. § 2741.07(A)(1)(b). | | | |
| Oklahoma | Okla. Stat. tit. 12 §§ 1448 (deceased personality), 1449 (non-deceased). | *Cardtoons, L.C. v. Major League Baseball Player's Ass'n*, 95 F.3d 959 (10th Cir. 1996). | Yes. *LeFlore v. Reflections of Tulsa, Inc.*, 708 P.2d 1068, 1074 (Okla. 1985).[86] | None. | 2 years<br><br>Okla. Stat. tit. 12 § 1449 (2014), per *Woods v. Prestwick House, Inc.*, 247 P.3d 1183, 1188 (Okla. 2011) | None. | - News, public affairs or sports broadcast or account.[87] Member of definable group.[88] |
| Oregon | None. | None. | Recognized in dicta. *Martinez v. Democrat-Herald. Publ. Co., Inc.*, 64 Or. App. 690, 693 (1983).[89] | n/a | Unclear-potentially 2 years for torts<br><br>O.R.S. 12.110. | n/a | - Newsworthy.[90] |
| Pennsylvania | 42 Pa. Cons. Stat. § 8316 (Applies only to uses for a "commercial or advertising purpose," "in | *Rose v. Triple Crown Nutrition, Inc.*, No. 07–0056, 2007 WL 707348, at *3 (E.D. Pa. Mar. 2, 2007).[91] | n/a | None. | 1 year.<br><br>42 Pa. C.S. § 5523(1). | None. | - Newsworthy, public interest.[92] |

---

[84] Ohio Rev. Code Ann. § 2741.09(A)(1)(b); § 2741.09(A)(3).

[85] Ohio Rev. Code Ann. § 2741.09(A)(4) (statute does not apply to "the use of the persona of an individual solely in the individual's role as a member of the public if the individual is not named or otherwise singled out as an individual").

[86] Citing Restatement (Second) of Torts § 652C to define appropriation of likeness tort.

[87] Okla. Stat. tit. 12 § 1449(A); *see also Cardtoons, L.C. v. Major League Baseball Player's Ass'n*, 95 F.3d 959 (10th Cir. 1996) (First Amendment protection for sports playing cards).

[88] Okla. Stat. tit. 12 § 1449(B)(2) (person depicted in photograph as member of a "definable group" such as a "baseball team" has no statutory claim).

[89] Citing Restatement (Second) of Torts § 652C.

[90] *Anderson v. Fisher Broadcasting Co., Inc.*, 300 Or. 456, 469 (1986) (applied in right of privacy case).

[91] Under Pennsylvania law, "[a] defendant violates a plaintiff's right of publicity by appropriating its valuable name or likeness, without authorization, and using it to defendant's commercial advantage." *Rose*, 2007 WL 707348, at *3.

[92] 42 Pa. Cons. Stat. § 8316(e)(2); *see also Fogel v. Forbes, Inc.*, 500 F. Supp. 1081, 1088 (E.D. Penn 1980).

WEIL:\95281615\6\80758.0311

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| | connection with (i) on or in connection with the offering for sale or sale of a product; (ii) for the purpose of advertising or promoting products; or (iii) fundraising."). | | | | | | |
| Rhode Island | R.I. Gen. Laws §§ 9-1-28, 9-1-28.1(a)(2).[93] | None. | n/a | None | 3 years. R.I. Gen. Laws 9-1-14(b). | R.I. Gen. Laws § 9-1-28(a) (written consent required). | - Matter of public concern.[94] - Photographer exemption.[95] |
| South Carolina | None. | *Gignilliat v. Gignilliat, Savitz & Bettis, LLP*, 385 S.C. 452, 459 (2009).[96] | n/a | n/a | 3 years. S.C. Code Ann. § 15-3-530(5). | n/a | No applicable statute or case law at this time. |
| South Dakota | None. | None. | Not explicitly recognized or rejected. *Montgomery Ward v. Shope*, 286 N.W.2d 806, 808 (S.D. 1979).[97] | n/a | Unclear. | n/a | No applicable statute or case law at this time. |
| Tennessee | Tenn. Code Ann. §§ 47-25-1102 to 1107.  Action limited to uses for purposes of advertising.[98] | "Tennessee's common law and statutory rights of publicity are coextensive . . . ." *Gauck v. Karamian*, 805 F. Supp. 2d 495, | n/a | None. | 1 year Tenn. Code Ann. § 47-25-1105, per Tenn. Code Ann. § 28- | None. | - News, public affairs or sports broadcast or account.[99] - Member of definable group.[100] |

---

[93] Attorney fees and court costs available to prevailing party.  R.I. Gen. Laws § 9-1-28.1(b).

[94] R.I. Gen. Laws § 9-1-28(b)(1).

[95] R.I. Gen. Laws § 9-1-28(b)(2).

[96] "Encompassed in the[] three recognized [privacy] torts is the infringement on the right of publicity." *Gignilliat*, 385 S.C. at 459.

[97] Citing Restatement (Second) of Torts section regarding appropriation of likeness.

[98] Tenn. Code § 47-25-1105(a); *Apple Corps Ltd. v. A.D.P.R., Inc.*, 843 F. Supp. 342, 347 & n.2 (M.D. Tenn. 1993).

[99] Tenn. Code Ann. § 47-25-1107(a).

WEIL:\95281615\6\80758.0311

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| | | 500 n.5 (W.D. Tenn. 2011). | | | 3-104(a)(1). | | |
| Texas | Tex. Prop. Code Ann. § 26.001 (deceased individuals only). | Yes- *Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994).[101] | n/a | None. | 2 years. [102] | Tex. Prop. Code Ann. § 26.011 (written consent required for post mortem use). | -Newsworthiness.[103] <br> - Public interest.[104] |
| Utah | Utah Code Ann. § 45-3-3 (applies only to advertisements that imply that an individual has endorsed the specific subject matter of the advertisement).[105] | Yes. *Nature's Way Prods., Inc. v. Nature-Pharma, Inc.*, 736 F. Supp. 245, 251 (D. Utah 1990).[106] | n/a | None | Unclear- potentially 3 years for statutory claim, Utah Code §78B-2-305(4), or 4 years for common law claims Utah Code §78B-2-307(3). | None. | No applicable statute or case law at this time. |
| Vermont | None. | None. | Yes. *Staruski v. Cont'l Tel.Co.*, 581 A.2d 266 (Vt. 1990) (recognizing damage remedy for invasion of | n/a | Unclear- potentially 3 years <br><br> 12 V.S.A. § 512; | n/a | No applicable statute or case law at this time. |

[100] Tenn. Code Ann. § 47-25-1102(1); 1105(d) (person depicted in photograph as member of a "definable group" such as a "baseball team," rather than as an individual, has no statutory claim).

[101] "There are three elements to a misappropriation claim under Texas law: (i) that the defendant appropriated the plaintiff's name or likeness for the value associated with it, and not in an incidental manner or for a newsworthy purpose; (ii) that the plaintiff can be identified from the publication; and (iii) that there was some advantage or benefit to the defendant." *Matthews*, 15 F.3d at 437.

[102] *Whitehurst v. Showtime Networks, Inc.*, 2009 WL 3052663, at *4-5 (E.D. Tex. Sept. 22, 2009) (applying 2 year statute of limitations from Tex. Civ. Prac. & Rem. Code § 16.003(a) to misappropriation of likeness claim).

[103] *Brown v. Ames*, 201 F.3d 654, 657–58 (5th Cir. 2000).

[104] *Dryer v. Nat'l Football League*, 2014 WL 5106738, at *13 (D. Minn. Oct. 10, 2014) (finding that use of historical NFL game footage was exempt from right of publicity claim under Texas law).

[105] Utah Code Ann. § 45-3-3(1).

[106] Holding that remedies available under Utah's statute may also be available in a common law action.

14

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| | | | privacy by appropriation and citing Restatement (Second) of Torts § 652C). | | *Gettis v. Green Mtn. Econ. Dev. Corp.*, 2005 VT 117 (2005). | | |
| Virginia | Va. Code Ann. § 8.01-40.[107] | No. exclusively statutory. *Crump v. Forbes*, 52 Va. Cir. 52 (Va. Cir. Ct. 2000). | n/a | None. | 5 years<br><br>Va. Code § 8.01-243(B); *Lavery v. Automation Mgmt. Consultants, Inc.*, 234 Va. 145 (1987). | Va. Code Ann. § 8.01-40 (written consent required prior to use, of parent if minor). | - Newsworthy; matter of public interest.[108] |
| Washington | Wash. Rev. Code § 63.60.050.[109] | No. Exclusively statutory. *Joplin Enters. v. Allen*, 795 F. Supp. 349, 351 (W.D. Wash. 1992). | n/a | The greater of $1,500 or actual damages. Wash. Rev. Stat. § 63.60.060(2). | Unclear-potentially 3 years.<br><br>RCW 4.16.080. | n/a | - Sports broadcast or account.[110]<br>- "Matters of cultural, historical, political, religious, educational, newsworthy, or public interest."[111] |
| West Virginia | None. | *Curran v. Amazon.com, Inc.*, Civ. A. No. 2:07-0354, 2008 WL 472433, *4 (S.D. W. Va. Feb. 19, 2008).[112] | n/a | n/a | 1 year.<br><br>*Slack v. Kanawha Cnty. Hous. & Redevelopment* | n/a | - Newsworthy or public interest.[113] |

---

[107] Proscribes uses "for advertising purposes or for the purposes of trade."

[108] *WJLA-TV v. Levin*, 564 S.E.2d 383, 395 (Va. 2002).

[109] Proscribes uses "n or in goods, merchandise, or products entered into commerce in this state, or for purposes of advertising products, merchandise, goods, or services, or for purposes of fund-raising or solicitation of donations." Wash. Rev. Code § 63.60.050. Statute provides for attorney's fees for prevailing party. *Id.* at § 63.60.060(5).

[110] Wash. Rev. Code. Ann. § 63.60.070(2)(b).

[111] Wash. Rev. Code § 63.60.070(1).

[112] West Virginia courts draw a "clear line…between" the right of publicity and the right of privacy. *Curran*, 2008 WL 472433, at *3. "[T]he right of publicity protects the commercial value of a name or likeness." *Id.*

[113] *Curran*, 2008 WL 472433, at *9.

WEIL:\95281615\6\80758.0311

| State | Statutory Right of Publicity ("ROP") | Common Law Right of Publicity | If no ROP, common law tort of (mis)appropriation | Statutory Damages | Statute of Limitations | Statutory written or express consent requirement | Statutory or common law exemptions |
|---|---|---|---|---|---|---|---|
| | | | | | *Auth.*, 423 S.E.2d 547, 551 (1992). | | |
| Wisconsin | Wis. Stat. § 995.50.[114] | *Hirsch v. S. C. Johnson & Son, Inc.*, 280 N.W.2d 129, 137 (Wis. 1979).[115] | n/a | None. | 3 years<br><br>Wis. Stat. Ann. § 893.57. | Wis. Stat. § 995.50(2)(b) (written consent required prior to use, of parent if minor). | - Newsworthy or public interest.[116] |
| Wyoming | **Wyoming has not recognized a right of publicity tort. See *Byrd v. Aarons, Inc.*, 2014 WL 1327503, at *19 (W.D. Pa. March 31, 2014) ("There is no tort cause of action for the invasion of privacy recognized by the state of Wyoming").** | | | | | | |

---

[114] Statute provides for attorney's fees for prevailing party. Wis. Stat. § 995.50(1)(c); 995.50(6)(a).

[115] Recognizing right of publicity separate from other privacy torts that gives a person "the right…to control the commercial exploitation of the property right in the use of that person's name." *Hirsch*, 280 N.W.2d at 137.

[116] *Stayart v. Google Inc.*, 2013 WL 811793, at *4 (7th Cir. Mar. 6, 2013).

WEIL:\95281615\6\80758.0311

# EXHIBIT 2

Page 1

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4    ------------------------------

5    YAHCHAAROAH LIGHTBOURNE, on

6    behalf of himself and all

7    others similarly situated,

8

9                         Plaintiff,

10

11   v.                   No. SACV13-00876 JVS (RNBx)

12

13   PRINTROOM, INC., PROFESSIONAL

14   PHOTO STOREFRONTS, INC.

15   BRAND AFFINITY TECHNOLOGIES,

16   INC., and CBS INTERACTIVE, INC.,

17                         Defendants.

18   ------------------------------

19    VIDEO DEPOSITION OF YAHCHAAROAH LIGHTBOURNE

20              MIDLAND, TEXAS

21              APRIL 14, 2015

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No. 91465

Page 10

1 put-away-forever one.
2     A.   Okay.
3     Q.   Okay.  So do you recognize what has
4 been marked as Lightbourne Exhibit 1?
5         (Exhibit 1 marked.)
6     A.   Yes, sir.
7     Q.   What is Lightbourne 1?
8     A.   It's just the complaint and
9 deposition, I guess.
10     Q.   Is it the first amended class action
11 complaint?
12     A.   Yes.
13     Q.   Okay.  And do you recognize this
14 document?
15     A.   Yes, I do.
16     Q.   And did you help prepare Lightbourne
17 Exhibit 1, the complaint?
18     A.   Yes, I did.
19     Q.   Okay.  And did you review it before
20 it was filed?
21     A.   Yes, I did.
22     Q.   And did you provide any comments
23 before it was filed?
24     A.   Whatever is there, I guess I signed
25 and read over it.  Other than that...

Page 11

1     Q.   Okay.  And to the best of your
2 recollection -- to the best of your
3 understanding, is everything in the complaint
4 true and accurate?
5     A.   Yes, sir.
6     Q.   Okay.  Is there anything in the
7 complaint that you disagree with?
8     A.   No, sir.
9     Q.   Okay.  Is there anything in
10 reviewing it yesterday that makes you think
11 that something needed to be changed?
12     A.   No, sir.
13     Q.   Okay.  Before this case, have you
14 ever been a plaintiff in a lawsuit before?
15     A.   No, sir.
16     Q.   Okay.  What were the circumstances
17 under which you decided to bring this lawsuit?
18     A.   Because I felt that it was wrong for
19 the Printroom to be making money off of me and
20 my fellow colleagues who played college
21 football, and we weren't able to get anything
22 from it because of a paper that we had signed
23 at UTEP stating that we could not use any of
24 our images or signatures or anything for
25 profit.

Page 12

1     Q.   How did you know that Printroom was
2 making money off of you and your fellow
3 colleagues who played college football?
4     A.   I looked up -- I went online and
5 just was looking at my pictures and stuff like
6 that, and I found the Printroom and saw that my
7 pictures and other colleagues' pictures were up
8 for sale.
9     Q.   When did you do that?
10     A.   It was about -- when I got out of
11 college, which was 2012, so I think it was the
12 2013 year that -- when I was playing arena
13 football.
14     Q.   Okay.  And you played arena football
15 for the Wyoming Calvary?
16     A.   Yes, sir.
17     Q.   Okay.  I'm just trying to get the
18 dates down.  You -- I'll show it to you after,
19 but does it sound right that you signed your
20 contract in November of 2012 with the Wyoming
21 Calvary?
22     A.   I think I signed it more towards
23 January, but I'm not sure.
24     Q.   And how long did you play for the
25 Wyoming Calvary?

Page 13

1     A.   For one season.
2     Q.   Okay.  And when did the season end?
3     A.   I think mid April.
4     Q.   Of 2000 --
5     A.   '13.
6     Q.   2013.  Okay.  So you think you
7 looked at -- you went online and looked at the
8 Printroom pictures sometime between January
9 2013 and April 2013?
10     A.   No.  The year before that, in 2012 I
11 looked for the pictures, yes.
12     Q.   Okay.  So sometime in 2012?
13     A.   Yes.
14     Q.   Okay.  And which pictures did you
15 find of yourself?
16     A.   Pictures of me during practice and
17 pictures of me at a game, I think.
18     Q.   If it helps, are the pictures
19 referenced on page 19 and 20 of Lightbourne 1
20 the pictures that you saw on the Printroom
21 website?
22     A.   Yes, sir.
23     Q.   Were there any others that you saw?
24     A.   Of me, honestly, I don't remember at
25 the time.  I remember these two photos, but

4

Page 14

1  other than that, I don't remember.
2      Q.   Do you know whether any pictures of
3  you were ever sold?
4      A.   No, I don't.
5      Q.   Okay.  Do you know whether any
6  pictures were sold?
7      A.   No, I don't.
8      Q.   Okay.  So when you said that you
9  felt that it was wrong for Printroom to be
10 making money, do you assume that because they
11 were selling, they must have -- they must have
12 sold some?
13     A.   Yes.  If there's a price on there, I
14 mean, there's a lot of college people that -- I
15 mean, people that like college football or any
16 college sport and, you know, the price was on
17 it, so I'm assuming that they were making money
18 off of us.
19     Q.   Okay.  But you don't know one way or
20 another; right?
21     A.   No.
22     Q.   Okay.  And you said Printroom was
23 making money off you and your fellow colleagues
24 who played college football.  Any colleagues in
25 particular you were concerned about?

Page 15

1      A.   Not really.  Just the fact that, you
2  know, there were college players that weren't
3  making any money from the Printroom.  I just
4  felt like it was wrong for them to be doing
5  that, knowing that we could not make any money
6  off of it.
7      Q.   Okay.  And were you concerned about
8  any -- any other athletes or just football
9  players?
10     A.   I mean, at the time I looked and I
11 saw football players, you know, because, I
12 mean, it was linked to me, which is -- I'm a
13 football player, so I saw football players, so
14 that was it.
15     Q.   Okay.
16     A.   I didn't really see -- at that time,
17 I didn't see the other athletes.
18     Q.   Okay.  But do you feel that it was
19 wrong for Printroom to be making money off of
20 you and others who played other sports --
21     A.   Yes, sir.
22     Q.   -- or just college football?
23     A.   Any sport that, you know, because I
24 know at UTEP that we signed the papers saying
25 that we couldn't sell any of our -- anything

Page 16

1  for profit.
2      Q.   Okay.  And what do you remember
3  about that paper?
4      A.   The paper, it just said that we are
5  signing this to say that we will not sell any
6  of our images or signatures or anything else
7  like that, and so -- I mean, if we did, we
8  could lose our scholarship or lose our time to
9  play at UTEP.
10     Q.   And do you remember whether you
11 referenced that piece of paper in your
12 complaint, Lightbourne Exhibit 1?
13     A.   I don't know if I had gotten it back
14 from UTEP, but I don't remember if you guys
15 have it, no.
16     Q.   Okay.  No, but I'm asking you, when
17 you filed your complaint against Printroom and
18 BAT and CBS, whether you recalled that you had
19 signed that piece of paper at UTEP that you are
20 referencing today?
21     A.   Yeah, I do recall, yes, signing the
22 paper.
23     Q.   Okay.  And let's just skip right to
24 it.  We always go out of order in these things.
25 It's inevitable.

Page 17

1          MR. BUCHWEITZ:  We'll mark these
2  Lightbourne 2, Lightbourne 3, and 4.
3          (Exhibits 2 - 4 marked.)
4      Q.   Mr. Lightbourne, do you see what's
5  been marked as Exhibits Lightbourne 2,
6  Lightbourne 3, and Lightbourne 4?
7      A.   Yes, sir.
8      Q.   Are Exhibits Lightbourne 2,
9  Lightbourne 3, and Lightbourne 4 the piece of
10 paper that you referenced in your testimony
11 previously?
12     A.   Yes.
13     Q.   Okay.  And where in Lightbourne 2,
14 3, and 4 does it say that you can't make a
15 profit off of --
16     A.   It was a verbal -- it was verbally
17 announced to us.
18     Q.   Verbally?
19     A.   Yes, sir.
20     Q.   By who?
21     A.   By Coach Mike Price at the time, and
22 the head of the athletic coordination.
23     Q.   So who is that?
24     A.   I honestly don't remember her name
25 or his name at the time.

---

Page 18

1    Q.   Was it Bob Stull?
2    A.   Yes, Bob, yes.
3    Q.   Okay.  And what was the
4  circumstances under which he said that?
5    A.   When they gave us this paper, they
6  said that you as an athlete cannot sell your
7  items or signatures for a profit.
8    Q.   Okay.  Did you sign -- did it say
9  anything else?  Did they say anything else,
10  sorry?
11    A.   No.
12    Q.   Okay.  Did you sign any other
13  papers?
14    A.   Release forms, I guess.  I don't
15  know what kind of forms they were, but just
16  forms -- they were health forms actually.  We
17  signed release health forms that day with
18  the -- I think it was.
19    Q.   Anything else?
20    A.   Honestly I don't remember.
21    Q.   Okay.  And why did you sign them?
22  Why did you sign Lightbourne 2, Lightbourne 3,
23  and Lightbourne 4?
24    A.   Because if we didn't sign to play --
25  I mean, we had to sign it.  It was mandatory

---

Page 19

1  that we signed it.
2    Q.   What would happen if you didn't?
3    A.   They didn't say.  They just said
4  sign it.
5    Q.   Did you ask?
6    A.   No.  We were in a group of over 100
7  athletes.
8    Q.   Uh-huh.
9    A.   So, I mean, I didn't ask any
10  questions.
11    Q.   Did all the ath -- I'm sorry for
12  interrupting you.
13    It's okay.
14    Q.   Were you done with your answer?
15    A.   Yes.
16    Q.   Did all hundred athletes that were
17  with you sign it?
18    A.   Yes.
19    Q.   Okay.  And was this -- focusing on
20  Lightbourne 2 for a moment, the date 16/9/09
21  signature date --
22    A.   Uh-huh.
23    Q.   -- does that mean September 16th,
24  2009?
25    A.   Yeah, I'm sure, yes.

---

Page 20

1    Q.   Okay.  And is -- is that your
2  signature?
3    A.   Yes.
4    Q.   And it says that your last -- and
5  then you also filled in your name,
6  Yahchaaroah -- did I pronounce that right?
7    A.   Yahchaaroah.
8    Q.   Yahchaaroah -- sorry.
9    A.   That's fine.
10    Q.   -- Lightbourne Stewart?
11    A.   Uh-huh.
12    Q.   Is your name -- is your last name
13  Lightbourne or Stewart?
14    A.   Both.
15    Q.   Okay.  In this case you know that
16  you're -- one of the things you're alleging is
17  that your name, in addition to your image and
18  likeness, has been misappropriated.  Which name
19  are you alleging was misused?
20    A.   Both names were used because both --
21  they were both different seasons.
22    Q.   Okay.
23    A.   So I had -- in my first starting
24  year I was Stewart, and my last season I was
25  Lightbourne.

---

Page 21

1    Q.   Okay.  And those seasons were 2010
2  and 2011?
3    A.   Yes.
4    Q.   Okay.  You have three forms here,
5  though, right, 2009, 2010, and 2011?
6    A.   Uh-huh.
7    Q.   Did you play in 2009?
8    A.   I redshirted.
9    Q.   Redshirted.  Okay.  And what does
10  redshirting mean?
11    A.   Redshirt means that you can practice
12  with the team, but you can't play officially at
13  a game.
14    Q.   Okay.  And at the time you signed
15  Lightbourne 2, you were 20 years old, right,
16  approximately?
17    A.   I was 21.
18    Q.   Okay.  When's your birthday?
19    A.   January 7th, 1989.
20    Q.   Okay.  And you had a high school
21  diploma?
22    A.   Yes, sir.
23    Q.   And an associates degree at that
24  time?
25    A.   Yes, sir.

Page 22

1      Q.   Okay.  And the document you signed,
2   am I correct that it says that "I, Yahchaaroah
3   Lightbourne Stuart, hereby authorize the
4   University of Texas El Paso or its agents to
5   make copies of, use, sell and distribute
6   directly or through a third party any
7   photographic or other image taken in connection
8   with my participation on UTEP intercollegiate
9   athletic team."  You signed that?
10      A.   Yes, sir.
11      Q.   Okay.  And you agreed to it?
12      A.   Yes, sir.
13      Q.   Okay.  And where were you when you
14   signed this?  What state were you in?
15      A.   Texas.
16      Q.   Okay.
17      A.   El Paso.
18      Q.   Okay.  And Lightbourne 3, were you
19   22 when you signed Lightbourne 3?
20      A.   Yes, sir.
21      Q.   And it was the same text; right?
22      A.   Yes, sir.
23      Q.   And you played that season; right?
24      A.   Yes, sir.
25      Q.   And, in fact, there were photographs

Page 23

1   of you taken?
2      A.   Yes, sir.
3      Q.   How do you know?
4      A.   Looking at the numbers on my jersey.
5      Q.   Okay.  And do you also know that
6   there were pictures taken because you saw
7   photographers --
8      A.   Yes.
9      Q.   -- at your practices and games?
10      A.   Yes, sir.
11      Q.   Okay.  Were there photographers at
12   your practices and games all the time?
13      A.   Yes, sir.
14      Q.   Okay.  And who were the
15   photographers who were at the games?
16      A.   Honestly I don't remember, but I do
17   remember Ivan is one of the names.  I think his
18   name was Ivan.
19      Q.   Ivan Pierre Aguirre?
20      A.   Yes.
21      Q.   Who is Ivan Pierre Aguirre?
22      A.   Honestly, I don't know.
23      Q.   Okay.
24      A.   I have never met him.
25      Q.   You never met him, okay.  But you

Page 24

1   saw him taking pictures at games --
2      A.   Well --
3      Q.   -- and practices?
4      A.   -- I mean, I didn't see him
5   particularly, but his name was the name that
6   was on the bottom of the photos.
7      Q.   And what does it mean for a name to
8   be at the bottom of the photos?
9      A.   That he took the picture.
10      Q.   How do you know that?
11      A.   It said photo taken by.
12      Q.   Okay.  Have you ever heard of a guy
13   named Michael Rees?
14      A.   It doesn't ring a bell.
15      Q.   Okay.  You don't recall that he may
16   have been another photographer at UTEP who took
17   pictures at UTEP while you were playing?
18      A.   He might have been -- might have
19   been a part of our athletic people who recorded
20   our videos.  I mean, I didn't talk to a
21   lot of them.  The only person I really remember
22   who was a part of recording was Jorg, and he
23   was our head of recording.
24      Q.   What does the head of recording do?
25      A.   He records all the games and takes

Page 25

1   pictures if he needs to.
2      Q.   Why does he do that?
3      A.   For our benefit to make sure that we
4   played well and for us to review film.
5      Q.   So there's like a coach for like
6   game films?
7      A.   Yes.
8      Q.   Okay.  And what did you
9   understand -- what was his name again?
10      A.   Jorg.
11      Q.   Jorg.  Okay.  Now, Jorg wasn't the
12   only person taking pictures at games; right?
13      A.   No.
14      Q.   Okay.  At any given game -- let's
15   take it one at a time.  At any given practice,
16   how many photographers would be at your
17   practice taking pictures?
18      A.   Honestly I don't know.  I know there
19   was news and people from UTEP.  Other than that
20   I really didn't pay attention.
21      Q.   Okay.  Why were they taking
22   pictures?
23      A.   Usually either for posters for UTEP
24   that we used to give out or just for film for
25   us to watch.

1    Q.   What about the news people?
2    A.   News people, just for pictures for
3  the news.
4    Q.   Did you ever tell any of the
5  photographers at any practice not to take any
6  pictures of you?
7    A.   No.
8    Q.   Did you ever consider telling a
9  photographer not to take a picture of you?
10    A.   No.
11    Q.   What about at games?  At any given
12  game that UTEP played at home, let's start
13  with, how many photographers were there at a
14  given game?
15    A.   I wasn't focused on it.
16    Q.   Okay.  There were photographers
17  though; right?
18    A.   I'm sure there were.
19    Q.   Okay.  Were UTEP games televised?
20    A.   Some of them.
21    Q.   Okay.  On national television?
22    A.   Yes.
23    Q.   Okay.  And who televised them?
24    A.   ESPN, I remember ESPN, and maybe
25  CBS, but I don't remember, per se.  I just

1  remember the Houston game.
2    Q.   What was the Houston game?
3    A.   ESPN.  It was because my family
4  called me afterwards and told me I was on ESPN.
5    Q.   Okay.  Did you like that?
6    A.   I guess.
7    Q.   I mean, it was nice to hear from
8  your family --
9    A.   Yes.
10    Q.   -- that you were on national
11  television; right?
12    A.   Yes, sir.
13    Q.   Okay.  The Houston game, was that at
14  home or away?
15    A.   In Houston.
16    Q.   In Houston, okay.  In general, did
17  you have -- were there more photographers at
18  home games or road games?
19    A.   I don't know.
20    Q.   Okay.  For the game that you
21  remember that was on ESPN, how many cameramen
22  were there?
23    A.   I couldn't tell you.
24    Q.   Okay.  Were UTEP games broadcast on
25  the radio?

1    A.   I'm sure they were.
2    Q.   Why do you say that?
3    A.   Because, I mean, if they weren't
4  on -- if they weren't on TV, the only way
5  people could listen to them were -- if they
6  weren't at the game was on the radio.
7    Q.   And why were people -- sorry.
8    A.   There was -- there actually is --
9  was a website online that if you wanted to
10  subscribe, you can, I guess, listen to the
11  games.
12    Q.   And whose website was that?
13    A.   UTEP's.
14    Q.   And did you have to pay a fee to
15  subscribe?
16    A.   Yes.
17    Q.   Did you get any of that money?
18    A.   No.
19    Q.   Why not?
20    A.   Because it was for the school.
21    Q.   Okay.  The -- how did you get to the
22  Printroom website?
23    A.   Just Googling my name.
24    Q.   Okay.  Did you -- when you Googled
25  your name, where did that take you?

1    A.   There is a bunch of different things
2  and then there was one Printroom that my name
3  popped up on.
4    Q.   Okay.  Did you first -- what's the
5  official UTEP athletic website?  Do you recall?
6    A.   No.
7    Q.   UTEPAggies.com; is that right?
8    A.   No, Miners.
9    Q.   Miners, Miners, right.
10  UTEPminers.com.  Have you ever been on that
11  website?
12    A.   Yeah, I think I have.
13    Q.   Okay.
14    A.   But I think it's UTEP Athletics --
15    Q.   Oh, UTEP Athletics, you're right.  I
16  apologize.  UTEPathletics.com.  Have you done
17  been on that website?
18    A.   Yes.
19    Q.   Have you seen pictures of student
20  athletes on that website?
21    A.   Yes.
22    Q.   Okay.  Have you seen pictures of
23  yourself?
24    A.   If you look for it, yes.
25    Q.   Okay.  Are you aware -- do you know

Page 30

1 whether you could buy a photograph from the
2 UTEP Athletics website in 2012 and '13?
3     A.   No.
4     Q.   You don't know, or you can't?
5     A.   I don't know.
6     Q.   Okay.  Do you know if the Printroom
7 site was linked to the UTEP Athletics website?
8     A.   No, I don't.
9     Q.   If the UTEP Athletics website was
10 selling the pictures, would that change your
11 perspective on whether there was an issue?
12     A.   If the school is making money off of
13 us, that's fine, but if somebody else is, it's
14 wrong.
15     Q.   Okay.  So how much of the money does
16 the school have to make in order for it to be
17 okay?
18     A.   It doesn't matter.  They pay for our
19 scholarships, so I mean, if the school is
20 making money off of us, it's fine because
21 they're paying for our way to go through
22 school, but if somebody else outside is making
23 money off of us, I feel as though it's wrong
24 because we can't make money ourselves.
25     Q.   Right.  But it's okay for the

Page 31

1 school?
2     A.   Yes.
3     Q.   So what if the school hired somebody
4 to help it do things like it does?  I mean,
5 like, for example, the bookstore at UTEP, do
6 you remember whether UTEP contracted with
7 somebody to do their bookstore?
8     A.   No, I don't.
9     Q.   Okay.  And UTEP -- if UTEP hired
10 somebody to help them sell books or to sell
11 pictures, even for the benefit of them and paid
12 them a fee, would that make it no longer okay,
13 in your mind?
14     A.   I'm not aware of them hiring
15 anybody.  As far as I know, UTEP did all of
16 their own things.
17     Q.   Okay.  But if UTEP hired someone to
18 help them sell photographs, and then they sold
19 those -- and then that -- that agent sold those
20 photographs, would that then be okay, if UTEP
21 made some of the money from it?
22     A.   Honestly, as far as I know, UTEP
23 didn't really make that much money off of our
24 likenesses because they could not put our names
25 on anything, as far as jerseys goes or anything

Page 32

1 else like that.  So as far as it goes, I
2 don't -- I don't know how I feel about it.
3     Q.   Okay.  But UTEP did believe when
4 they gave you Exhibits UTEP 2 and UTEP 3 and
5 UTEP 4 -- not UTEP, sorry, Lightbourne 2,
6 Lightbourne 3, and Lightbourne 4 that they
7 could sell photographs of college athletes;
8 right?
9         MR. SOWDERS:  Objection, foundation,
10 relevance.  You can answer.
11     Q.   Go ahead.
12     A.   Can you repeat the question?
13     Q.   Sure.
14         MR. BUCHWEITZ:  Why don't you go
15 ahead and read it back.
16         (Record read.)
17     A.   Yes.
18     Q.   And you agreed that they could sell
19 those either on their own or through an agent
20 if they needed an agent to help them?
21     A.   That's what the paper says.
22     Q.   And you signed it?
23     A.   Yes, sir.
24     Q.   Okay.  So if UTEP hired CBS or UTEP
25 hired IMG -- have you ever heard of IMG?  Do

Page 33

1 you know what IMG is?
2     A.   It means image -- I mean, like when
3 you think about it --
4     Q.   Oh, okay.  Have you ever heard of --
5 when you -- when you signed your Wyoming
6 Calvary contract, did you use an agent?
7     A.   Yes.
8     Q.   And was the agent -- was he with an
9 agency?
10     A.   Yes.
11     Q.   Okay.  It's okay, you don't have to
12 guess about whether --
13     A.   No, no, no, no.  I'm -- his agency
14 wasn't IMG though.
15     Q.   Right, okay.  But you've heard of --
16 are you aware that IMG is an agency that does a
17 number of things?
18     A.   Yes.
19     Q.   Okay.  And one of the things that it
20 does is it helps universities with licensing?
21     A.   Okay.
22     Q.   Do you know that or not?  If you
23 don't know, just say "no."
24     A.   No, I don't.
25     Q.   Okay.  Fine.  If hypothetically UTEP

Page 34

1   hired IMG to help its multimedia solutions,
2   including its websites, and IMG hired CBS
3   to run the UTEP Athletics website, and then CBS
4   hired Printroom to help it do a photo store and
5   a portion of the money went back to UTEP, would
6   you have a problem with that kind of a sale?
7   MR. SOWDERS:  Objection, relevance.
8   You can answer.  Thanks for checking.
9   A.   Would I have a problem with it?  If
10  it wasn't linked to UTEP's website, yes.
11  Q.   But if it was linked to UTEP's
12  website, then it would be fine; right?
13  A.   Yes.
14  Q.   Okay.  And just to close the loop on
15  this Lightbourne 4 was the one you signed on --
16  it says 03/08/2011, I believe; is that --
17  A.   Uh-huh.
18  Q.   -- accurate?
19  A.   Yes.
20  Q.   Okay.  And you were 23 years old
21  then or --
22  A.   Yes.
23  Q.   Okay.  And you signed the same form
24  saying that UTEP's agents could make copies of,
25  use, sell, or distribute directly or through a

Page 35

1   third party any photograph or other images
2   taken in connection with your participation on
3   UTEP intercollegiate athletic team; right?
4   A.   Yes.
5   Q.   Okay.  And you signed that in Texas?
6   A.   Yes.
7   Q.   And you played that season in 2011?
8   A.   Yes.
9   Q.   And there were photographs taken of
10  you?
11  A.   Yes.
12  Q.   Okay.  You don't know one way or
13  another whether any were sold?
14  A.   No.
15  Q.   Are you aware whether other
16  universities have similar forms to Lightbourne
17  2, Lightbourne 3, and Lightbourne 4 that the
18  student athletes sign?
19  A.   I'm not aware if they do or don't.
20  Q.   Okay.  You just have no -- you have
21  no knowledge one way or another?
22  A.   No.
23  Q.   Okay.
24  A.   But I do think because all of them
25  are run by the NCAA, they all do have to sign

Page 36

1   this paper.
2   Q.   Okay.  Was there anyone from the
3   NCAA that told you to sign this paper?
4   A.   No.  If it was -- I mean, thinking
5   about like coming from a different college and
6   everything else like that, all of them have to
7   sign the same guidelines.  You can't have one
8   college do one thing and the other one do
9   another.
10  Q.   Okay.  But you have no idea whether,
11  say, for example, some other school may have a
12  little bit different form that their students
13  sign?
14  A.   Honestly, I don't know, no.
15  Q.   Okay.  And you have never done any
16  investigation into that; right?
17  A.   No.
18  Q.   Okay.  You played at -- or I'm
19  sorry, you attended another school before you
20  went to UTEP; right?
21  A.   Yes.
22  Q.   What school was that?
23  A.   Taylor University.
24  Q.   And where is Taylor University?
25  A.   Indiana.

Page 37

1   Q.   Okay.  And that's where you went to
2   high school --
3   A.   Yes.
4   Q.   -- as well, Indiana?
5   A.   (Witness nods his head.)
6   Q.   Did you play football at Taylor?
7   A.   Yes, I did.
8   Q.   And what division are they in?
9   A.   NAIA.
10  Q.   NAI -- okay.  And were there -- did
11  you sign any forms at Taylor?
12  A.   I don't recall.
13  Q.   Okay.  Were there any photographers
14  at games at Taylor?
15  A.   Sure.
16  Q.   Taking pictures?
17  A.   Sure.
18  Q.   And for what purpose?
19  A.   To put up on the website.  As far as
20  I know, none of the pictures were sold, as far
21  as I know, honestly.
22  Q.   Right.  But if Taylor sold them
23  though for themselves for their own benefit,
24  that would have been okay?
25  A.   Yes.

Page 42

1   A.   You mean of the lawsuit?
2   MR. SOWDERS:  Foundation.
3   Q.   Of the lawsuit.  Go ahead unless he
4   says don't answer.
5   MR. SOWDERS:  Yes, please, go ahead.
6   I'll make a big scene if I don't want you
7   to answer.
8   MR. BUCHWEITZ:  He'll say, do not
9   answer that question, I promise you.
10   MR. SOWDERS:  You'll know.
11   Q.   It's really -- he can correct
12   anything I say now, but really it's for
13   evidentiary record for much later on.  The
14   point is we take these depositions now to try
15   to be efficient, and we worry about objections
16   for evidence later, and that's why he makes a
17   record, and then we can -- we can deal with it
18   if we have to at some point down the road.
19   MR. BUCHWEITZ:  Is that fair?
20   MR. SOWDERS:  Agreed.
21   A.   Honestly, I don't think that any of
22   our athletes have really bought our photos.  I
23   mean, usually if we wanted a photo, we could go
24   to the person who took the photo, or we can go
25   to Jorg and ask him for a photo of us usually.

Page 43

1   Q.   What about from Ivan -- Ivan Pierre
2   Aguirre?
3   A.   I honestly don't know who he is, per
4   se.
5   Q.   Okay.  Who is Anthony Puente?  Do
6   you remember him?
7   A.   Yes.
8   Q.   Another one of your --
9   A.   He played on --
10   Q.   -- teammates?
11   A.   Yes.
12   Q.   Is his mom Rosalinda Puente?
13   A.   I have no idea.
14   Q.   Is Anthony from San Antonio?
15   A.   Yes.
16   Q.   8607 Honiley Street?
17   A.   I don't know.
18   Q.   Okay.  Do you think Rosalinda Puente
19   is his mom?
20   A.   Possibly.
21   Q.   If his mom bought a picture of him,
22   is that something you're complaining about in
23   your lawsuit?
24   A.   I don't understand why she would
25   have to buy a photo when her son plays for us.

Page 44

1   I mean, I don't know.
2   Q.   Well, don't you think that if a --
3   if there is a professional photographer taking
4   pictures of official university games, that
5   would be interesting for a family member to be
6   to buy a picture like that?
7   A.   Sure.
8   Q.   And that would be a benefit to the
9   student; right?
10   MR. SOWDERS:  Foundation and
11   relevance.
12   A.   Sure.
13   Q.   Who is Eric Tomlinson?  Do you
14   remember him?
15   A.   Another player.
16   Q.   Tight end?
17   A.   Yes.
18   Q.   And is his mom Susan?
19   A.   I have no idea.
20   Q.   Is he from Spring, Texas?
21   A.   I'm sure.  I honestly don't know.
22   Q.   Okay.  And same question, if his mom
23   bought some pictures of him playing, that would
24   be, you know, beneficial to him; right?  and
25   MR. SOWDERS:  Foundation and

Page 45

1   relevance.
2   A.   I guess so.
3   Q.   Okay.  What about Craig Wenrick?
4   Did you ever hear of him?
5   A.   Yes.
6   Q.   Another one of your teammates?
7   A.   Tight end, yes.
8   Q.   Okay.  And is he from Sulfur
9   Springs, Texas?
10   A.   Possibly.
11   Q.   Is his mom Carol Wenrick?
12   A.   I don't know.
13   Q.   And again, if -- if Carol bought
14   some professional photographs of Craig playing
15   in games, that would be a benefit for Craig;
16   right?
17   MR. SOWDERS:  Foundation, relevance.
18   A.   A benefit for -- I guess.
19   Q.   Okay.  What about Ian Campbell, did
20   you ever hear of him?
21   A.   Yes.
22   Q.   Another one of your teammates?
23   A.   Yes.
24   Q.   And is he from Duarte, California?
25   A.   I know he's from California.

---

Page 46

1    Q.   Okay.  And is his mom Diane
2  Campbell?
3    A.   I don't know.
4    Q.   Okay.  And if his mom bought a whole
5  bunch of pictures of him, professional
6  photographs taken by Ivan Pierre Aguirre, that
7  would be beneficial to --
8    A.   His family.
9    Q.   -- him also; right?
10      MR. SOWDERS:  Foundation and
11  relevance.
12    A.   Every question you're going to ask
13  me about somebody is --
14      MR. SOWDERS:  Hold on.  No speeches.
15      THE WITNESS:  Okay.
16      MR. SOWDERS:  If you need to finish
17  an answer to his question, you should.
18      THE WITNESS:  Okay.
19    A.   Yeah, I guess.
20    Q.   And if someone's mom or dad or
21  brother or sister are buying a picture of them,
22  that would mean that the athlete is not
23  objecting to that picture being taken and sold;
24  right?
25      MR. SOWDERS:  Foundation, relevance.

---

Page 47

1    A.   I'm sure not.
2    Q.   And it would be sold for personal
3  use, right, family use, not a commercial use?
4      MR. SOWDERS:  Foundation and
5  relevance.
6    A.   Sure.
7    Q.   Who is Blaire Sullivan?
8    A.   Another player.
9    Q.   Another one of your teammates?
10    A.   Uh-huh.
11    Q.   And he's from San Antonio?
12    A.   Possibly.
13    Q.   Okay.  And is Vince Blaire's dad?
14    A.   I don't know.
15    Q.   Okay.  And if Vince bought pictures
16  of Blaire, that would mean that would be a
17  benefit for Blaire; right?
18      MR. SOWDERS:  Foundation and
19  relevance.
20    A.   I guess.
21    Q.   And it would mean that Blaire didn't
22  object to his picture being sold; right?
23    A.   I guess so.
24    Q.   And it would be for a personal use,
25  not a commercial use?

---

Page 48

1      MR. SOWDERS:  Foundation and
2  relevance.
3    A.   Yes, sir.
4    Q.   Okay.  Nick Dooley, who is Nick
5  Dooley?
6    A.   I don't know.
7    Q.   Okay.  There we go.  Do you remember
8  a guy named Nick Dooley was number 64, played
9  in 2012?  If you don't remember him, you don't
10  remember him.
11    A.   No, I don't.
12    Q.   Okay.  That's fine.  Who is Jessica
13  Wilson?
14    A.   An ex-girlfriend.
15    Q.   Okay.  When was she your girlfriend?
16    A.   I don't recall dates.
17    Q.   Okay.  Do you remember what your
18  first -- the first game you played in was?
19    A.   No.
20    Q.   Could it have been against Arkansas
21  Pine Bluff September 5th, 2010?
22    A.   It wasn't my first game.
23    Q.   Okay.  But you remember playing in
24  that game?
25    A.   Yes.

---

Page 49

1    Q.   Okay.
2      MR. SOWDERS:  Can we take a break
3  when you finish this topic?
4      MR. BUCHWEITZ:  I'm bouncing around,
5  but we can take a break after this
6  exhibit --
7      MR. SOWDERS:  Just when it -- when
8  it works for you.
9      MR. BUCHWEITZ:  After this exhibit
10  is fine.
11      MR. SOWDERS:  Yeah, when it works
12  for you.
13      MR. BUCHWEITZ:  We'll go through
14  this exhibit and then we'll move on.
15    Q.   How long was Jessica your
16  girlfriend?
17      MR. SOWDERS:  Relevance.
18    A.   Six to eight months, I think,
19  probably eight months.
20    Q.   Do you remember talking to her about
21  the Printroom photo stores?
22    A.   No, I don't.
23    Q.   Okay.  Do you know if she bought any
24  pictures of you?
25    A.   No, I don't.

---

Page 50

1      MR. BUCHWEITZ:  We're going to mark
2  this document as Lightbourne 5.
3      (Exhibit 5 marked.)
4      MR. BUCHWEITZ:  It's actually two
5  documents, so we will mark it 5 and 6.
6      (Exhibit 6 marked.)
7      MR. BUCHWEITZ:  I'll give Bill a
8  picture.
9      Q.   And I'll explain to you what it is.
10  I'll ask you -- you're not going to know what
11  anything is other than one page of it.
12      If you look at the second page of 5,
13  do you recognize the second page of Lightbourne
14  5?
15      A.   Yes.
16      Q.   Okay.  What is the second page of
17  Lightbourne 5?
18      A.   A picture of me at Arkansas Pine --
19  I mean, we're at home, but yeah.
20      Q.   And which one are you?
21      A.   Number 95.
22      Q.   Okay.  And you're home because
23  you're wearing the blue uniforms?
24      A.   Yes, sir.
25      Q.   Okay.  And what -- what did you --

Page 51

1  looks like you're celebrating; is that right?
2      A.   Yeah.
3      Q.   What did you just do?
4      A.   First tackle.
5      Q.   First tackle?
6      A.   Yes.
7      Q.   Okay.  Were you proud of that
8  moment?
9      A.   Yes, sir.
10      Q.   And are you aware that Jessica
11  Wilson -- if you look on Exhibit 6, there is
12  information that Jessica Wilson purchased this
13  on April 15th, 2013, a 5-by-7 print for $11.99?
14      A.   I wasn't aware of that, no.
15      Q.   Okay.  She didn't give that to you
16  as a gift?
17      A.   Not that I know of.
18      Q.   Okay.  If she had, would you
19  remember that?
20      A.   Yeah.  I do remember that photo, but
21  that photo was printed out as a poster for one
22  of our like locker room photos.
23      Q.   So it was a famous photo?
24      MR. SOWDERS:  Objection, relevance,
25  foundation.

Page 52

1      A.   I don't know if it was a famous
2  photo, but...
3      Q.   Well, it was displayed in -- within
4  the team; right?
5      A.   Yes.
6      Q.   Was it published anywhere else?
7      A.   I don't know.
8      Q.   Do you know how Jessica found it?
9      A.   No, I don't.
10      Q.   Okay.  Do you have any recollection
11  one way or another as to why she might have
12  bought it?
13      A.   She was my girlfriend.  I'm sure she
14  wanted to keep the picture.
15      Q.   Okay.  So that was for personal use?
16      MR. SOWDERS:  Foundation.
17      A.   I guess so.
18      Q.   Not a commercial use?
19      MR. SOWDERS:  Foundation.
20      A.   I guess so.
21      Q.   And did you object to your
22  girlfriend buying a picture of you?
23      A.   No.
24      Q.   It was fine; right?
25      MR. SOWDERS:  Objection, relevance.

Page 53

1      A.   Yes.
2      Q.   You were number 95 in this picture,
3  and I think at least one of the pictures in
4  your complaint you were number 97; right?
5      A.   Yes, sir.
6      Q.   Why did you change numbers?
7      A.   Somebody -- a senior had my -- the
8  number that I wanted the year that I first
9  started playing.
10      Q.   Is it pretty common for student
11  athletes to change numbers during their career?
12      A.   Yes.
13      Q.   And in 2010 you went by Yahchaaroah
14  Stuart; right?
15      A.   Yes.
16      Q.   And then in 2011 you went by
17  Yahchaaroah Lightbourne?
18      A.   Yes.
19      Q.   Okay.  And you had number 95 in
20  2010?
21      A.   Yes, sir.
22      Q.   And number 97 in 2011?
23      A.   Yes, sir.
24      MR. SOWDERS:  Can I interrupt?
25  Where does Lightbourne 6 start?

1    MR. BUCHWEITZ:  Oh, okay, yeah.  So
2  Lightbourne 5 is the first two pages.
3    MR. SOWDERS:  Okay.
4    MR. BUCHWEITZ:  Which is -- and for
5  the record, what I'll say is Lightbourne 5
6  is CBSI-Lightbourne0160238.  And the cover
7  sheet, Number 5, is the metadata that goes
8  along with 160238.
9    And then the Lightbourne 6 is -- and
10  includes all the sources, the various data
11  from the different sheets which are
12  CBSI 9936, CBSI 9935, and BAT 391.
13    Q.   And did you think this picture was
14  worth 11.99?
15    MR. SOWDERS:  Relevance.
16    A.   I honestly don't know how much it
17  was worth, but I guess.
18    Q.   It was a fair price?
19    A.   I guess.
20    Q.   Okay.
21    MR. BUCHWEITZ:  All right.  You
22  wanted to take a break, Bill, that's fine.
23    MR. SOWDERS:  Can we?  Thanks.
24    VIDEOGRAPHER:  That is the end of
25  Media Number 1.  The time is 10:57.

1    (Recess, 10:57 to 11:07 a.m.)
2    VIDEOGRAPHER:  This is the beginning
3  of Tape Number 2.  The time is 11:07.
4    Q.   Just turning back to Jessica Wilson
5  for a second, did you live together while you
6  were dating?
7    A.   No.
8    Q.   Okay.  And you don't recall ever
9  seeing the 5-by-7 picture she purchased for you;
10  right?
11    A.   No.
12    Q.   Okay.  The -- the picture of your
13  first tackle -- withdrawn.
14    Would you like to have that picture?
15    A.   It's on my Facebook.
16    Q.   How do you have it on your Facebook?
17    A.   Got it from one of the guys -- Jory
18  or one of the guys who got it off line off of
19  their Facebook.  Actually, it was -- I think
20  Stephanie, she was one of our photographers,
21  and she would take pictures also, and it was
22  just on her Facebook.
23    Q.   Same picture or same --
24    A.   Same picture.
25    Q.   -- same --

1    A.   Same picture.
2    Q.   Okay.  Do you know if she got it
3  from Ivan?
4    A.   No, I don't.
5    Q.   Okay.  And why do you have it on
6  your Facebook page?
7    A.   It's my picture, and I was proud of
8  my moment.
9    Q.   Okay.  And do you know if it was
10  anywhere else on the internet, that picture?
11    A.   No, I don't.
12    Q.   Okay.  And when it was reproduced
13  in -- on the -- the poster in -- was that in
14  the locker room, you said?
15    A.   Yes.
16    Q.   And so who would see that?
17    A.   Players.
18    Q.   Anyone else?
19    A.   If they had any fan days, then I
20  guess they let them walk through the locker
21  room, but other than that.
22    Q.   Okay.  Was that picture reproduced
23  anywhere else, as far as you know?
24    A.   No, not as far as I know.
25    Q.   Okay.  When I asked you before

1  whether it was a famous picture, you kind of
2  weren't -- didn't have a -- weren't sure
3  whether it was or wasn't.  What -- what do you
4  think would be a famous picture?
5    MR. SOWDERS:  Relevance.
6    A.   Honestly, I don't know.
7    Q.   Okay.  But you understand there's a
8  difference between sort of a picture that's an
9  iconic, like, Christian Laettner hitting the
10  shot versus a, you know, women's volleyball
11  player doing a spike in some game?
12    MR. SOWDERS:  Foundation, relevance.
13    A.   No.
14    Q.   You don't -- you don't see any
15  difference to those pictures?
16    A.   I mean, I understand where you're
17  coming from, but, I mean, like, I don't
18  consider that a famous picture, no.
19    Q.   Okay.  But putting aside your
20  picture, on whether it is famous or not, do
21  you -- what -- what's the difference between a
22  famous picture and a not famous picture?
23    A.   The eyes of the beholder, I guess
24  you can say.
25    Q.   Okay.  If a picture was reproduced

Page 58

1  in Sports Illustrated and in newspapers and on
2  posters, would you consider that to be a famous
3  picture?
4       A.  I guess so.
5       Q.  Okay.  And if there was a picture of
6  someone who went on to become a very
7  accomplished professional, would that be a
8  famous person?
9       A.  If they became famous, yes.
10      Q.  And -- and you understand that there
11  a difference between that and, you know, your
12  average women's soccer player?
13      A.  Sure.
14      Q.  Okay.  And you -- your -- what is
15  the difference?
16      A.  The difference, I guess, is their
17  status, if you're famous, you've arrived,
18  you've made it, I guess, you're playing at a
19  professional level.
20      Q.  Would the -- would there be a
21  difference between the value of their -- a use
22  of their name, image, and likeness of a famous
23  person versus an average, you know, women's
24  soccer player?
25      A.  Sure.

Page 59

1       MR. SOWDERS:  Foundation, relevance.
2       Q.  And what's the difference?
3       MR. SOWDERS:  Foundation, relevance.
4       A.  I guess the difference is how the
5  people look at them.  Are they great player or
6  not?  I mean, that's what it all comes down to.
7  Do the fans come to see them or not?
8       Q.  Okay.  And you in your -- in your
9  proposed class action, you -- and you propose
10  to represent both; right?  Both -- both famous
11  and not famous?
12      A.  Yeah.
13      Q.  Okay.  And even though there may be
14  a difference in the value of their name, image,
15  and likeness?
16      A.  Uh-huh.
17      MR. SOWDERS:  Foundation.
18      Q.  You have to answer verbally.
19      A.  Yes.
20      Q.  Okay.  Do you know whether some of
21  the people whose pictures were displayed on
22  different websites through Printroom photo
23  stores value the publicity that they receive
24  from their pictures being posted?
25      A.  I don't know.

Page 60

1       Q.  You would expect that to be the
2  case, though; right?
3       A.  I don't know.
4       Q.  Okay.  You have the complaint in
5  front of you.  There's four different companies
6  listed as defendants on -- on the cover.
7       A.  Okay.
8       Q.  Why -- let's just take them one at a
9  time.  Why are you suing Printroom, Inc.?
10      A.  That's where the pictures were
11  online.
12      Q.  Okay.  And why are you suing --
13      A.  They were selling them.
14      Q.  Sorry.
15      A.  Go ahead.
16      Q.  Why are you suing Professional Photo
17  Storefronts, Inc.?
18      A.  They were a part of everything with
19  Printroom.
20      Q.  And why are you suing Brand Affinity
21  Technologies, Inc.?
22      A.  They were also a part of the
23  Printroom.
24      Q.  Okay.  And do you recall that you
25  originally sued, excuse me, Printroom,

Page 61

1  Professional Photo Stores -- Storefronts, Inc.,
2  and Brand Affinity Technologies only?
3       A.  Well, I was made aware that CBS had
4  hired Printroom, so that's why CBS is in this.
5       Q.  Okay.  But when you -- when you
6  first sued in June of 2013, you didn't include
7  CBS; right?
8       A.  No.
9       Q.  Why not?
10      A.  Because I didn't know CBS was a part
11  of all of it, and later on, Printroom pointed
12  out that CBS had hired them.
13      Q.  So Printroom -- Printroom told you
14  that CBS was involved?
15      A.  Yes.  Well, not me personally, but,
16  yes.
17      Q.  Told your counsel that?
18      A.  Yes.
19      MR. BUCHWEITZ:  Okay.  Let's show
20  him this one.  Actually, we don't need to.
21  Yes.  Show him this one.  Try to do this
22  quick.
23      (Exhibit 7 marked.)
24      Q.  This is number 7.  Mr. Lightbourne,
25  do you recognize what's been marked as

Page 62

1    Lightbourne Exhibit 7?
2        A.   Yes.
3        Q.   What is Lightbourne Exhibit 7?
4        A.   It was the first, I guess, lawsuit.
5        Q.   Okay.  And if you would turn to
6    Paragraph 27.
7        A.   It's long.
8        Q.   Yeah.  It's page 5, paragraph 27.
9    You see there are --
10       A.   Yes.
11       Q.   -- paragraph numbers, as well?
12       A.   I got you.  Yes, sir.
13       Q.   And do you see in paragraph 27 where
14   it says, "On information and belief,
15   CBSSports.com (which on information and belief
16   is a division of CBS Interactive, which is a
17   division of CBS Corp.) produces, manages, and
18   hosts the official athletic websites --
19   including the e-commerce components -- of
20   numerous NCAA member institutions, CBS Sports,
21   with the consent of its NCAA member institution
22   clients, uses Printroom.com to create
23   individual photo stores on the Printroom.com
24   website for each of its NCAA member institution
25   clients."

Page 63

1        Q.   Does this refresh your recollection,
2    looking at paragraph 27 of Lightbourne
3    Exhibit 7, that, in fact, at the time of the
4    original complaint, you knew that CBS had
5    engaged Printroom.com?
6        A.   Does it refresh my memory?  I guess
7    so.
8        Q.   Okay.  So -- so why is it that
9    you -- that you decided to sue CBS later?
10            MR. SOWDERS:  Relevance.
11       A.   Well, it was brought to my attention
12   that, I guess, Printroom -- Printroom was hired
13   by CBS.  So, I -- I mean -- and because they
14   were hired by CBS, we -- I'd rather go after
15   the person that hired them than Printroom.
16       Q.   Okay.  But you -- but in June of
17   2013, you knew about CBS's role; you just
18   decided not to sue them then?
19       A.   At that time, yes.
20       Q.   So it was a conscious decision?
21       A.   Yes.
22       Q.   Okay.  Do you plan on suing anybody
23   else?
24       A.   No.
25       Q.   Sorry, one last thing in the -- in

Page 64

1    Lightbourne 7.  In paragraph 3, it says here,
2    as of June 2013, that you are a resident of
3    El Paso County, Texas?
4        A.   Paragraph --
5        Q.   It's page 2.
6        A.   Yes.
7        Q.   Paragraph 13.
8        A.   Okay.
9        Q.   My only question is whether that was
10   true and accurate as of June 2013.
11       A.   Yes.
12       Q.   Okay.  And have you always --
13   withdrawn.
14            You went -- you lived in -- you went
15   to high school in Indiana; right?
16       A.   Yes.
17       Q.   And you went to -- is it Taylor?
18       A.   Yes.
19       Q.   Okay.  When did you finish Taylor,
20   if you remember?
21       A.   Honestly, I don't remember.
22       Q.   Okay.  Were you living in Indiana
23   the whole time you were at Taylor?
24       A.   No.
25       Q.   Okay.  Where were you living?

Page 65

1        A.   Shoot.  Honestly, I can't remember
2    because it was just for a while.
3        Q.   Okay.
4        A.   But it was in Sweetwater.
5        Q.   Sweetwater is in --
6        A.   Texas.
7        Q.   -- in Texas?
8        A.   Yes, sir.
9        Q.   Okay.  So you went to -- you were
10   going to school in Indiana, but you --
11       A.   Yes.
12       Q.   -- lived in Texas?
13       A.   Yes.
14       Q.   How did that work?
15       A.   Just on my -- during breaks and
16   everything, go back to Texas.
17       Q.   Okay.  I got it.  And have --
18   since -- and since the time that you moved to
19   Texas, I guess, from Indiana, have you always
20   lived in Texas?
21       A.   Yes.
22       Q.   Did you ever live in Wyoming?
23       A.   Don't consider it living, no.
24       Q.   Okay.
25       A.   I played a season there.

Page 66

1   Q.   Okay.
2   A.   And I did pick up a job for a short
3   time there, but you can't -- I couldn't
4   consider myself living there.
5   Q.   Okay.  Let me just show you -- and
6   when -- and what was the time period that you
7   were in --
8   A.   Wyoming.
9   Q.   -- in Wyoming?
10  A.   From maybe late January until the
11  end of the season that I went back in -- I went
12  back in June until about August.
13  Q.   And we're talking about 2013 here?
14  A.   Yes.
15  Q.   I'm sorry.  Now, I -- January to the
16  end of the season, the end of the season was in
17  the summer?
18  A.   Yes.  They end of the season, yes.
19  Q.   Okay.  And were you dating Jessica
20  Wilson at that time?
21  A.   Yes.
22  Q.   Did she come with you to Wyoming?
23  A.   No.
24  Q.   She stayed in El Paso?
25  A.   Yes.

Page 67

1   Q.   So if she bought the picture on
2   April 15th, 2013, that is while you were away
3   in Wyoming?
4   A.   Yes.
5   Q.   She probably wanted to -- to have a
6   picture of you to remember you?
7   MR. SOWDERS:  Foundation.
8   A.   I honestly don't think so, because
9   she could FaceTime me anytime she wanted to.
10  Q.   Okay.  All right.  Let me just show
11  you two documents.  We will mark them
12  Lightbourne 8 and Lightbourne 9.  Lightbourne 8
13  is Bates labeled Lightbourne 1 through 26.
14  MR. BUCHWEITZ:  Oh, I'm sorry.  I
15  wrote on this.  Just put the sticker over
16  that.
17  (Exhibit 8 marked.)
18  (Exhibit 9 marked.)
19  MR. BUCHWEITZ:  And Lightbourne 9
20  was attached to a pleading, so it doesn't
21  have a Bates number.
22  MR. SOWDERS:  8 and 9?
23  MR. BUCHWEITZ:  8 and 9, yes.
24  Q.   Okay.  Mr. Lightbourne, do you
25  recognize what's been marked Lightbourne

Page 68

1   Exhibit 8 and Lightbourne Exhibit 9.
2   A.   Yes.
3   Q.   Okay.  What are Lightbourne 8 and
4   Lightbourne 9?
5   A.   Settlement agreements.
6   Q.   Okay.  If you look at, first,
7   Lightbourne 8, page 23, do you see your
8   signature?
9   A.   Yes, sir -- no, I don't.
10  Q.   Really?  Page 23.  There's more than
11  one page 23.
12  A.   Oh.
13  Q.   See the Bates number that says
14  Lightbourne 23?
15  A.   Oh, okay.
16  Q.   It's just people signed on --
17  A.   Yes, I do.
18  Q.   Okay.  Is that your signature?
19  A.   Yes, it is.
20  Q.   March 31, 2014?
21  A.   Yes, sir.
22  Q.   Okay.  And did you read this
23  document before you signed it?
24  A.   Yes, sir.
25  Q.   Okay.  And if you look at page

Page 69

1   Lightbourne 3.
2   A.   Uh-huh.  The --
3   Q.   Yeah, of -- of -- of Lightbourne 8.
4   A.   Okay.
5   Q.   Page 3?
6   A.   Yes.
7   Q.   Do you see 1-A, paragraph 1-A,
8   "Lightbourne" --
9   A.   Yes.
10  Q.   -- "is a resident of Wyoming, a
11  former football player, University of Texas
12  El Paso."
13  A.   Yes, I see it.
14  Q.   Of as March 31, 2014, were you a
15  resident of Wyoming?
16  A.   I don't -- I didn't consider myself
17  a resident, but, I mean, because I was playing
18  there, I guess you can say that.  I mean, I
19  lived at a -- I lived there at a hotel, but, I
20  mean, if that's what you consider a resident.
21  Q.   Well, I didn't see this document.
22  A.   Well --
23  Q.   I'm just asking -- I mean, I'm just
24  asking questions about it.  I mean, you signed
25  it.

Page 70

1      A.   Yes, I did, but I wasn't a resident
2  at the time.
3      Q.   So this -- this paragraph was wrong?
4      A.   I guess so.
5      Q.   Okay.  Is there anything else in
6  this document that's wrong?
7      A.   I mean, it's been two years.
8  Honestly, I don't know.
9      Q.   Okay.  But you read it before you
10 signed it?
11     A.   Yes.
12     Q.   And you just missed that?
13     A.   I mean, at -- at the time, I
14 honestly wasn't thinking about it.  I mean, I
15 was, I guess, living and residing in Wyoming.
16 So I guess me signing it did not perjure
17 anything because I was actually living there at
18 the time.
19     Q.   Okay.  So it was -- it was -- it was
20 accurate that you were living --
21     A.   Yes.
22     Q.   -- in Wyoming in March 2014?
23     A.   Yes.
24     Q.   Okay.  All right.  And just this
25 next one, Lightbourne 9, do you recognize

Page 71

1  Lightbourne -- actually, let me -- let me --
2  let me do it this way.
3           If you'd first turn to page 22,
4  there's 22s, the first 22 of the document.
5      A.   Yes.
6      Q.   Is that your signature?
7      A.   Yes.
8      Q.   And it's dated December 13th, 2014?
9      A.   Yes.
10     Q.   Okay.  Why did you sign another
11 settlement agreement?
12     A.   Because it was sent to me by Bill to
13 sign for another agreement.
14     Q.   Okay.  Do you know why you signed
15 another agreement?
16     A.   It's for -- I mean, honestly, I
17 don't remember.  I -- I know I signed it, but I
18 don't remember exactly what it was for --
19     Q.   Okay.
20     A.   -- at that time.
21     Q.   And this is --
22     A.   I haven't seen this document since
23 then.
24     Q.   Since December 13, 2014?
25     A.   Yes.

Page 72

1      Q.   Okay.  It was about five months ago?
2      A.   Yes.  I mean, I have done a lot in
3  five months.
4      Q.   Good.
5      A.   So I honestly don't remember.
6      Q.   All right.  Turn to page 3, please.
7  You see paragraph 1-A?
8      A.   Uh-huh.
9      Q.   Where it says Lightbourne was a
10 resident of Wyoming?
11     A.   Uh-huh.
12     Q.   As of December 13th, 2014, were you
13 a resident of Wyoming?
14     A.   No.
15     Q.   Okay.  So was this wrong?
16     A.   This is wrong, yes.
17     Q.   Okay.  Did you read this before you
18 signed it?
19     A.   I honestly don't remember.
20     Q.   Okay.  Did you -- were you given
21 the -- were -- were you just given the
22 signature page, or were you given --
23     A.   No.
24     Q.   -- the full document?
25     A.   I was given the full document.

Page 73

1      Q.   Okay.  You're just not sure whether
2  you read it all?
3      A.   Right.
4      Q.   Okay.  All right.  You can put that
5  one aside for now.
6           Besides Texas and Wyoming and
7  Indiana, have you lived in any other states?
8      A.   No, no.
9      Q.   Where -- were you born in this
10 country?
11     A.   I was born in Florida.
12     Q.   Okay.  How long did you live in
13 Florida?
14     A.   Honestly, I don't know.  Maybe a
15 week, if that.
16     Q.   Okay.  Okay.  So did you grow up in
17 Indiana?
18     A.   No.  I grew up in the Bahamas.
19     Q.   Bahamas.  Okay.  And how long --
20 when did you move to Indiana?
21     A.   When I was 16.
22     Q.   16.  Okay.  What were the
23 circumstances under which you came to play
24 football at University of Texas El Paso?
25     A.   Frank Rutherford, who I went to

## Page 74

1  frequently in Sweetwater, he knew Mike Price.
2  He called Mike Price and -- for me, and I sent
3  him my film from NAIA, and he told me to come
4  and play football for him.
5     Q.   Okay.  And who is Frank Rutherford?
6     A.   He's a fellow Bahamian that my mom
7  knew from back in the day, and he got in
8  contact, because I went home one summer, and
9  him and his nephew -- I can't remember his
10  name, but he played in the NFL.  They were
11  hosting a camp.  And Frank Rutherford lives in
12  Sweetwater, and so I told him that I wanted to
13  play Division I football, and he made a few
14  calls.
15     Q.   Okay.  And you tried out, and Mike
16  Price --
17     A.   Yes.
18     Q.   -- signed you up?
19     A.   Yes.
20     Q.   Okay.  And you redshirted the first
21  year, and then you played two seasons?
22     A.   Yes, sir.
23     Q.   Okay.  Did you apply to any other
24  schools?
25     A.   No.

## Page 75

1     Q.   Okay.  Did you receive scholar- -- a
2  scholarship for UTEP?
3     A.   Yes.
4     Q.   And what was the scholarship?
5     A.   Athletic scholarship.
6     Q.   How much was it?
7     A.   I don't know.
8     Q.   Did you have to pay anything?
9     A.   My first, the redshirt year, yes, I
10  did.
11     Q.   You paid -- what did you pay.
12     A.   Some of my tuition.
13     Q.   Okay.  How much?
14     A.   I honestly don't remember.
15     Q.   Okay.  Did you get a partial
16  scholarship your redshirt year?
17     A.   My redshirt year, no.
18     Q.   Okay.
19     A.   I -- it was just financial aid,
20  and --
21     Q.   Okay.
22     A.   -- that was it.
23     Q.   Okay.  Need based or merit based?
24     A.   Need based.
25     Q.   Okay.  And then for your two

## Page 76

1  seasons, 2010 and 2011, you received an
2  athletic scholarship?
3     A.   Yes.
4     Q.   And what did that cover?
5     A.   Everything as far as books, school,
6  classes.
7     Q.   Okay.  So do you -- do you have any
8  recollection as to about how much it -- that
9  was?
10     A.   No, I honestly don't.
11     Q.   Okay.  But it covered everything?
12     A.   Yes.
13     Q.   Okay.  During your two seasons that
14  you played, do you recall where -- what states
15  the games were in?
16     A.   Not all of them.
17     Q.   Huh?
18     A.   Not all of them.
19     Q.   Okay.  Do you recall whether any
20  games were in California?
21     A.   None of them -- I don't think any of
22  them were.
23     Q.   Okay.
24        MR. BUCHWEITZ:  I want to just show
25  him these quickly.  It's just these two, 62

## Page 77

1  and 63.
2        (Exhibit 10 marked.)
3        (Exhibit 11 marked.)
4        MR. BUCHWEITZ:  These are 10 and 11.
5     Q.   Mr. Lightbourne, it's just whether
6  these two documents we just printed out, taking
7  a look at them, whether they refresh your
8  recollection as to the games that UTEP played
9  in 2010 and 2011 --
10     A.   Uh-huh.
11     Q.   -- and the locations of those games.
12     A.   Yes, sir.
13     Q.   Does looking at Lightbourne 10 and
14  Lightbourne 11 refresh your recollection that
15  you didn't play any games om California in
16  those two seasons?
17     A.   Yes, sir.
18     Q.   Yes?
19     A.   Yes, sir.
20     Q.   Okay.  Great.  You can put them
21  aside.
22        MR. BUCHWEITZ:  This is 12.
23        (Exhibit 12 marked.)
24     Q.   Okay.  Mr. Lightbourne, I've put
25  before you a three-page document from your

Page 86

1   Q.   Paul Santillan?
2   A.   I don't remember.
3   Q.   Okay.  In the -- under the picture,
4   it says -- you say, "UTEP football players
5   ready for the Houston game."  Then it says
6   "Ivan Pierre Aguirre/Courtesy of UTEP
7   Athletics."
8        What does "Courtesy of UTEP
9   Athletics" mean?
10  A.   That somebody -- a part of the UTEP
11  athletic team took the picture or the -- the --
12  part of the UTEP photograph team or whatever
13  took the picture.
14  Q.   Okay.  And does the reference to
15  Ivan Pierre Aguirre mean that he took the
16  picture?
17  A.   Yeah.
18  Q.   Did you have to get -- when it says
19  "courtesy," does that mean that you had to get
20  permission of UTEP athletics to use the
21  picture?
22  A.   Honestly, I don't even remember how
23  I got the picture.
24  Q.   Okay.  What's your general
25  understanding of what "courtesy of" means under

Page 87

1   a picture, if any?
2   A.   "Courtesy of," that it was given to
3   me to use for the news story.
4   Q.   Okay.  You had to get permission in
5   order to use it?
6   A.   Yes.
7   Q.   Because they own the picture?
8        MR. SOWDERS:  Foundation.
9   A.   Not because they own the picture,
10  but maybe because they took the picture, I
11  don't know.
12  Q.   Well, when someone takes a
13  picture -- withdrawn.
14       Do you understand what a copyright
15  is, just generally?
16  A.   Yeah.  You can't use their picture
17  without their knowledge or permission.
18  Q.   Okay.  And who is -- when someone --
19  when a photographer takes a picture, who owns
20  the copyright --
21  A.   I guess --
22  Q.   -- in your understanding?
23  A.   I guess the photographer or the
24  company that he works for.
25  Q.   Okay.  And in order to use a picture

Page 88

1   that is copyrighted by a photographer or the
2   company owns it, you have to get permission of
3   that person; right?
4   A.   Yes.
5   Q.   Okay.  And one of the rights that
6   someone has in owning a copyright is to sell
7   the picture however they want?
8        MR. SOWDERS:  Foundation.
9   Q.   Right?
10  A.   I guess.
11  Q.   And to license it, if they wanted
12  to, to someone, give someone permission?
13       MR. SOWDERS:  Foundation.
14  A.   I guess.
15  Q.   Okay.  In your -- your degree was in
16  multimedia studies?
17  A.   Yes.
18  Q.   A focus on radio and TV?
19  A.   Yes.
20  Q.   Did you have any -- and with honors?
21  A.   Yes.
22  Q.   Congratulations.
23  A.   Thanks.
24  Q.   Did you have any courses on
25  copyright or that touched on copyright in radio

Page 89

1   and television?
2   A.   Possibly.
3   Q.   Do you recall?
4   A.   I don't recall that at the time.
5   Q.   Okay.  And what about the First
6   Amendment?
7   A.   Yes, free speech.
8   Q.   Free speech.  In the use of radio
9   and television?
10  A.   Yes.
11  Q.   You recall learning about that?
12  A.   Yes.
13  Q.   What do you recall learning?
14       MR. SOWDERS:  Relevance.
15  A.   You can use a news story.  I mean,
16  freedom of speech just, I guess -- I mean, I'm
17  free to write about what I want to write about.
18  Q.   Okay.  Is there anyone in this
19  picture, on Lightbourne 13, of the players
20  coming in from the Houston game, that you
21  recall asking for permission before using this
22  photograph in the -- in the article that you
23  wrote?
24  A.   Honestly, I --
25       MR. SOWDERS:  Relevance.

Page 106

1      VIDEOGRAPHER:  This is the beginning
2  of media number 3.  The time is 12:10.
3      Q.   You can put the resume in the done
4  pile, also the Borderzine article.
5      A.   All right.
6      Q.   Thank you.
7      MR. BUCHWEITZ:  Okay.  I'm going to
8  mark another exhibit as Number Lightbourne
9  13 --
10      COURT REPORTER:  14.
11      MR. BUCHWEITZ:  -- 14.
12      (Exhibit 14 marked.)
13      Q.   Mr. Lightbourne, do you recognize
14  what's been marked as --
15      MR. BUCHWEITZ:  Sorry, let me make a
16  record.  Lightbourne 14 is a four-page
17  Bates stamped document labeled Lightbourne
18  1109 to 1112.
19      Q.   Mr. Lightbourne, do you recognize
20  what has been marked as Lightbourne Exhibit 14?
21      A.   Yes.
22      Q.   What is Lightbourne Exhibit 14?
23      A.   My IFL contract.
24      Q.   Okay.  And this is your Indoor
25  Football League player contract for your time

Page 107

1  on the Wyoming Calvary; right?
2      A.   Yes.
3      Q.   Okay.  And are the Wyoming Calvary
4  now defunct?
5      A.   Yes.
6      Q.   What happened?
7      A.   I have no idea.
8      Q.   Okay.  What happened after the
9  season you played with them?
10      A.   I got a job for a while, and then
11  moved back to El Paso.
12      Q.   Okay.  Have you tried to play
13  professional football in any other league since
14  then?
15      A.   Not recently.  Not yet at least.
16      Q.   Okay.  You would like to though in
17  the future?
18      A.   Sure.
19      Q.   Okay.  I'm just going to ask you a
20  few questions about this document.  First, is
21  your signature on the top of pages -- the first
22  and second pages and then the bottom of the
23  third page and the bottom of the fourth page?
24      A.   Yes, yes.
25      Q.   And am I correct that you signed the

Page 108

1  top -- you signed Y. Stuart, and then just
2  below that, the player name uses Lightbourne as
3  your last name?
4      A.   It's just my signature.
5      Q.   Okay.  So is that -- does that say
6  "Stuart" though?
7      A.   Yeah.  It's never changed.
8      Q.   Okay.  So you signed Stuart, even
9  with Lightbourne as your name?
10      A.   That's my signature.
11      Q.   Okay.  So the answer is "yes"?
12      A.   Yes.
13      Q.   Okay.  And the date, I mentioned
14  earlier 11/13/2012.  Does this refresh your
15  recollection that you signed the contract to
16  play for Wyoming on November 13th, 2012?
17      A.   Yes.
18      Q.   And do you see the very small print
19  under the signature in this -- this little
20  quote.  It says, "The IFL does not review the
21  law in each different state where our teams
22  play, so each team must have your local
23  attorney review this form of player contract to
24  ensure compliance with your own local state
25  laws."  You signed -- you read that and you

Page 109

1  signed right above it; right?
2      A.   Yeah.
3      Q.   And you understand that every state
4  has somewhat different law; right?
5      A.   Sure.
6      Q.   And Wyoming law may differ from
7  Texas law in certain things?
8      A.   Yes.
9      Q.   May differ from California law?
10      A.   Yes.
11      Q.   Okay.  And it may -- and it's not
12  just contract law, but other law as well;
13  right?
14      A.   Right.
15      Q.   It could be different right of
16  publicity laws in California and Texas and
17  Wyoming?
18      A.   Yes.
19      Q.   And other states?
20      A.   Yes.
21      Q.   Okay.  In the first paragraph after
22  team name and player name, it says in the third
23  line, "The player is a skilled football player.
24  The team desires to secure the playing services
25  of the player."

Page 110

1    And then in paragraph 2, right after
2  employment and services, it says, "Team employs
3  player as a skilled football player. Player
4  accepts such employment."
5    So is it correct that you understood
6  you were being paid for your skills and your
7  performance; right?
8    A.  Yes.
9    Q.  Not for your name, your imagery or
10  likeness?
11    MR. SOWDERS:  Form and foundation.
12    A.  I understand.
13    Q.  And I'm sorry?
14    A.  I understand it.
15    Q.  Okay.  And in paragraph 3 it says,
16  player will receive an amount up to and not
17  exceeding 225 per league game while on active
18  roster and a bonus if they win, and a
19  different -- $50 if on inactive roster.  Are
20  these the amounts that you were paid for your
21  time --
22    A.  Yes.
23    Q.  -- at the Wyoming Calvary?
24    A.  Yes.
25    Q.  For your period on the active

Page 111

1  roster --
2    A.  Yes.
3    Q.  -- and on the inactive roster?
4    Do you recall whether you were on
5  the active roster -- how many games you were on
6  the active roster versus inactive?
7    A.  The whole season.
8    Q.  Active the whole season?
9    A.  Yes.
10    Q.  How many games was the season?
11    A.  I don't remember.
12    Q.  10, 15?
13    A.  Maybe 12, I'm not sure, or 15, I'm
14  not sure.
15    Q.  Okay.  Paragraph 9 you see it says,
16  "Publicity and cooperation with news media,
17  charities and sponsors."
18    A.  Uh-huh.
19    Q.  And the contract requires that at
20  the direction of the team or league, player
21  shall make personal appearances on behalf of
22  official league or team charity, sponsor or
23  supplier," and then it also says, "Player will
24  cooperate with news media and will participate
25  upon request and promotional activities of the

Page 112

1  league and team.  Player may not receive
2  compensation of any kind for said appearances."
3  Do you recall -- do you recall that and signing
4  that?
5    A.  Yes.
6    Q.  Okay.  So is it fair to say that you
7  have to make yourself available for the media,
8  and you weren't entitled to additional
9  compensation; right?
10    A.  Yes.
11    Q.  And they could take -- that includes
12  pictures; right?
13    A.  Yes.
14    Q.  And you couldn't get paid extra for
15  that?
16    A.  No.
17    Q.  Okay.  And in paragraph 10 you see
18  where it says, "Use of player's name and/or
19  likeness.  Player irrevocably grants and
20  assigns team league and any league designated
21  entity during and beyond the term of his
22  contract separately and together the right to
23  use his name, image, likeness and pictures for
24  publicity and promotion, advertisement, sell
25  trading cards, posters or any other commercial

Page 113

1  product or entity of the league, team, and any
2  other of its member teams.  Player's name and
3  likeness can be used in or extend to
4  newspapers, magazines, motion pictures, game
5  programs, roster manuals, media guides,
6  broadcasts and all other publicity and
7  advertising media and merchandise including,
8  but not limited to, the advertisement and
9  promotion of the official league or team
10  corporate sponsors and official league or team
11  suppliers.  Player hereby waives any claim to
12  any revenue received by league, team, and/or
13  league designated entity as a consequence of
14  such player's name or likeness."
15    Do you recall reading that and
16  agreeing to that?
17    A.  Yes.
18    Q.  Okay.  And you understood what this
19  meant; right?
20    A.  Yes, sir.
21    Q.  And it meant that they could use --
22  the Calvary could use your image however they
23  wanted; right?
24    A.  Yes.
25    Q.  And they -- and you weren't allowed

Page 114

1    to get any additional money for that?
2         A.   Yes.
3         Q.   And that use was just like the way
4    UTEP was able to use your image; right?
5         A.   No.
6         Q.   Why not?
7         A.   Because I was a professional and --
8    in the IFL, and it was different in college.
9         Q.   Okay.  But in the IFL they paid you
10   the 225 per game, and then they could use your
11   name, image, and likeness however they wanted,
12   and at UTEP they used your -- they paid your
13   tuition, and they were able to use it --
14        A.   The contract might have stated that
15   they could use my image, but they would always
16   ask before they did, if they ever used it,
17   which on my recollection, they didn't.
18        Q.   Okay.  So how do you know that they
19   would ask you?
20        A.   Because they would -- they would
21   ask.
22        Q.   But you said they never used it?
23        A.   I mean, my picture is up for -- on
24   the -- whenever it was, but on the Wyoming
25   Calvary website, not for sale or anything else

Page 115

1    like that, but for -- just for publicity.
2         Q.   Okay.
3         A.   To bring in fans.
4         Q.   But under this contract, they didn't
5    have to ask you?
6         A.   They did.
7         Q.   But they didn't have to?
8         A.   They might not -- no, they didn't
9    have to, but they did.
10        Q.   And you see in paragraph 15 it says
11   that the law -- the contract is made under and
12   shall be governed under the state in which the
13   team plays its home games?
14        A.   Uh-huh.
15        Q.   And that would have been Wyoming
16   law; right?
17        A.   Yes.
18        Q.   Okay.  And we already said before
19   that you understand the difference that some
20   states have different law; right?
21        A.   Yes.
22        Q.   In 16 it says you have been given
23   the opportunity to seek advice of counsel of
24   his own selection to assist in any review of
25   the contract.  Did you do that?

Page 116

1         A.   No.
2         Q.   Did you ever play professionally for
3    any other team?
4         A.   No.
5         Q.   Turning back to the complaint for a
6    moment, page 20, if you turn to page --
7    paragraph 65.  In paragraph 64 you allege
8    plaintiff -- that's you -- never granted
9    defendants the right to exploit his name, image
10   or likeness commercially, nor did plaintiff
11   grant these rights to UTEP or to any company
12   that manages the online display under a sale of
13   photos of UTEP's sporting events.  But based on
14   what we talked about this morning, paragraph 65
15   is not -- is not accurate; right?
16        MR. SOWDERS:  Foundation, form.
17        A.   I mean, I honestly never thought
18   that UTEP would use my photos for financial
19   gain, I guess you could say.  I just thought it
20   would be for promotion of the school.  That's
21   about it.
22        Q.   Okay.  But Exhibit Lightbourne 2,
23   Lightbourne 3, and Lightbourne 4 specifically
24   say that UTEP can sell; right?
25        MR. SOWDERS:  Form.

Page 117

1         A.   When you -- when I thought -- when I
2    was signing it, it was more of a signature to
3    say I wanted to play.  It wasn't a signature to
4    say, well, use my thing to make a profit.  It
5    was more to say, you know, if -- I can't
6    personally sell any of my photos to make a
7    profit, so I mean, that's exactly what I
8    remember them saying, you can't sell your
9    photos or anything.
10        And so with that statute, I thought
11   that it meant that they couldn't sell it or
12   anything.  They could use it for promotions,
13   because remembering going into the bookstore,
14   it had no name on the back of the jersey.  It
15   was just the jersey number.  Anything that was
16   sold by UTEP was not -- was not actually in our
17   likeness or anything like that.  It was just a
18   number or anything else like that.  It was
19   nothing of us.
20        Q.   Now, Mr. Lightbourne, you signed and
21   you testified earlier that you signed and you
22   understood and you agreed that when you signed
23   Exhibits 2, 3, and 4, that you authorized UTEP
24   or its agents to make copies of, use, sell, and
25   distribute directly or through a third party

1  any photographic or other images taken in
2  connection with my participation on UTEP
3  collegiate athletic team; right?
4      A.   Yes.
5      Q.   And when you signed that, you were
6  of age; right?
7      A.   Yes.
8      Q.   And you had already achieved a high
9  school degree?
10     A.   Yes.
11     Q.   And you had achieved an associates
12 degree?
13     A.   Yes.
14     Q.   And you were on your way to an
15 honors degree at the University of Texas El
16 Paso?
17     A.   Yes.
18     Q.   And you are a guy who is now working
19 at a radio station?
20     A.   Yes.
21     Q.   And has worked at a television
22 station?
23     A.   Yes.
24     Q.   And you have written articles that
25 have been published in -- in online newspapers?

1      A.   Yes.
2      Q.   And you have done stories on -- on
3  news reporting?
4      A.   Yes.
5      Q.   And you have signed agreements with
6  professional football teams?
7      A.   Yes.
8      Q.   You -- you knew exactly what you
9  were signing here, didn't you?
10          MR. SOWDERS:  Form and foundation.
11     Q.   Didn't you?
12     A.   Honestly, no.  Hey, honestly -- I'm
13 being honest with you, no.  It was, like I
14 said, when -- when you came in, it was like
15 sign this paper so that you can play.  You
16 can't sell your -- your images, and that's
17 that.  So it was just a big forum where every
18 athlete is in there, and it's like you can't do
19 this, do this, sign the paper.  Okay.  Next
20 paper.
21     Q.   Lightbourne 2, Lightbourne 3, and
22 Lightbourne 4 are four-line documents; right?
23     A.   Yes.
24     Q.   They're four lines?
25     A.   Yes.

1      Q.   And you signed them and you read
2  them?
3          MR. SOWDERS:  Form.
4      Q.   You read them and you signed them?
5          MR. SOWDERS:  Form.
6      A.   I mean, to say that I honestly read
7  them, honestly, no.  I honestly -- could
8  honestly tell you that it was whatever was
9  said, you signed it and you moved on.  It was
10 just like that, I mean...
11     Q.   Did your counsel tell you to say
12 that at a break?
13     A.   No.  No, he didn't.  This is me
14 being honest with you.  This is going back to
15 what I remember in college.  I mean, for me it
16 was a big room of all of our athletes, and it
17 was, okay, this paper, sign this paper, this is
18 what the paper is saying, sign it.  This is
19 what the paper is saying, sign it.
20     Q.   And this paper says that you're
21 authorizing you would have to sell your
22 picture?
23     A.   What it was saying -- what I
24 remember them saying was you can't sell
25 anything that UTEP -- like photos or anything,

1  autographs or anything else like that to make a
2  profit.
3      Q.   But UTEP can, you can't?
4      A.   Honestly, I don't even remember UTEP
5  being -- like them saying, well, we can sell.
6  It was just like, you can't sell your image,
7  sign the paper.  Next paper.
8      Q.   When you alleged paragraph 65 of the
9  complaint that you did not grant UTEP or any
10 company that manages the online display and/or
11 sale of photos of UTEP's sporting events, when
12 you alleged that in your complaint and you sued
13 CBS, did you just forget that you signed
14 Exhibits 2, 3, and 4?
15     A.   Honestly, I didn't remember exactly
16 what the papers had said, but all I can
17 remember is exactly what Bob Stull or Coach
18 Price had said at the moment.
19     Q.   And they never told -- did they tell
20 you not to read what you were -- what you were
21 signing?
22     A.   It wasn't anything for them to say.
23 It was more of, do you want to play.  You know,
24 for me, I mean, coming from the Bahamas, it was
25 just an opportunity for me to play.

Page 122

1    Q.   Sure.
2    A.   You know, I really -- I was thinking
3  like, you know, sign this paper, you can't sell
4  any of your images, so sign the paper, okay,
5  cool.  I won't get my scholarship taken away if
6  I don't sell anything of mine.  That's
7  perfectly fine.
8    Q.   So in exchange for signing Exhibits
9  2, 3, and 4 --
10   A.   Uh-huh.
11   Q.   -- you got a UTEP education, you got
12 a scholarship for UTEP for two years, you got
13 to work in a -- you got to play on a team that
14 led to -- that both the academic work that you
15 did and the athletic work that you did that led
16 to multiple jobs, including the one you are in
17 now; right?
18   A.   I guess you could say that.
19   Q.   And you testified earlier today that
20 you did authorize UTEP to sell your pictures?
21       MR. SOWDERS:  Form.
22   A.   Like I said, it was, sign the paper.
23 Next paper.
24   Q.   If your testimony -- so your
25 testimony sitting here today is that despite

Page 123

1  the signatures you gave and authorizations you
2  gave in Exhibits 2, 3, and 4, that paragraph 65
3  of your complaint is true and accurate?
4    A.   Yes.
5    Q.   So you're swearing today under oath
6  that you did not grant UTEP or any company that
7  manages the online display and/or sale of
8  photos the right to sell your photographs?
9    A.   No.
10   Q.   You are not swearing that today?
11   A.   Oh.  I am swearing that I did --
12 like I did not give UTEP the -- what's the word
13 I'm looking for -- the authority, I guess, to
14 sell my photos, I guess, you can say.
15       All I know is when I signed that
16 paper, like I'm saying, when I signed the
17 paper, it was you cannot sell anything of
18 UTEP's signature, likeness, anything.  You
19 can't sell it to make a profit.  That's what
20 that paper meant.
21   Q.   And you signed this paper on
22 September 16, 2009; right?
23   A.   I don't recall.  If that's the
24 signature there, I guess.
25   Q.   And then again on August 4th of

Page 124

1  2010; right?
2    A.   Yes.
3    Q.   And then again on August 8th of
4  2011; right?
5    A.   Yes.
6    Q.   And your testimony is that you
7  didn't read it the first time, you didn't read
8  the second time, and you didn't read it the
9  third time either; right?
10   A.   We were in a big room of athletes
11 trying to get through a book because we would
12 like to go and rest because we're trying to --
13 we're practicing.  It's just a long tedious
14 process of the -- you get in there.  All right,
15 guys, this is going to be a long process, it's
16 probably a book about that big (indicating) of
17 things that we have to sign, and they go over
18 it, like this is in general what you're
19 signing.  Okay, cool.  Signature, date.
20   Q.   And when I asked you earlier today
21 what forms you signed in addition to Exhibits
22 Lightbourne 2, Lightbourne 3, and Lightbourne
23 4, you said the only other thing was some
24 health forms?
25   A.   Exactly.

Page 125

1    Q.   And now you're saying there is a
2  huge book of stuff?
3    A.   It's like that big.  Health forms,
4  yes.
5    Q.   Okay.
6    A.   There's so many health forms that we
7  have to sign.  It was the physical other health
8  forms, other things like that, so --
9    Q.   And the student athlete image
10 authorization form, how many -- how many
11 single-page four-line documents did you sign?
12   A.   Let's see.  I don't know.  It has
13 been a long time.
14   Q.   Were there any others like this?
15   A.   I don't know.
16   Q.   Now that you've seen that you have
17 signed Lightbourne Exhibits 2, Lightbourne 3,
18 and Lightbourne 4 which authorized UTEP to sell
19 these photographs, whether you remember it
20 exactly like that now or not, sitting here
21 today, isn't it true that paragraph 65 is
22 false?
23       MR. SOWDERS:  Form and foundation.
24   A.   I won't answer the question.  I
25 mean, for me, I won't answer the question.

Page 126

1    Q.   You have to, I'm sorry.
2        MR. SOWDERS:  Form and foundation.
3    It has been asked and answered 10 times.
4    Q.   You still have to answer.
5        THE WITNESS:  Can I plead the Fifth?
6        MR. SOWDERS:  No.
7    A.   Like I said before, when I signed
8    the paper, it was -- you can't use your -- you
9    can't sell your likeness.  That's exactly all I
10   remember from signing the paper.
11   Q.   I know.
12   A.   I can't --
13   Q.   I'm sorry, go ahead.
14   A.   That's my answer to your question.
15   Q.   I'm asking you a different question,
16   which is -- I understand what you are saying
17   you did back in 2009, 2010, and 2011.
18       My question is, knowing today,
19   sitting here in this room that you, in fact,
20   did sign Lightbourne 2, Lightbourne 3, and
21   Lightbourne 4 --
22   A.   Uh-huh.
23   Q.   -- knowing that you did sign these
24   and seeing the words in front of you today --
25   A.   Yes.

Page 127

1    Q.   -- isn't it true that paragraph 65
2    is false?
3        MR. SOWDERS:  Form and foundation,
4        asked and answered.
5    A.   Yes.
6    Q.   So page 19 of your complaint, the
7    picture, Figure 9 --
8    A.   Uh-huh.
9    Q.   -- who are the people in the white
10   uniforms, if you can tell?
11   A.   Tulsa.
12   Q.   Okay.  And this was from a game
13   against Tulsa?
14   A.   Yes.
15   Q.   Do you know the four Tulsa players?
16   A.   No, I don't.
17   Q.   How many times did you look at that
18   picture on the Printroom website, Figure 9,
19   page 19 in the complaint?
20   A.   Obviously I don't remember.
21   Q.   Okay.  Do you know how many times
22   your counsel looked at it?
23   A.   No.
24   Q.   During the Tulsa game, were you
25   aware that there were photographers at the --

Page 128

1    I'm sorry, withdrawn.
2        Your blue uniform means home game;
3    right?
4    A.   It depends on the year.
5    Q.   Oh, okay.  Do you remember if the
6    Tulsa game was a home game?
7    A.   I think so.
8    Q.   Okay.  Do you recall during the
9    Tulsa game whether there were photographers?
10   A.   There's photographers at every game.
11   Q.   And did you object to photographers
12   at the Tulsa game?
13   A.   No.
14   Q.   Okay.  Figure 10 on page 20.  Is
15   this a -- is this another picture of you?
16   A.   Yes.
17   Q.   And is this during a practice?
18   A.   Yes.
19   Q.   Okay.  Did you find this picture or
20   did your counsel?
21   A.   I saw that picture.
22   Q.   Okay.  How many times did you look
23   at it on the Printroom site?
24   A.   I have no idea.
25   Q.   Okay.  Did you -- were you aware

Page 129

1    that there were photographers at the practice?
2    A.   UTEP photographers, I guess, yes,
3    and the news.
4    Q.   Did you object to them being there?
5    A.   No.
6    Q.   Do you know who the other two people
7    in the picture are?
8    A.   Yes, Coach Patterson and Coach
9    Connelly.
10   Q.   Okay.  We're now going to go through
11   a number of allegations in the complaint.  I'm
12   just going to ask you some basic questions
13   about them.  Starting with -- I'll give you
14   both the page number and the paragraph so you
15   can find it quickly.
16   A.   Uh-huh.
17   Q.   On page 5, paragraph 29 --
18   A.   Uh-huh.
19   Q.   -- it says, "Although Printroom
20   hosted and managed Printroom.com, student
21   athlete photographs were uploaded to a site
22   directly by CBS."  What's your basis for that
23   statement?
24   A.   Because Printroom was -- yeah,
25   because Printroom was hired by CBS, and CBS had

Page 134

```
1        Q.   Okay.  If you look at the third page
2   of this document, there is sales data from --
3   from Brand Affinity.  The -- I think you might
4   be on -- do you see that it says, bill to, ship
5   to Zeke Riser?
6        A.   Uh-huh.
7        Q.   Would you agree, based on this, that
8   Zeke Riser bought a picture of himself?
9            MR. SOWDERS:  Foundation.
10       A.   Anybody could have used his card.
11  That's how I feel about it -- not anybody, but
12  I mean, if he had a girlfriend, wife, family
13  member, anybody that he gives responsibility to
14  could have, at the moment.
15       Q.   Could have bought the picture for
16  him?
17       A.   Yes.
18       Q.   Okay.  But there is no other
19  explanation?
20       A.   No.
21       Q.   Okay.  And is he part of the class?
22       A.   Yes.
23       Q.   Okay.  And -- but he -- he either
24  bought the picture or somebody who had his
25  credit card bought a picture of himself; right?
```

Page 135

```
1        A.   Sure.
2        Q.   So as to Zeke Riser, it wouldn't be
3   true that no student athlete consented to the
4   sale of his or her image; right?
5            MR. SOWDERS:  Form and foundation.
6        Q.   He bought it himself?
7        A.   Yeah.  Because he bought the picture
8   does not mean that he contented.  He just
9   bought the picture.  I mean, that doesn't mean
10  that you consent to anything.
11       Q.   Uh-huh.  What do you think the word
12  "consent" means?
13       A.   The word "consent" means that you
14  give an okay -- yeah, giving an okay.
15       Q.   Okay.  But if you buy it yourself,
16  it means that you are okay with the picture
17  being taken and sold; right?
18           MR. SOWDERS:  Form and foundation.
19       A.   Maybe.
20           MR. BUCHWEITZ:  Okay.  Let's do this
21  one, 16.
22           (Exhibit 16 marked.)
23       Q.   S2.  This is now 16.  It's a
24  four-page document.  Do you see -- same deal,
25  Mr. Lightbourne, you see on the second page,
```

Page 136

```
1   there is a picture of a couple of women soccer
2   players?
3        A.   Uh-huh.
4        Q.   And on the cover it says -- the
5   description is Jennie Krauser.  And if you look
6   at the sales data on the third page, billed to
7   Jennie Krauser, shipped to Jennie Krauser?
8        A.   I see it.
9        Q.   Isn't this another example of a
10  student athlete purchasing a picture of
11  themselves?
12       A.   Sure.
13       Q.   And is Jennie Krauser the soccer
14  player -- the women's soccer player from North
15  Carolina State part of your class?
16       A.   Yes.
17       Q.   Okay.  But she obviously was okay
18  with her picture being taken and sold, since
19  she bought it; right?
20           MR. SOWDERS:  Foundation.
21       A.   I guess so.
22       Q.   And without, you know, these photo
23  stores, Jennie Krauser may never have been able
24  to get a professional grade photograph of
25  herself playing college athletics; right?
```

Page 137

```
1        A.   No.  That's what you go to your --
2   your athletic people for, because that's --
3   they take your pictures.
4        Q.   Uh-huh.  And if this was an AP
5   photographer, though, and I don't know whether
6   it is or it isn't, I'm just asking you now
7   hypothetically, that would -- that option
8   wouldn't be available then; right?
9            MR. SOWDERS:  Form.
10       A.   Maybe.
11       Q.   Or from a news organization?
12       A.   From the news, you can definitely go
13  through the news and get it.
14       Q.   No, no.  What I mean is from a
15  sports journalist who took a picture and owned
16  it, just like you owned your pictures that you
17  took.  If you wanted to get that professional
18  grade picture from, you know, some professional
19  photographer, you wouldn't be able to get it
20  other than this way; right?
21           MR. SOWDERS:  Form, foundation.
22       A.   No.  Usually -- usually you can get
23  a free one from the photographer if it's of
24  you.
25       Q.   Why?
```

Page 142

1    Q.   You think if Marion Grice or Sir
2  Thomas Jackson asked --
3    A.   Went to --
4    Q.   -- Wiley Lowe --
5    A.   To go get his photo?
6    Q.   For free?
7    A.   Oh, yeah.
8    Q.   How do you know that?
9    A.   I mean, why would you charge the guy
10 that you took the photo, if they -- if he
11 wasn't playing, there would be no photo.
12   Q.   Uh-huh.  And who else can get that
13 picture for free from Wiley Lowe?
14   A.   Any of those three guys standing
15 there.  It doesn't matter if he addressed his
16 name or not.
17   Q.   What about you?  If you wanted --
18   A.   I wasn't --
19   Q.   If you wanted this picture, how do
20 you get it?
21   A.   I have no idea.
22   Q.   Do you have to pay Wiley Lowe for
23 it?
24        MR. SOWDERS:  Relevance.
25   A.   I mean, to me, I wouldn't want the

Page 143

1  photo, so I don't know.
2    Q.   Okay.  Let's say if somebody did
3  want it.
4    A.   That's their issue.
5    Q.   Is this a work of art?
6    A.   Eyes of the beholder.
7    Q.   In -- in your eyes.
8    A.   It's a football game.
9    Q.   Is that an expressive work?
10        MR. SOWDERS:  Form, foundation.
11   A.   Expressive?
12   Q.   I mean --
13   A.   I mean, it's just an athlete playing
14 football.
15   Q.   Yes.  Have you ever seen, like, a
16 coffee table book of any kind like about --
17 like, you know, athletes over the years or
18 pictures of Texas or pictures of the Bahamas,
19 anything like that?
20   A.   Yes.
21   Q.   And do those pictures include people
22 sometimes?
23   A.   Sometimes, yeah.
24   Q.   And are those books expressive
25 works?

Page 144

1        MR. SOWDERS:  Form and foundation.
2    A.   I guess so.
3    Q.   Works of art?
4        MR. SOWDERS:  Form and foundation.
5    A.   I mean, like I said, eye of the
6  beholder.  It depends on, you know...
7    Q.   Do you know whether any pictures of
8  Figure 1 from your complaint were sold?
9    A.   No, I don't.
10   Q.   Okay.  Quick look at fig- ---
11 Figure 2, the next page.
12        Who is in this picture?
13   A.   Stanford's Jeanette Po-- Pohlen
14 and Danielle Orsillo.  Yeah.
15   Q.   And the caption -- the caption
16 doesn't just include their names; right?  It
17 also tells what happened?
18   A.   Right.
19   Q.   And it says -- it provides
20 information about that game?
21   A.   Right.
22   Q.   It provides information about where
23 the game was; when the game was; and the result
24 of the game, too?
25   A.   Uh-huh.

Page 145

1    Q.   You have to say "yes" or "no."
2    A.   Sorry, yes.
3    Q.   Do these -- do the amount of
4  information included in these captions vary --
5    A.   Oh, in Figure --
6    Q.   -- in Figure 1, Figure 2?
7    A.   Yes.  Yes, they do.
8    Q.   Some have more information, some
9  have less information?
10   A.   Right.
11   Q.   But they, nonetheless, provide
12 information about what's going on in the
13 picture?
14   A.   Yes.
15   Q.   And do you recognize any of the
16 people other than Pohlen and Orsillo?  Do you
17 know who they are?
18   A.   In those photos, no, I don't.
19   Q.   Okay.  And the people sitting on the
20 bench in street clothes, are they part of the
21 class?
22   A.   In street clothes?
23   Q.   Yeah, the women sitting on the
24 bench?
25   A.   No.

Page 146

1    Q.   What about the fans?
2    A.   No.
3    Q.   What about the woman who you can see
4 only part of her face and part of her number
5 with the -- it's like she's got a headband?
6        MR. SOWDERS:  Form, foundation.
7    Q.   Can you tell if she's part of the
8 class?
9    A.   I mean, she's wearing a jersey.
10 That means she's playing.
11    Q.   But how do -- how -- how could you
12 figure out who she is, based on looking at this
13 picture?
14    A.   Process of elimination.
15    Q.   Any other way?
16    A.   Look at the roster.
17    Q.   Okay.  How many people are on a --
18 how many people are on a roster of a women's
19 college basketball team?
20    A.   How many women's number starts --
21        MR. SOWDERS:  Form, foundation.
22    A.   -- with the number 2?
23    Q.   I don't know.
24    A.   Exactly.  You just have to look it
25 up.

Page 147

1    Q.   Okay.  All right.  Next page,
2 Figure 3.  Did you -- did you pull this picture
3 from the Printroom website?
4    A.   I didn't personally, no.
5    Q.   Do you know who did?
6    A.   Counsel.
7    Q.   Okay.  And who is -- who is in
8 Figure 3?
9    A.   Randy Culpepper.
10    Q.   And is he a member of your class?
11    A.   Yes.
12    Q.   Okay.  And who are the three players
13 that you can see part of them?
14    A.   Players from Tulsa.
15    Q.   Who are they?
16    A.   I don't know.
17    Q.   Are they part of your class?
18    A.   Yes.
19    Q.   Now, you said before that the --
20 when you said no student athlete consented to
21 the sale of his or her image by defendants,
22 that the people who you knew that fact as -- or
23 that allegation as to where the people who were
24 on your team at --
25    A.   Yeah.

Page 148

1    Q.   -- at --
2    A.   UTEP.
3    Q.   -- at UTEP --
4    A.   Uh-huh.
5    Q.   -- college football.
6       These other people that are part of
7 your class, you don't actually know that fact
8 as to them; right?
9       MR. SOWDERS:  Form.
10    Q.   What you allege in paragraph 33?
11    A.   I guess not.
12    Q.   Okay.  Let's see.  Figure 4 is --
13 you see Figure 4?
14    A.   Yes, sir.
15    Q.   Okay.  And that's another picture
16 with a caption; right?
17    A.   Yes, sir.
18    Q.   And it provides some information
19 about what's happening in the photograph?
20    A.   Yes, sir.
21    Q.   And it says North Carolina's Reggie
22 Bullock blocks a shot by Wake Forest's
23 C.J. Harris; right?
24    A.   Yes.
25    Q.   And then it also says it's an AP

Page 149

1 photo?
2    A.   Yes.
3    Q.   Chuck Burton?
4    A.   Yes.
5    Q.   Did you pull this picture?
6    A.   Counsel.
7    Q.   Okay.  And between Reggie Bullock's
8 legs, is there -- there is a little blue there.
9 Is that another athlete?  Can you tell?
10    A.   Yes, it is.
11    Q.   And who is it?
12    A.   I couldn't tell you.
13    Q.   Is there anyway you could tell me?
14    A.   Look who's playing that game.
15    Q.   Okay.
16       MR. BUCHWEITZ:  How much time do we
17 have?  Take five minutes now and change the
18 tape?
19       MR. SOWDERS:  Sure.
20       MR. BUCHWEITZ:  Okay.
21       MR. SOWDERS:  Whatever you like.
22       VIDEOGRAPHER:  We're off the video
23 record.  The time is 12:58, end of Media
24 Number 3.
25      (Recess, 12:58 to 1:09 p.m.)

Page 158

1  for it, it's the same thing.
2      Q.   Do you know how much -- how much
3  Printroom -- how -- how much revenue Printroom
4  made from the sale of player photographs?
5      A.   I don't remember.
6      Q.   Turning to page 26, paragraph 95 and
7  98, both paragraphs 95 and 98 say:  Plaintiff
8  and class -- "As a result of Defendants'
9  misappropriation of their publicity rights,
10  Plaintiff and class members have been injured."
11      How -- how were you injured?
12      A.   As far as funds go, as far as money
13  goes, I mean, it would have been nice to have
14  all that money in college, if they made any
15  money off of us.
16      Q.   Okay.  If the only sale of any
17  pictures of you were to Jessica Wilson for
18  11.99, how much of that should you have gotten?
19      A.   I don't know, maybe 50/50.
20      Q.   Okay.  So about 6 bucks?
21      A.   That's fine with me.
22      Q.   Any other way you were injured?
23      A.   No.
24      Q.   What about other class members?
25          MR. SOWDERS:  Form.

Page 159

1      Q.   How were they injured?
2      A.   I'm sure the same way.
3      Q.   Any other way other than for --
4  other than for sales actually made?
5      A.   No.
6      Q.   Okay.  Do you have any hurt feelings
7  from your pictures being sold?
8      A.   Hurt feelings?
9      Q.   Uh-huh.
10      A.   I mean, the fact that I couldn't
11  make any money off of it because I signed a
12  contract that said that -- or my scholarship
13  would be taken away or anything else like that,
14  yeah, to know --
15      Q.   But --
16      A.   -- that somebody made money off of
17  me, yeah.
18      Q.   Just the --
19      A.   It doesn't --
20      Q.   -- 6 bucks?
21      A.   It doesn't matter how much money it
22  is.
23      Q.   No, I understand.
24      A.   Okay.
25      Q.   I'm just trying to get -- but

Page 160

1  there's nothing beyond the 6 bucks?
2      A.   No.
3      Q.   Okay.  You mentioned before a Bob
4  Stull.  Is he part of the class?
5      A.   I mean, no.
6      Q.   Do you know whether there are
7  pictures in the -- in the different photo
8  stores that do not include athletes?
9      A.   I don't know.  I'm sure there
10  probably was.  There was coaches in -- in the
11  photo of me.
12      Q.   So any pic- --- right, that's
13  understood.
14      Any picture that didn't have any
15  athletes at all wouldn't be part of the class;
16  right?
17          MR. SOWDERS:  Form.
18      A.   I guess, yes.
19      Q.   Like, for example, if it only had
20  coaches or pictures of the stadium?
21      A.   I guess.
22      Q.   I'm trying.  I'm trying.  I know the
23  doctor is important.  I'm trying.
24      Do you have a -- you mentioned
25  Voice123 before.  Do you have a Voice123

Page 161

1  account?
2      A.   Yeah.
3      Q.   Okay.  Is that part of your online
4  presence?
5      A.   Sure.
6      Q.   Do you have a LinkedIn account?
7      A.   Yes.
8      Q.   Is that part of your online
9  presence?
10      A.   (Witness nods his head.)
11      Q.   Yes?
12      A.   Yes.
13      Q.   Do you have an IMDB account?
14      A.   Yes.
15      Q.   And is that part of your online
16  presence?
17      A.   Yes.
18      Q.   And do you have a Facebook page?
19      A.   Yes.
20      Q.   And is that part of your online
21  presence?
22      A.   Yes.
23      Q.   Do you have an Instagram page?
24      A.   Yes.
25      Q.   And is that part of your online

1 presence?
2     A.   Yes.
3     Q.   And all of those sites that I just
4 went through have photographs; right?
5     A.   Sure.
6     Q.   Of you?
7     A.   Yes.
8     Q.   Okay.  And all of those photographs
9 and all of those social media sites increase
10 your online presence; right?
11     A.   Sure.
12     Q.   Do you have a YouTube account?
13     A.   Yes.
14     Q.   Okay.  And have you posted some
15 videos on YouTube?
16     A.   Yes.
17     Q.   We are going to mark screenshots,
18 and then we're going to show you the videos and
19 ask you some questions about them.
20     A.   Sure.
21     Q.   Okay?
22         MR. BUCHWEITZ:  So we are up to 18.
23 So we're going to be marking -- excuse me,
24 18 and 19.
25         Let's do this one 18.  This one is

1 19.
2         (Exhibit 18 marked.)
3         (Exhibit 19 marked.)
4     Q.   This is 18, and this is 19.
5         Mr. Lightbourne, do you recognize
6 what has been marked as Lightbourne 18?
7     A.   Yes.
8     Q.   What is Lightbourne 18?
9     A.   Beginning of my highlight film.
10     Q.   And when it says -- when it has your
11 name next to the little blue person, what does
12 that mean?  Is that your -- does that mean it's
13 your account?
14     A.   Yes.
15     Q.   Okay.  And on Exhibit 19, what --
16 what is Exhibit 19?
17     A.   Highlight tape from arena football.
18     Q.   Okay.  And is that also from your
19 account?
20     A.   Yes.
21     Q.   And why do you -- why did you post
22 these videos?
23     A.   So that teams could see it, and so
24 that my friends could see it.
25     Q.   Okay.  What teams do you want to see

1 it?
2     A.   Any professional team.
3     Q.   So these could -- you intended --
4 you posted these to -- to hopefully derive some
5 benefit from the publicity from them; right?
6     A.   Sure.
7     Q.   On Exhibit 18, on the top left,
8 there's something that says DVDRipper for Mac.
9         What's DVDRipper?
10     A.   It's -- it was the software that I
11 used to put together the tape.
12     Q.   Okay.  And do you know what this is,
13 what tape -- what the tape is without us
14 showing it to you?
15     A.   Yeah.
16     Q.   Okay.  So we don't even need to show
17 it to you?
18     A.   No.
19     Q.   What does it -- what -- what does
20 the tape depict?
21     A.   A highlight film of games that I
22 played in, in college.
23     Q.   In college.  And did you have --
24 where did you get the college footage?
25     A.   From the UTEP staff.

1     Q.   Okay.  And they gave it to you, they
2 gave you permission to use it on a --
3     A.   Yes.
4     Q.   Okay.  And you didn't have to rip it
5 from something?
6     A.   Well, they gave me a bunch of DVDs;
7 and they sat me down at the Mac and said, Make
8 the photos.  And this was the -- make the
9 highlight tape, and this was the software that
10 I used.
11     Q.   Okay.  Got it.  Thank you.
12         And do you know who's viewed this
13 Lightbourne Exhibit 18?
14     A.   No, I don't.
15     Q.   Okay.  Were other players depicted
16 in the highlight film?
17     A.   Yeah.
18     Q.   And did -- did you get consent from
19 every one of them?
20     A.   No.
21     Q.   Why not?
22     A.   Because it's a highlight film.
23     Q.   Okay.  But they were in a video that
24 you posted on the internet?
25     A.   I mean, I'm sure I'm in somebody

Page 170

```
 1    rights for that music that you played?
 2        A.   No.
 3            MR. SOWDERS:  Form.
 4        Q.   Why not?
 5        A.   Because I'm not making a profit off
 6    of it, I'm not trying to make a profit off of
 7    it.
 8        Q.   Okay.
 9        A.   Not off a highlight film, no.
10        Q.   Okay.  So you can use images, you
11    can use music, you can use footage as long as
12    you're not making a profit?
13            MR. SOWDERS:  Form, foundation.
14        A.   I guess.
15        Q.   Okay.  Do you recall that you drew a
16    circle around yourself in -- in this highlight
17    film?
18        A.   Yes.
19        Q.   And why did you draw that circle?
20        A.   To make sure that you know that the
21    player is me.
22        Q.   This is going to make it humongous.
23    I'm going to ask you one question without
24    marking it, but if you want to me to mark it,
25    I'm happy to do it.
```

Page 171

```
 1            Mr. Lightbourne, do you recall that
 2    in your document production you produced the
 3    two copies of the NCAA Division 1 manual?
 4        A.   I do remember doing that?
 5        Q.   Producing it to your lawyers to turn
 6    over to us?
 7        A.   They probably -- I don't --
 8    personally, I didn't do that, no.
 9        Q.   Okay.  Because the only question I
10    had about it was there is a ton of highlighting
11    within it, and my only question was, was the
12    highlighting yours or was it your counsel's or
13    someone else's?
14        A.   I'm sure it was my counsel.
15        Q.   It wasn't yours?
16        A.   No.
17        Q.   Okay.
18            MR. BUCHWEITZ:  Just for the record,
19    I was looking at Lightbourne 37 through
20    918.
21        Q.   Okay.  You don't have a copy of the
22    NCAA manual that you gave to the lawyers to
23    turn over to us; right?
24        A.   No, I don't.
25        Q.   Okay.  Do you have any plans on how
```

Page 172

```
 1    you would notify class members in this lawsuit
 2    of the class?
 3            MR. SOWDERS:  Form, foundation.
 4        A.   Probably mail.  I don't know.
 5        Q.   Okay.  And how do you -- does Taylor
 6    University have a current mailing address for
 7    you?
 8        A.   I don't know.
 9        Q.   Does UTEP?
10        A.   Yes.
11        Q.   How does UTEP have current
12    information for you?
13        A.   Well, if you ever update your
14    mailing address, the U.S. Postal, you have to,
15    so anytime that you send mail, it's going to go
16    to you.
17        Q.   Right.  But I'm saying you have
18    moved a number of times since you graduated
19    college; correct?
20        A.   Uh-huh.  And all my mail gets to me
21    because I changed mine on the U.S. Postal
22    address.
23        Q.   Okay.  Now, you're talking about
24    mail forwarding?
25        A.   Basically.
```

Page 173

```
 1        Q.   And you're aware that mail
 2    forwarding only lasts for a certain period of
 3    time; right?
 4        A.   Well, not mail forwarding, no.  When
 5    you go online and update your mailing address.
 6        Q.   Oh, you mean within the UTEP?
 7        A.   No, within anything.  Like if I live
 8    someplace else and you -- and whenever you
 9    move, you have to go online and change your
10    mailing address.
11        Q.   Uh-huh.
12        A.   That's exactly what I did.
13        Q.   Okay.  So you think that
14    universities have current mailing addresses for
15    all former student athletes?
16        A.   Yeah, because I still get mail from
17    them, alumni mail.
18        Q.   Okay.  And you let UTEP know every
19    time you move?
20        A.   I don't have to.  The U.S. Postal
21    Service does.
22        Q.   Okay.  And if the Postal Service
23    somehow didn't update the -- the -- you know,
24    the school you went to each time, then they
25    wouldn't have the address; right?
```

Page 174

1    A.   I guess so, but it's not up to the
2  school.  It's up to you, because you control
3  where your mailing address is.
4    Q.   Do all the members of your proposed
5  class update their mailing addresses?
6    A.   I'm sure everybody updates their
7  mailing address because they would like their
8  mail.
9    Q.   Do you think placing advertising on
10 social media sites is a good way to get in
11 touch with me?
12   A.   Placing what?
13   Q.   Just some advertising on some social
14 media sites?
15   A.   Is that a good way to get in touch
16 with people?
17   Q.   Yeah, to contact all the specific
18 members of your class?
19        MR. SOWDERS:  Form, foundation.
20   A.   I don't know.  I mean, placing ads?
21 I mean, no, that's not a good way to get in
22 touch with everybody, by placing an ad, no.
23   Q.   Okay.  Turning back to Exhibit 9 for
24 a couple of minutes.
25   A.   Okay.

Page 175

1    Q.   What do you understand to be your
2  personal obligations under the Exhibit 9?
3    A.   I just understand that I'm the
4  spokesman for the class and that I must speak
5  truthfully about the situation.
6    Q.   Okay.  And you understand that under
7  this proposed -- do you understand that the
8  prior --
9    A.   Exhibit 8.
10   Q.   -- Exhibit 8 was proposed to the
11 Court and then subsequently withdrawn?
12   A.   I guess so.
13   Q.   But are you aware of that, other
14 than what I've told you just now?
15   A.   Well, I know this one I signed
16 first, and then he sent this one to me and I
17 signed this one, so I assume that that one was
18 thrown out and this one was relevant.
19   Q.   Okay.  What do you understand to be
20 the -- the main terms of Exhibit 9?
21        MR. SOWDERS:  Form.
22   A.   For me, just be honest about
23 everything.
24   Q.   Okay.  Is there anything that the
25 class is getting out of Exhibit 9 -- proposed

Page 176

1  to get?
2    A.   Supposed to --
3    Q.   Proposed?
4    A.   Proposed, if anything comes of it,
5  sure.
6    Q.   Okay.  And I'm just going to ask you
7  just about a couple of provisions when you are
8  ready.
9    A.   All right.
10   Q.   Page 5, item 4.
11   A.   Go ahead.
12   Q.   It says, "Lightbourne and the
13 settlement class shall reimburse Brand Affinity
14 for a portion of the legal fees and expenses
15 Brand Affinity has incurred in connection with
16 the Lightbourne action by making payment to
17 Brand Affinity in the amount of $250,000."
18        Were you aware that Brand Affinity
19 was going to be getting -- or is proposed to
20 get under Exhibit 9, $250,000 out of the
21 settlement funds?
22   A.   Yes.  I knew people were getting
23 settlements.  That's all I knew.
24   Q.   Do you know who Brand Affinity is?
25   A.   No, honestly I don't.  I would have

Page 177

1  to --
2    Q.   They're one of the defendants;
3  right?  You've got your complaint right there?
4    A.   Yeah.
5    Q.   Okay.  So do you think it's fair for
6  the class for them to be getting $250,000 out
7  of the settlement funds?
8    A.   Just depends on what part they
9  played in it.
10   Q.   Okay.  What part did they play in
11 it?
12   A.   Honestly, I don't remember at this
13 time.
14   Q.   Just turn to page 16, paragraph 21.
15   A.   Uh-huh.  Yes, sir.
16   Q.   Do you -- do you understand that you
17 agreed in this document, Lightbourne 9, that
18 you on behalf of yourself and the settlement
19 class and your counsel, including settlement
20 counsel, will defend settling defendants, which
21 was Printroom, Photo Store, Professional Photo
22 Store, Brand Affinity, Hudson and Travelers?
23   A.   Yes.
24   Q.   Okay.  And do you understand that
25 you would be responsible under this for legal

Page 178

1  fees in connection with that defense?
2      A.  Yes, I do.
3      Q.  And you're prepared to stand by
4  that?
5      A.  Yes.
6      Q.  Do you think that's fair to the
7  class?
8      A.  Yes.
9      Q.  Do you understand the difference
10  between statutory damages and actual damages?
11          MR. SOWDERS:  Form, foundation.
12      A.  Do I understand the difference?
13  Claimed damages and what actually happened, I
14  guess.
15      Q.  Okay.  What do you understand the
16  difference to be?
17          MR. SOWDERS:  Form, foundation.
18      A.  I mean, actual damages are what
19  actually happened, and statutory are presumably
20  to have happened.
21      Q.  Okay.  Do you know whether some
22  states have -- provide for a statutory minimum,
23  some states provide a statutory maximum, and
24  some states provide that it has to be actually
25  the damages that were incurred?

Page 179

1      A.  I wasn't aware of that at all.
2      Q.  Okay.  Do you know what states your
3  proposed class -- where they come from?
4          MR. SOWDERS:  Form, foundation.
5      A.  No.
6      Q.  Do you believe -- or do you have any
7  understanding as to whether or not members of
8  your class come from many states?
9      A.  I do.  I know they all come from
10  many states.
11      Q.  Okay.  Do you think they come from
12  every state?
13      A.  Possibly.
14      Q.  Okay.  Do you know whether the
15  damages available by each state's law differ?
16          MR. SOWDERS:  Foundation.
17      A.  I'm sure they do.
18      Q.  Okay.  And do you know which --
19  which damages the members of your class will be
20  seeking?
21      A.  No.
22      Q.  Do you understand that in your
23  complaint you have also asked for an
24  injunction?
25      A.  Which --

Page 180

1      Q.  It's Lightbourne 1, page 28 --
2      A.  This is --
3      Q.  Sorry, I know I told you this was
4  one you could put away.
5      A.  No, you're fine.
6      Q.  Item E on page 28, equitable relief.
7  Do you understand that?
8      A.  Yes, I understand that.
9      Q.  Okay.  Are all the members of your
10  class seeking equitable relief?
11      A.  As far as I know.
12      Q.  Okay.  Are they also seeking
13  monetary relief?
14      A.  As far as I know.
15      Q.  Are there any that only want
16  equitable relief?
17          MR. SOWDERS:  Foundation.
18      A.  I don't know.
19      Q.  Are there any that only want
20  monetary relief?
21      A.  I don't know.
22          MR. SOWDERS:  Foundation.
23      Q.  Okay.  Do you know any class members
24  who have suffered emotional distress?
25      A.  I don't know.

Page 181

1      Q.  Do you have a plan for -- if there
2  are damages to -- how to allocate them among
3  the different class members?
4          MR. SOWDERS:  Form and foundation.
5      A.  Try and contact them, I guess,
6  through the schools or not.
7      Q.  Other than the people that called
8  you after they saw the lawsuit was filed, is
9  there anyone you know who has indicated to you
10  that they wanted to be a member of the class?
11      A.  No, nobody else has said anything.
12      Q.  Are you aware that we've -- CBS has
13  served document requests on you through your
14  counsel?
15      A.  Yes.
16      Q.  Okay.  And have you reviewed them
17  with your counsel and produced any documents
18  that would be responsive to them?
19      A.  I've reviewed them, and no,
20  everything -- you have everything.
21      Q.  Okay.  Are you aware that under the
22  California right of publicity statute which you
23  have sued under, that if my clients win this
24  case, you may be responsible for my legal fees?
25      A.  Yes.

Page 194

1    consent when you played football --
2        A.   Well, when you --
3        Q.   -- for UTEP that permitted --
4        A.   When the consents was --
5        Q.   -- them from using your photographs
6    and likeness any way that they wanted; correct?
7        A.   When the consent form was signed, it
8    was more so you cannot sell your own likeness.
9    It was not -- it wasn't like we --
10       Q.   But that's not what the consent
11   says; correct?
12       A.   I don't --
13       Q.   This is your interpretation of what
14   it means; is that right?
15       A.   No, this is what was told to me.
16           MR. SOWDERS:  Hold up.  There is no
17   question.  Why don't you let him finish the
18   answer to your question before you start
19   talking over him.
20       Q.   Do you need me to repeat the
21   question?
22       A.   Sure.  Go ahead.
23       Q.   Okay.  The consent that you signed
24   has no limitations on it with respect to UTEP's
25   use of your photograph, image, or likeness;

Page 195

1    correct?
2        A.   Correct.
3        Q.   There are no -- there are no words
4    that limit its use; correct?
5        A.   Correct.
6        Q.   At any point in time, did you ever
7    communicate to anyone at UTEP that you had a
8    problem with your photographs being identified
9    for sale on the website?
10       A.   No.
11       Q.   You never asked anyone at UTEP to
12   discontinue using your photographs?
13       A.   No, I haven't.
14       Q.   When you saw the poster of yourself
15   in the UTEP locker room, that was a pretty
16   proud moment, wasn't it?
17       A.   Yes.
18       Q.   So you didn't suffer any emotional
19   distress as a result of UTEP's use of that
20   photograph; correct?
21       A.   It was put in the locker room.  Why
22   would I suffer any kind of distress?  It was
23   for me and my teammates to see and any fans
24   that wanted to see it, not purchase.
25       Q.   And it was a proud moment; right?

Page 196

1        A.   Well, it wasn't purchased, so it
2    doesn't, and actually I was given that photo at
3    the end of the --
4        Q.   I'm not asking if it was purchased.
5        A.   -- season.
6        Q.   I said it was a proud moment when
7    you saw the use of your photograph in UTEP's
8    locker room; right?
9        A.   Yes.
10       Q.   Okay.  And were you not equally
11   proud to know that your pictures were for sale
12   on UTEP's official athletic website?
13       A.   No.
14       Q.   You weren't?
15       A.   No.  Like I said, I didn't get those
16   photos from the UTEP official website.  It was
17   on Printroom.
18       Q.   Okay.  But you have -- have you
19   given a copy of this alleged separate
20   Printroom.com website to your lawyers?
21       A.   No.
22       Q.   Now, the exhibit that's in front of
23   you, the one that's attached to the complaint
24   that your attorneys prepared on your behalf
25   initiating this class action, the top of that

Page 197

1    indicates that this is the UTEP official Miners
2    photo store; correct?
3            MR. SOWDERS:  Foundation.
4        A.   From what I can see, yes.
5        Q.   Okay.  Now, at any point in time
6    when you were reading and authorizing the
7    filing of this class action lawsuit, and you
8    saw the allegations wherein your lawyer alleged
9    that your photographs were available and for
10   sale on the official CBS affiliated UTEP Miners
11   photo store, did you ever tell your lawyer,
12   hey, that's not correct, I think this is a
13   separate website?
14       A.   I don't recall.
15       Q.   Earlier you indicated that you
16   couldn't remember how many times that you had
17   actually been to the Printroom.com website.  Do
18   you recall saying that?
19       A.   No, I don't remember.
20       Q.   Do you remember whether it was more
21   than once?
22       A.   I mean, no, I don't remember if
23   there was more than one, but I mean, like I
24   said, I just typed in my name.  After that --
25       Q.   Do you know how many photos you have

# EXHIBIT 3

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3  YAHCHAAROAH LIGHTBOURNE, on    )
   behalf of himself and all     )
4  others similarly situated,    )
                                 )
5       Plaintiff,               )
                                 )
6  v.                            )   No.SACV13-00876-JLS(RNBx)
                                 )
7  PRINTROOM, INC., PROFESSIONAL )
   PHOTO STOREFRONTS, INC., BRAND)
8  AFFINITY TECHNOLOGIES, INC.   )
   and CBS INTERACTIVE, INC.,    )
9                                )
        Defendants.              )

10

11       *********************************************

12            ORAL AND VIDEOTAPED DEPOSITION OF

13                 ROBERT WILLIAM STULL

14                   APRIL 16, 2015

15       *********************************************

16

17          The Oral and Videotaped Deposition of ROBERT

18  WILLIAM STULL, taken at the request of the Plaintiff, at

19  1:06 p.m., Thursday, April 16, 2015, at 420 E. San

20  Antonio, 2nd Floor, El Paso, Texas, before Ruth Aguilar, a

21  Certified Shorthand Reporter of the State of Texas (State

22  Certificate #7450).

23

24

25

6

1 that's -- that's about it, I think, that I talked to just
2 to find out, you know -- familiar who that was and then I
3 did recall -- recall who he was.  He didn't play very much
4 so the only time I really recall probably -- maybe I
5 shouldn't say this, but was after he was done, he was
6 arrested for cocaine possession or something along those
7 lines and then he did -- he did come to graduation with
8 his mother, I believe.  We have a graduation breakfast --
9    Q.   Uh-huh.
10   A.   -- and I think -- I think he was there which kind
11 of surprised me because I didn't know what his status was
12 at the time.
13   Q.   Do you recall anything else about that
14 conversation with the head coach?
15   A.   No, just the fact that he -- well, he -- he was a
16 walk-on originally and -- and he -- they were short of
17 some defensive linemen and he ended up playing a little
18 bit.  And so what he does a lot of times -- and we try do
19 for seniors -- if they -- if they are contributors and
20 they're -- and they're helping the team, a lot of times
21 they'll ask you -- they'll give them a scholarship so I'm
22 not sure if he gave it to him his junior year or senior
23 year, but he awarded him a scholarship because he was
24 getting a little bit of playing time.  I -- oh, I did ask
25 Jeff -- Jeff Darby to pull out some stats on him because I

7

1 couldn't remember him and he -- and basically he had eight
2 tackles as a junior and four as a senior.  But that was
3 the only two people.
4    Q.   Who's Jeff Darby?
5    A.   Jeff Darby is senior associate for communi- --
6 communications ex sports information director.
7    Q.   Okay.  And I know we started a little late so I
8 don't need a lot of detail, but I want to get a quick
9 education history.  It's my understanding you went to
10 Kansas State?
11   A.   Uh-huh.
12   Q.   And your major was?
13   A.   It was education.
14   Q.   Okay.  And you graduated?
15   A.   Yeah, and I got my master's, too.
16   Q.   Okay.  And what was your master's in?
17   A.   Sin- -- master's of science.
18   Q.   Okay.  And what was your first significant job
19 after graduating from Kansas State?
20   A.   My first full-time job was at high school at
21 Dubuque High School for one year.  And then I came back to
22 Kansas State and was a graduate assistant for two years.
23 And then my first full-time coaching job was at
24 Kansas State University.
25   Q.   What was your title?

8

1    A.   I was assistant offensive line coach,
2 offensive -- recruiting coordinator.  And on that team was
3 Nick Saban of the -- Alabama and Gary Pinkel from Missouri
4 and Jack Lambert with the Steelers and --
5    Q.   And what were your duties and responsibilities as
6 a recruiting coordinator?
7    A.   At that time -- most people have recruiting
8 coordinators now, but I just send out materials.  I was in
9 charge of tickets on game day.  And then, of course, we
10 all had recruiting areas so it was kind of a management
11 thing.  And we -- nobody was organized like they are
12 today.  They don't have staffs to do the --
13   Q.   Uh-huh.
14   A.   -- and, you know, the -- we -- everybody had
15 different noncoaching assignments and so I got -- it was
16 my first full-time job and so I got a lot of
17 go-do-it-stuff.
18   Q.   Did -- as the recruiting coordinator, did you
19 familiarize yourself with the NCAA rules and regulations?
20   A.   Every coach has to do that.  They all take a test
21 every year.
22   Q.   Okay.  But in addition to your coaching
23 responsibilities, did you also familiarize yourself with
24 the NCAA rules and regulations as a recruiting
25 coordinator?

9

1    A.   Yeah, but they're all the same.  When -- when we
2 have a test -- like coaches will be tested each year to be
3 certified to recruit.
4    Q.   Who certifies the coach?
5    A.   The compliance coordinator.  They -- they test
6 them and that's -- that's recorded and then their score --
7 I can't remember exactly what the percentages to be, you
8 know, basically 90 percent, I believe, and then -- to be
9 certified so they get tested every year before they go
10 out, every year so --
11   Q.   Is it a written test, an oral test, what type of
12 test -- test is it?
13   A.   It's written -- now, I think it's probably online
14 now I would suspect.
15   Q.   When was the last time you took that test?
16   A.   That I took the test?
17   Q.   Yeah.
18   A.   I've taken sample tests when -- we -- we have
19 compliance education sessions.
20   Q.   Uh-huh.
21   A.   All during the year, our compliance coordinator
22 schedules education sessions and they'll do sample tests
23 along the way and I've probably taken one at some point
24 but --
25   Q.   You take one at some point every year or

Stull, Robert W.   04-16-2015

34

1  I'm going to mark this as Exhibit 2- --
2              MR. BUCHWEITZ:  Let's -- let's do Stull 1.
3  I'd rather do it that way.
4              MR. ARAGON:  I'd rather not do it that way
5  because then we're going to have -- we're going to have --
6  I'd rather have them sequentially numbered for exhibits at
7  trial.
8              MR. BUCHWEITZ:  I don't want to go there.
9  We can do it for now.  It's going to be --
10             MR. ARAGON:  Okay.  Let's talk about that
11 later.  Yeah.
12     Q.   (BY MR. ARAGON)  Mr. Stull, I'm handing you a
13 document that's been marked as Exhibit 22.  Can you review
14 that document, please.
15             (Exhibit 22 marked.)
16             MR. BUCHWEITZ:  Do you have copies?
17             MR. ARAGON:  Yeah.
18     Q.   (BY MR. ARAGON)  Do you recognize that document?
19     A.   Uh-huh.
20     Q.   And what is it?
21     A.   It's a image authorization form that we do with
22 all student athletes.
23     Q.   When did UT- -- UTEP start using the student
24 athlete image authorization form?
25     A.   As far as I know, we've always done it.

35

1      Q.   Since at least 1998 when you came to the school?
2      A.   Uh-huh.
3      Q.   Okay.  And -- and do you know why this document
4  was implemented?
5      A.   Yeah, so that -- that when we talk to a student
6  athlete, we want them aware that we would -- we'd be using
7  their -- we would like to use their -- their pictures and
8  photographs for promotions, Website and for their own --
9  for their own good also.  I mean every one of the student
10 athletes loves to see themselves on the paper and pictures
11 and their family buys pictures and -- or wants pictures
12 so --
13     Q.   And do you know who created this document?
14     A.   No, we've just -- I don't know who created it.
15     Q.   Sure.
16     A.   I'm sure we copied off somebody else's form a
17 long time ago.
18     Q.   And to the -- and to the best of your knowledge,
19 has this changed since 2000 and -- well, since 1998?
20     A.   Not to my knowledge.
21     Q.   Okay.  Do you know how this is presented to the
22 student athletes?
23     A.   Yes.
24     Q.   How?
25     A.   Compliance director goes to every team when they

36

1  come in, when they first come in so the football team
2  is -- first comes in like -- and he will have a meeting.
3  Every one of the coaches wants to get all the paperwork
4  out initially so they'll have a meeting with the
5  compliance director who has about 15 forms to be signed
6  and the coach will turn the meeting over to the compliance
7  person and he'll go one form after the other and that's
8  the way this one is presented as one of the forms
9  they've --
10     Q.   Does he explain what the form is and what the
11 form does?
12     A.   Yes.
13     Q.   And what -- what does he explain with respect to
14 this particular form?
15     A.   I don't really listen to him other than the fact
16 he explains that this is a form that allows us to -- to
17 use your photograph in the Website and pictures.  And
18 he'll always say, "Read it carefully.  Any questions let
19 me know."  Then he goes to the next one.  There's never
20 really been a question that I know of.  And, again, now,
21 let me say, I'm never at those meetings.
22     Q.   And -- and the person presenting this would that
23 be Mr. Kooger?
24     A.   Right.  Currently Kooger, yeah.
25     Q.   Kooger.  Okay.

37

1      A.   The only time I come to a meeting if the football
2  team arrives and they're having their first meeting, I'll
3  probably be up there to say hello to the coaches and the
4  players when they walk in.  But once they start all these
5  paperwork stuff, I usually go to a different team and say
6  hello.
7      Q.   Okay.  And you said there's about 15 other forms
8  that are -- that are handed over to the student athletes
9  in addition to this form.  Do you know what those forms
10 are?
11     A.   I know some of them.  I can give you examples.
12     Q.   Yeah, can you -- can you, please.
13     A.   There's only two that -- that are really
14 important.  One is the drug testing consent form and the
15 other one is an NCAA form that basically asks you or to --
16 to say that you have not violated any NCAA rules or
17 regulations.
18     Q.   Uh-huh.
19     A.   You know, accepting gifts, et cetera.  Those are
20 the two main forms that they need to sign or they can't
21 participate, those two.
22     Q.   Do you know what that document's called?
23     A.   I -- I don't know.  I'd have to -- I'd have to
24 ask.  It's -- I can't remember.
25     Q.   Are you familiar with the -- with the -- the

Stull, Robert W.   04-16-2015

42

```
1    Q.   Okay.
2    A.   And -- and, again, our form may not look
3  exactly -- it'll say the same thing.  It may not have the
4  logos on it --
5    Q.   Sure.
6    A.   -- but that's -- you know --
7    Q.   But you do recognize that as the UTEP logo on the
8  upper left-hand corner?
9    A.   Yes.
10   Q.   Okay.  Okay.  I want to actually ask a couple
11 questions about the actual language of the form.  It
12 says -- at least this particular form says:  I,
13 Yahchaaroah Lightbourne Stuart, hereby auth --
14      MR. BUCHWEITZ:  Yahchaaroah.
15   Q.   (BY MR. ARAGON) -- hereby authorize the
16 University of Texas at El Paso or its agents to make --
17 makes copies of use, sell and distribute directly or
18 through a third party any photographic or other images
19 taken in connection with my participation on a UTEP
20 interle- -- -collegiate athletic team.  Right?
21   A.   Correct.
22   Q.   And when -- the word "agents" here.  Who -- who
23 are the agents of UTEP -- that -- that -- in this
24 agreement?  Who's being referenced?
25   A.   Well, again, what we have done since 2006 is we
```

43

```
1  outsourced all of our media rights to -- it was ISP
2  originally, now it's IMG.  And they have -- they had the
3  right to all of our media stuff.  And I think at one point
4  there was -- I think a photo print company or something
5  that, I guess, they could sell them or they could buy the
6  pictures so I guess that -- that would apply to that.
7    Q.   Is that Replay Photos, do you know?
8    A.   I don't know.
9    Q.   Okay.
10   A.   We didn't sell many.  The demand at UTEP is not
11 real huge right now so --
12   Q.   Okay.  So an agent right now IMG.  Is -- is agent
13 as referenced in this agreement is that -- is that -- did
14 that include PrintRoom at any point in time?
15   A.   Yes.
16   Q.   Okay.  Did that also include CBSI?
17   A.   Yes, CBS runs the Website.
18   Q.   Okay.
19   A.   And IMG selects -- works with us.
20   Q.   What does IMG do?  I'm sorry.
21   A.   IMG is involved with selecting what the Website
22 is that we would structure it with so -- and the media
23 rights and then we provide the content.
24   Q.   UTEP provides the content for the Website?
25   A.   Yeah, they have structure.  We -- on a daily
```

44

```
1  basis, you know, we'll -- today the tennis team went to
2  the Conference USA, that would report that on a daily
3  basis so --
4    Q.   And -- and you're referring to the UTEP
5  athletic's Website?
6    A.   Uh-huh.
7    Q.   Okay.  Who -- who provided content for the
8  PrintRoom Website, do you know?
9    A.   No.
10   Q.   Do you know if UTEP ever provided any content for
11 the PrintRoom Website?
12   A.   I don't know.  I -- you'd have to ask -- have to
13 ask Darby how that works.
14   Q.   Can a student athlete refuse to sign this
15 document and still play intercollegiate athletics at UTEP?
16   A.   Yep.  Yes, they can.
17   Q.   Are you aware of any student athlete not signing
18 this agreement?
19   A.   No.  Most student athletes would like -- like
20 their pictures taken.  They like being on the front page
21 specifically, if they could.
22   Q.   Do you think you need this release to have a
23 student athlete appear on the front page of a -- of a
24 newspaper?
25   A.   No.
```

45

```
1    Q.   Who is ISP Sports?
2    A.   That was -- that was the original media rights
3  provider that then sold to IMG.
4    Q.   And what did -- what did ISP do with respect to
5  UTEP?
6    A.   Well, they had -- again, they have all -- they
7  had all of our media rights and so that allows them to
8  sell, you know, all the signage, all the advertising for
9  radio, advertising for television.  The programs, the
10 radio spots, all the different media sales --
11   Q.   Uh-huh.
12   A.   -- points, they were in charge of.
13   Q.   And when you -- and -- and that's now IMG is
14 taken custody.
15   A.   IMG is now a different company now.  I can't
16 think of the name of it.  They just sold recently to
17 somebody else.
18   Q.   And what's the name of that company?
19   A.   I'd -- I'd have to look it up.
20   Q.   Between 2011 and 2014, IMG held those rights?
21   A.   Right, uh-huh.
22   Q.   And when you say all media rights were given to
23 this company to utilize, does that include the name, image
24 and likeness of student athletes?
25   A.   Well, they -- yeah, they have the capabilities I
```

Stull, Robert W.   04-16-2015

62

```
 1              MR. BUCHWEITZ:  25?
 2              MR. ARAGON:  I'm sorry.  25.
 3              MR. BUCHWEITZ:  Exhibit 25.
 4      Q.   (BY MR. ARAGON)  You haven't visited the
 5  PrintRoom.com Website, but let's assume this is the
 6  PrintRoom.com Website.
 7              MR. BUCHWEITZ:  Objection to the form.
 8      Q.   (BY MR. ARAGON)  On the right-hand side, there
 9  are -- there's -- there's a column that says:  Featured
10  products.
11              Correct?
12      A.   Uh-huh.
13      Q.   Okay.  And one of those featured products is a
14  2013 calendar, 11 by 14, about halfway down, that's priced
15  at $30.  Do you see that?
16      A.   Uh-huh.
17      Q.   Assuming this is Mr. Lightbourne, would
18  Mr. Lightbourne be able to profit from the sale of the
19  2013 calendar, without jeopardizing his NCAA eligibility,
20  if one was sold on this Website?
21      A.   How would he profit?  He's not selling it.
22      Q.   Well, let's say he was.  Let's say he was selling
23  it.
24      A.   He's not able to sell it.
25      Q.   Okay.  So he can't -- he can't sell this without
```

63

```
 1  jeopardizing his NCAA eligibility.
 2              MR. BUCHWEITZ:  Objection to the form.
 3      Q.   (BY MR. ARAGON)  He couldn't sell a 2013 calendar
 4  without --
 5      A.   Himself, no.
 6      Q.   Okay.
 7      A.   And profit, no.
 8      Q.   Nor could his agent.
 9      A.   They can't have an agent.
10      Q.   Well, UTEP's his agent.  Right?  I mean in some
11  respects?
12      A.   Define an agent.  You know, I mean --
13      Q.   Well, let me ask you this.  Can UTEP sell the
14  calendar, make a profit without jeopardizing --
15      A.   Yes.
16      Q.   -- Mr. Yahchaaroah's --
17      A.   Yes.
18      Q.   -- eligibility?
19              How so?
20      A.   We're able to.
21      Q.   Could you sell a calendar -- could you sell a
22  mouse pad and make a profit without jeopardizing
23  Mr. Yahchaaroah's --
24      A.   With his image, no.
25      Q.   Yeah.  So could you sell a calendar --
```

64

```
 1      A.   I don't even think we -- we don't even sell
 2  calendars.  We don't sell calendars, we don't sell
 3  posters.  We hand them out so they're promotional.
 4      Q.   Okay.  And I'm fine with that.  I'm saying if a
 5  third party, let's just say PrintRoom.com, sold a
 6  calendar, sold a mug, sold a mouse pad, you agree that
 7  that cannot be sold without jeopardizing
 8  Mr. Yahchaaroah's -- I'm sorry. -- Mr. Lightbourne's
 9  eligibility?
10              MR. BUCHWEITZ:  Objection to the form.
11      A.   I'm not sure.  I mean -- I'm not sure on that
12  definition.
13      Q.   (BY MR. ARAGON)  Well --
14      A.   I'm kind of confused where you're going with it.
15      Q.   Okay.  Well, then let me ask you --
16      A.   We've moved away from it so --
17      Q.   Let me ask you a more specific question.  UTEP
18  has a contract with IMG.  Correct?
19      A.   Correct.
20      Q.   IMG has a contract with CBSI.  Correct?
21      A.   Correct.
22      Q.   CBSI has a contract with PrintRoom.com to sell
23  certain products on its Website.  Right?  You're aware of
24  that.  Correct?
25      A.   Correct.
```

65

```
 1      Q.   Yeah.  And some of those products are na- --
 2  products containing the name and image of student
 3  athletes.  Correct?
 4      A.   Correct.
 5      Q.   Okay.  Can they sell those without jeopardizing
 6  Mr. Yahchaaroah's -- Mr. Lightbourne's eligibility?
 7              MR. BUCHWEITZ:  Objection to the form.
 8      A.   Yes.
 9      Q.   (BY MR. ARAGON)  Why -- why is that?
10      A.   Because they have allowed us -- they've --
11  they've given us rights to -- for their image.
12      Q.   And so they -- you can sell commercial products,
13  PrintRoom --
14      A.   Not -- not products.  The only thing -- the only
15  thing I'm aware of, period, is the photographs here with
16  the PrintRoom.
17      Q.   What if those photographs are on a product,
18  though?  What if -- a coffee mug is not -- it's a product.
19  Right?
20              MR. BUCHWEITZ:  Objection.
21      Q.   (BY MR. ARAGON) -- if you put a photograph on a
22  product --
23      A.   I've never seen it.
24      Q.   But if it existed, is that okay?
25              MR. BUCHWEITZ:  Objection.
```

Stull, Robert W.   04-16-2015

74

1   **A.   Correct.**

2   Q.   People pay for that.  Right?

3   **A.   Correct.**

4   Q.   And in your term at UTEP, they paid for more for

5   it than before.  Right?

6   **A.   Correct.**

7   Q.   And that's because it's -- the product is more

8   valuable.  Right?

9   **A.   Correct.**

10  Q.   Same for the radio.  Right?

11  **A.   Correct.**

12  Q.   Okay.  And there are photographs at -- at -- at

13  UTEP athletic events.  Right?

14  **A.   Correct.**

15  Q.   Games, practices, events?

16  **A.   Yep.  You have -- you have both people that are**

17  **hired and plus media.**

18  Q.   Okay.  And the hired people, there are people

19  that are hired by UTEP?

20  **A.   The -- the photographers are.**

21  Q.   The athletic --

22  **A.   And then the media, of course.**

23  Q.   Yeah.  And are there -- why do you hire

24  photographers?

25  **A.   So that we can get action photos the -- of our**

75

1   **student athletes that we -- again, we put on our Website**

2   **and trying to chronicle games and people.**

3   Q.   Okay.

4   **A.   For their -- for their own promotions basically.**

5   Q.   Yep.  And -- and are there also photos taken of

6   practices?

7   **A.   Yes.**

8   Q.   And of other athletic events?

9   **A.   Every one.**

10  Q.   Okay.  And do you have any idea how many pictures

11  a year are taken at UTEP athletic events?

12  **A.   Thousands.  Thousands.**

13  Q.   How about pictures of you?

14  **A.   Not quite as attractive.  Not as many.**

15  Q.   But do you think --

16  **A.   I'm thrown in there once in a while, yeah.**

17  **Usually when something's happening so -- you don't want to**

18  **be on but -- you know.**

19  Q.   Do you ever object to your picture being taken

20  and -- taken at an athletic event?

21  **A.   No.**

22  Q.   Okay.  Now, one of the thing -- oh, there it

23  is -- within the -- the rights that you granted -- that

24  UTEP granted to -- within the multimedia rights, IMG --

25  UTEP granted IMG the ability to sell video footage.

76

1   Right?

2   **A.   Right.**

3   Q.   And radio footage?

4   **A.   Right.**

5   Q.   And also pictures?

6   **A.   Correct.**

7   Q.   All right.  And for the benefit of UTEP?

8   **A.   Right.**

9   Q.   And UTEP got a portion of the revenue that IMG

10  generated.  Right?

11  **A.   Correct.**

12  Q.   Yeah.  And you trusted IMG to make contracts with

13  different vendors in order to make sure that UTEP's image

14  was promoted properly.  Right?

15  **A.   Correct.**

16  Q.   And you made a lot of money.  Right?  Or --

17  **A.   Correct.**

18  Q.   -- made money.

19  **A.   Made -- not as much as some but, yeah, we --**

20  Q.   Made some money?

21  **A.   Yes, we made some money.**

22  Q.   More money than you made before the IMG contract?

23  **A.   Correct.**

24  Q.   And -- and they made that money because they were

25  selling athletic events.

77

1   **A.   For -- yes, correct.**

2   Q.   Uh-huh.  And for all those years, you were doing

3   that and it was perfectly permissible.  Right?

4   **A.   Correct.**

5   Q.   Do you -- talked a little bit about Jeff Darby

6   today, the sports information director.

7   **A.   Uh-huh.**

8   Q.   One of the things you said that he -- he -- he

9   ensures that things don't violate NCAA rules.  Right?  The

10  Website stuff.  Is that right?

11  **A.   Yes.**

12  Q.   Okay.  And you trust Jeff Darby?

13  **A.   Yeah, he's been there for 15 years.**

14  Q.   He knows what he's doing.  Right?

15  **A.   Yeah, he works with ESPN, everybody.  Yeah,**

16  **uh-huh.**

17  Q.   And if Jeff Darby was pro- -- was -- was given a

18  mock-up of the official photo store that would be linked

19  to the UTEP athletics Website and was asked, "Is this

20  okay," would you trust him to say it's okay if he approved

21  it?

22          MR. ARAGON:  Form.

23  **A.   Yes.**

24  Q.   (BY MR. BUCHWEITZ)  Okay.  Do you know if that

25  happened?

Stull, Robert W.   04-16-2015

78

1     A.   I would -- I don't know.

2     Q.   Okay.

3     A.   I would, but I don't know.

4          MR. BUCHWEITZ:  Okay.  Just give him this

5 one, PS1.  You have to mark it.  You have your stickers?

6          MR. ARAGON:  Stickers I got.

7          MR. BUCHWEITZ:  I'll take those.  You start

8 marking after this.  It'll be my last marking.  27.

9          (Exhibit 27 marked.)

10    Q.   (BY MR. BUCHWEITZ)  Mr. Stull, do you see

11 Exhibit 27?

12    A.   Uh-huh.

13    Q.   Okay.  Mr. Stull, is Exhibit 27 an e-mail

14 exchange between Jeff Darby and some other people?

15    A.   Uh-huh.

16    Q.   Okay.  Do you recognize some of them as being

17 people from IMG?  Tara Puckett and Bea Lich?

18    A.   Bridget Burke -- Tara Puckett.  I don't -- I do

19 not know who she is.

20    Q.   Okay.

21    A.   I know Bridget Burke, I met her, yes.

22    Q.   Who's Bridget Burke?

23    A.   She -- well, she was with IMG, I believe, at the

24 time.  We've had some transition so --

25    Q.   Yeah.  Was she at one time at CBS Interactive?

79

1     A.   I can't tell you.

2     Q.   Okay.  If you look at the e-mail from

3 Bridget Burke August 7, 2012, do you see that it's --

4 they're talking about launching the new photo store:

5 Here's a mock for your review,

6 www.UTEPSchoolPhotos.printroom.com.  Please take a look.

7          Do you have an understanding that the UTEP

8 school photos.printroom.com is the same Website that

9 Mr. Aragon showed you from Exhibit 25?

10    A.   Yes.

11    Q.   Okay.

12    A.   Well, I couldn't verify it because I've never

13 turned to -- to the Web -- that Website myself so --

14    Q.   But that seems right to you.  Right?

15    A.   Yes.

16    Q.   Okay.  And Mr. Darby responded:  Looks good to

17 me?

18    A.   Uh-huh.

19    Q.   And Mr. Darby wouldn't have said, "Looks good to

20 me," if it didn't look good to him.  Right?  You trust him

21 to do that?

22    A.   Correct.

23    Q.   Okay.  Now, the -- Mr. Aragon showed you

24 Exhibit 26 which you have in front of you.  If you would

25 flip to -- do you see that little numbers on the bottom,

80

1 CBSI and then some numbers.  If you look to the -- flip to

2 the page that says 34653.

3     A.   -53, yeah.

4     Q.   See 3465- -- do you see that -- that Exhibit 26

5 is actually a draft document of some kind, unexecuted

6 version.  Do you see that?

7     A.   The bottom of this sheet?

8     Q.   Yeah.  There's no signatures on -- on --

9     A.   Correct.

10    Q.   -- page 653.  Right?

11    A.   Correct.

12    Q.   Okay.  Do you know whether there was one or more

13 executed contracts between CBS and IMG --

14    A.   No.

15    Q.   -- on behalf of UTEP?

16    A.   I do not know.

17    Q.   Okay.  Do you know whether UTEP -- withdrawn.

18         Who's Brian Wickstrom?

19    A.   Brian Wickstrom was the -- actually the senior

20 associate -- senior associate at that time.  He was

21 where -- who Chris Park is now.

22    Q.   Okay.

23    A.   Brian Wickstrom is now the athletic director at

24 University Louisiana Monroe.

25    Q.   Okay.  And in 2007 -- excuse me -- in 2007, Brian

81

1 Wickstrom was the senior associate athletics director for

2 external relations for UTEP.  Right?

3     A.   Correct.

4     Q.   And what would that -- what would that mean his

5 job was?

6     A.   He would be overseeing and looking at everything

7 that has to do with our external relations which includes

8 marking -- marketing, development, promotions and TV

9 contracts, et cetera, uh-huh.

10         MR. BUCHWEITZ:  Okay.  Yeah, we get this

11 one.  I'm just going to mark an exhibit quickly.  We're up

12 to --

13         MR. ARAGON:  28.

14         MR. BUCHWEITZ:  -- 28.  Put it on the

15 bottom, please.  Thank you.

16         Leonard.

17         MR. ARAGON:  Thank you.

18         (Exhibit 28 marked.)

19    Q.   (BY MR. BUCHWEITZ)  Mr. Stull, I'm sure that

20 Exhibit 28 may be as unfamiliar to you as Exhibit 26 was,

21 but if you would turn to the very last page of the

22 document, CBS 35012.

23    A.   Uh-huh.

24    Q.   Do you see that?

25         What do you see page on 35012?

Stull, Robert W.   04-16-2015

82

1    A.    I see it's a -- it's a confirmation of ISP media

2    rights.

3        Q.    And -- am I correct that this is signed by

4    Brian Wickstrom.  Right?

5        A.    Correct.

6        Q.    Okay.  And Brian Wickstrom tells Mr. Kendall from

7    CSTV Networks, which I'll represent to you was an entity

8    within the CBS family as of 2007, and he says:  This

9    letter confirms ISP is the exclusive multimedia rights

10   holder for UTEP.  As such ISP Sports has the right to

11   enter into a new four-year agreement with CSTV Online,

12   Inc., for Web hosting and related media services in

13   connection with UTEP's official department of athletics

14   Website.

15       A.    Okay.

16       Q.    Does this -- does this document refresh your

17   recollection or give you any information about whether or

18   not UTEP and specifically Brian Wickstrom approved

19   Exhibit 28, the contract between ISP and -- and CSTV

20   Online?

21       A.    I -- I would suspect that -- I would suspect that

22   he reviewed that.

23       Q.    Okay.  And --

24       A.    And would -- it would -- and if he had an issue

25   with it, I -- I would suspect he would say something, yes.

83

1        Q.    And if you would just --

2        A.    That I'm sure.

3        Q.    -- do -- do you know -- I know you said that

4    there weren't a lot of sales -- and I can tell you that's

5    right -- but do you know how much of any photo that was

6    sold on the -- one of the Websites, on the photo store,

7    the official UTEP photo store, how much of that ISP got on

8    behalf of UTEP versus --

9        A.    I have no idea.

10       Q.    -- CBS?

11       A.    I have no idea.

12       Q.    Okay.  Can you just turn very briefly to page

13   35002.  It's the third page of the document.

14       A.    Okay.

15       Q.    And you see little k on the bottom photographic

16   image, reproduction and sale?

17       A.    Okay.

18       Q.    And it says that 90 percent would go to ISP and

19   10 percent to CSTVO.

20       A.    Correct.

21       Q.    Do you have any reason to believe that it's not

22   accurate that 90 percent of the CBS share would go back to

23   UTEP and CBS would keep only ten percent of any sales?  Or

24   go back to ISP on behalf of UTEP to go through your --

25       A.    Yeah.

84

1        Q.    -- generate -- revenue generation share.

2        A.    Yeah.

3        Q.    Yes?

4        A.    I have no reason not to think that, no.

5        Q.    And if you look at page 35008, you see how -- you

6    see that -- you see 35008 Exhibit B to Exhibit 28, you see

7    that's a Website photographic service and indemnity

8    agreement?

9        A.    Uh-huh.

10       Q.    Does this look to you like a separate agreement

11   just for a photo store that became part of the online

12   official athletic Website deal memorandum?

13       A.    Yes.

14       Q.    Okay.  And so there was a three-page additional

15   agreement just about having the photo store and the sales

16   of a photo store.  Right?

17             And Mr. Wickstrom approved this contract,

18   Exhibit 28?

19       A.    Uh-huh.

20       Q.    You have to say yes.  I'm sorry.

21       A.    Yes.  Yes.  I'm sorry.

22       Q.    Okay.  And he did that because it was something

23   that you were allowed to do.  Right?

24       A.    Correct.

25       Q.    Just a couple more.

85

1             MR. BUCHWEITZ:  Give him these two.  Five

2    and 6.1.

3        Q.    (BY MR. BUCHWEITZ)  This is Exhibit 29 and

4    Exhibit 30.

5             (Exhibits 29 and 30 marked.)

6        Q.    (BY MR. BUCHWEITZ)  Do you recognize Exhibit 29?

7        A.    Yep.

8        Q.    Okay.  What's Exhibit 29?

9        A.    It's the -- it's an agreement with the IMG and

10   CBS's for the Website structure.

11       Q.    Okay.  And this is from 2013, so it's a later

12   agreement?

13       A.    Uh-huh.

14       Q.    Is that right?

15       A.    Correct.

16       Q.    Okay.  And if you look at page 217 of the

17   document, you see the first bullet -- the first bullet on

18   the top says:  CBS shall have the right to implement other

19   online stores specifically DVDs, publications, photos

20   consistent with the parties' practice in the current

21   2012-2013 contract year and is otherwise agreed upon by

22   the parties i.e. confirmation via electronic mail shall be

23   sufficient with net of vendor revenue splits to be

24   90 percent to IMG, ten percent to CBS?

25       A.    Right.

Stull, Robert W.   04-16-2015

86

1   Q.   (Reading)  And CBS acknowledges that IMG's rights
2   vary from university to university with respect to IMG's
3   rights to provide such products for sale via Websites.
4           Right?  You saw that?
5   A.   Yep.
6   Q.   And -- and on page 220 you see they have a list
7   of the schools that are covered by this agreement?
8   A.   Yep.  Yes.
9   Q.   You see that UTEP is one of those schools.
10  Right?
11  A.   Yes.
12  Q.   Okay.  And so UTEP -- so there was -- authority
13  was given to have a photo store consistent with the
14  practice of the 2012-2013 contract year.  Right?
15  A.   Correct.
16  Q.   And Exhibit 27 showed that Jeff Darby approved,
17  in August 2012, the photo store that's described in that
18  document.  Right?
19  A.   Correct.
20          MR. ARAGON:  Form.
21  Q.   (BY MR. BUCHWEITZ)  And if you look at Exhibit 30,
22  this is a document that doesn't have a Bates number
23  because it was produced by IMG, but do you see it's an
24  e-mail from Jeff Darby to some folks at IMG approving the
25  IMG/CBS agreement?

87

1   A.   Uh-huh.
2   Q.   Okay.  So Jeff Darby again, someone you trust.
3   Right?
4   A.   Correct.
5   Q.   And he approved the IMG/CBS agreement?
6   A.   Correct.
7   Q.   And that was within his responsibilities and job
8   at UTEP to make sure that --
9   A.   That is his job.
10  Q.   That is his job.
11          You mentioned before that there were 15
12  forms that were signed -- and I'm sorry if I'm jumping
13  around -- you mentioned before that there were 15 forms
14  that were signed approximately --
15  A.   Approximately, yeah.
16  Q.   -- when they were together.
17          And you said that, you know, some of them
18  they had their signature, but other things they needed to
19  actually provide some information.  Right?
20  A.   Correct.
21  Q.   It's like they had to tell them if they had a
22  car, where they lived.  Right?
23  A.   Yes.
24  Q.   So you couldn't just blindly go through and sign
25  every form.  Right?

88

1   A.   Correct, no.  There's a whole packet of them,
2   yes.
3   Q.   And did anyone from UTEP ever say, "Don't read
4   these forms, just sign it so you get out and back to
5   practice"?
6   A.   No.
7           MR. ARAGON:  Foundation.
8   Q.   (BY MR. BUCHWEITZ)  Did anyone say -- did anyone
9   ever say, "Don't read the forms"?
10          MR. ARAGON:  Foundation.
11  A.   No.  Opposite.  They usually say, "This is the
12  form, read it.  This is what it's about.  Any questions?
13  If not, sign it."
14  Q.   (BY MR. BUCHWEITZ)  And do you know if
15  Mr. Yahchaaroah Lightbourne ever objected to signing the
16  student athlete image authorization forms?
17  A.   No.
18  Q.   Did he ever -- do you know if he ever asked any
19  questions about it?
20  A.   No.
21  Q.   Do you know if any athlete ever objected to
22  signing the student athlete image authorization form to
23  your knowledge?
24  A.   Never.
25  Q.   And --

89

1   A.   To my knowledge, no.
2   Q.   -- and did anyone ever, to your knowledge, object
3   to signing the student athlete image authorization form?
4   A.   No.
5   Q.   Okay.  And were the forms always signed in -- on
6   campus in Texas?
7   A.   Yes.
8   Q.   Okay.  And they're always signed after the
9   students are already enrolled in -- in school?
10  A.   Yes.
11  Q.   Okay.  When you did -- when you got some
12  background information about Mr. Lightbourne, I think you
13  mentioned that he did come to graduation.  Did he, in
14  fact, graduate?
15  A.   I believe so.
16  Q.   Okay.  Do you know if he graduated with honors?
17  A.   I don't -- I don't know.
18  Q.   Okay.  Looking at Exhibit 22 for a second.  The
19  form says that Mr. Lightbourne Stuart -- I'm sorry.  Do
20  you have it?
21  A.   They're all the same, I think.
22  Q.   You can -- yeah, just let me know which one
23  you're looking at and then we'll do that one.
24  A.   Yeah, that's fine.
25  Q.   Okay.  -- Authorized UTEP or its agents, which

Stull, Robert W.   04-16-2015

90

1 include both CBS and PrintRoom, to make copies of, use,

2 sell and distribute directly or through a third party any

3 photographic or other image taken in connection with my

4 participation on a UTEP intercollegiate athletic team.

5     **A.   Correct.**

6     Q.   Right?

7        So that meant that UTEP was allowed to sell

8 photographs of athletes participating in anything having

9 to do with the team.  Right?

10     **A.   Correct.**

11     Q.   A game?

12     **A.   Yes.**

13     Q.   A practice?

14     **A.   Practice.**

15     Q.   Other events.  Right?

16     **A.   Correct.**

17     Q.   And a couple of times you talked about

18 commercial, commercial purpose, things like that.  When

19 you say commercial purpose, you mean like -- like a car

20 dealership.  Right?

21     **A.   Correct.**

22     Q.   And you don't mean like someone's grandma buying

23 a picture of them from -- from the volleyball game.

24 Right?

25     **A.   No.**

91

1     Q.   And would you agree -- would you -- would you --

2 withdrawn.

3        Do you know how many pictures were sold

4 through the print -- the PrintRoom UTEP photo store that

5 was linked up to the CBS managed UTEP athletic Website?

6     **A.   I have no idea.  It wasn't a lot.**

7     Q.   If I told you it was 79 pictures in year and a

8 half, would that surprise you?

9     **A.   It surprises me.  More than I thought.  But, you**

10 **know, not --**

11     Q.   Do you know who --

12     **A.   It could be very --**

13     Q.   I'm sorry.

14     **A.   You know, it could be.**

15     Q.   Do you know who the number one purchaser of

16 pictures in the UTEP athletic Website was?

17     **A.   It's family members, I would imagine.**

18     Q.   You ever hear of a guy named Randy Massey?

19     **A.   Yeah.**

20     Q.   Who's Randy Massey?

21     **A.   Randy Massey's a car dealer.**

22     Q.   Okay.  And does he have a daughter --

23     **A.   He was.  They sold their dealerships.**

24        Huh?

25     Q.   -- does he have daughter named Amber?

92

1     **A.   Yes.**

2     Q.   And did Amber play on the volleyball team?

3     **A.   Yes.**

4     Q.   What did --

5     **A.   He probably bought 78 of them.**

6     Q.   He -- he was the number one purchaser.  He bought

7 at least 17 pictures of his daughter playing volleyball in

8 games.

9     **A.   It's too bad she quit after her freshman year**

10 **for -- because she had a boyfriend --**

11     Q.   Oh.

12     **A.   -- but he was having fun at the time so --**

13     Q.   Well, so that means she only played one season

14 and he managed to buy 17 pictures of her.

15     **A.   Uh-huh.**

16     Q.   You think that Randy Massey was -- was -- was

17 buying them and selling them on the free market?

18     **A.   No.**

19     Q.   He was buying them for himself.  Right?

20     **A.   Correct.**

21     Q.   And for his family.

22     **A.   Yeah.**

23     Q.   And for his daughter?

24     **A.   He was having a great time, yeah.**

25     Q.   Okay.  Do you know him?  Are you friends with

93

1 him?

2     **A.   Yeah.**

3     Q.   Okay.

4     **A.   Yeah.  He -- they sold their dealership a couple**

5 **years ago.  Actually, I'm -- I'm more friends with his**

6 **father who was the original car dealer there so --**

7     Q.   So Amber's grandpa?

8     **A.   Yeah.**

9     Q.   Okay.

10     **A.   He was always at the games, too, so that's**

11 **probably getting half of the shots right there.**

12     Q.   Okay.  And -- and you agree, wouldn't you, that

13 it's a benefit for Amber and for other athletes for their

14 parents to be able to buy professional-grade photographs

15 of them playing university athletics.  Right?

16     **A.   Yes.**

17     Q.   You ever hear of -- you ever see any of the

18 pictures that Randy bought?

19     **A.   No.**

20     Q.   Now, you ever hear of someone named Stacy

21 Babcock?

22     **A.   Stacy Babcock?  That's probably a soccer mom,**

23 **yeah.**

24     Q.   Jade Babcock?

25     **A.   Yeah.**

Stull, Robert W.   04-16-2015

94

1    Q.   So who's Jade Babcock?

2    A.   She was a soccer player.  I think she finished a

3  year ago?

4    Q.   Okay.

5    A.   Yeah.  I think she might be -- I don't know if

6  she's from Canada.  Half of them are from Canada.  I'm not

7  sure where she's from but --

8    Q.   And it's -- you think Stacy's her mom?

9    A.   I would suspect, yes.

10   Q.   Okay.  And if she -- would it surprise you to

11 know that Stacy Babcock was the number two consumer of

12 UTEP athletic photos buying pictures of her daughter

13 playing soccer?

14   A.   I guess.

15   Q.   But you would agree --

16   A.   I wouldn't have brought her name up, but I

17 don't -- you know.  Who knows?  Parents.

18   Q.   Do you know Stacy Babcock?

19   A.   Uh-huh.

20   Q.   Okay.

21   A.   I don't know Stacy, no.  I know --

22   Q.   You know Jade?

23   A.   I know Jade, yeah.

24   Q.   You think -- do you think it was a benefit for

25 Jade to have her mom be able to buy photographs of her

95

1  in -- by professional photographers buying her playing

2  university --

3    A.   A benefit?

4    Q.   -- university athletics?

5         MR. ARAGON:  Form.

6    A.   A benefit?

7         No, not a benefit.  It's just -- I'm sure --

8    Q.   (BY MR. BUCHWEITZ)  It's something positive for --

9    A.   -- well, I'm sure it's hanging in her basement

10 right now, I'm sure.

11   Q.   And why is it hanging in her basement?

12   A.   Because she's celebrating her efforts, yeah.

13   Q.   She's proud of it.  Right?

14   A.   Yeah.  Right.

15   Q.   Now, in general athletes like Amber -- before she

16 had the boyfriend -- and Jade Babcock and others were

17 excited to have their pictures taken.  Right?

18   A.   Correct.

19   Q.   And some of them were excited to have -- to buy

20 the pictures and get a professional looking picture of

21 themselves.  Right?

22        MR. ARAGON:  Foundation, form.

23   A.   Right.

24   Q.   (BY MR. BUCHWEITZ)  And their parents as well.

25 Right?

96

1    A.   Correct.

2         MR. ARAGON:  Same objection to the last

3  question.

4    Q.   (BY MR. BUCHWEITZ)  Do you know a na- -- guy named

5  Ivan Pierre Aguirre?  You ever hear of him?

6    A.   No.

7    Q.   Okay.  How about Michael Ruiz (phonetic)?

8    A.   No.

9    Q.   Okay.  If I suggested to you that they were

10 photographers for UTEP, would that refresh your

11 recollection at all?

12   A.   What's the first ones na- -- what --

13   Q.   Ivan Pierre Aguirre and Michael Ruiz?

14   A.   I can't tell you.

15   Q.   Okay.  But there are photographers --

16   A.   Yes.

17   Q.   -- who are around at every game and practice and

18 taking pictures?

19   A.   Yeah.

20   Q.   Okay.  And who owns -- who owns -- are you

21 familiar with -- with the concept of copyright generally?

22 I'm not asking you to you be a lawyer.

23   A.   Generally, yes, I guess.

24   Q.   And if someone takes a picture, is that -- who

25 owns the picture?

97

1         MR. ARAGON:  Form, foundation.

2    A.   The person.

3    Q.   (BY MR. BUCHWEITZ)  The person who takes it.

4  Right?

5    A.   Right.  Right.

6    Q.   So if -- if I take a picture right now of those

7  people walking down there and I think it's artistic and

8  someone else does too and they want to buy it from me, do

9  they need to say it's okay?

10        MR. ARAGON:  Form, foundation.

11   A.   No.

12   Q.   (BY MR. BUCHWEITZ)  Because it's my picture and

13 I'm allowed to take it.  Right?

14   A.   Correct.

15   Q.   And this coun- -- and in this country we don't

16 have to only take pictures of trees.  Right?

17   A.   You can see pictures everyday on the news, the

18 people who don't want the pictures on the news, videos of

19 them, yeah.

20   Q.   And not just that, but people are allowed to sell

21 those pictures, too.  That's one of the -- the things

22 that, you know, the copyright act allows in this country.

23   A.   Correct.

24        MR. ARAGON:  Form, foundation.

25   Q.   (BY MR. BUCHWEITZ)  It's their -- in fact, it's

Stull, Robert W.   04-16-2015

98

1 their exclusive right to sell.  Right?
2    A.    To my knowledge.
3         MR. ARAGON:  Same -- same objection.
4    Q.    (BY MR. BUCHWEITZ)  Now, when Randy bought those
5 pictures of Amber, do you think Amber objected to Randy
6 buying those pictures?
7    A.    No.
8    Q.    She was okay with it.  Right?
9    A.    Sure.
10   Q.    Same with Jade, right, Babcock?
11   A.    Sure.
12   Q.    They were okay with their --
13   A.    Yes.
14   Q.    -- parents buying pictures of them.
15        Okay.  We talked just briefly about UTEP
16 providing content for the -- it's the official university
17 athletic Website, utepathletics.com.
18   A.    Uh-huh.
19   Q.    Does that include -- I know we're not talking
20 about the link to the PrintRoom store, but just the
21 photographs within the UTEP athletic Website, were
22 photographs included when you were describing content,
23 like photos of games.
24   A.    Yes.
25   Q.    Okay.  And those photographs came from who?

99

1    A.    Usually from the people we hire.
2    Q.    The photographers who UTEP hires to cover the
3 games?
4    A.    Right.  Right.
5    Q.    Okay.
6    A.    Sometimes -- sometimes they come from the
7 press --
8    Q.    Uh-huh.
9    A.    -- just, you know --
10   Q.    Like AP?
11   A.    Yeah, AP feed.
12   Q.    Just looking briefly at Exhibit 25, which you had
13 in your pile, you said that the number -- it could be a
14 few numbers because it's hard to tell exactly what number
15 it is.
16   A.    What are we looking at?
17   Q.    On -- on the -- the football player on
18 Exhibit 25?
19   A.    Oh, the picture?
20   Q.    Yeah.  Which numbers could that be?
21   A.    Well, the only thing it says -- as soon as I can
22 find it here -- it could be a three or a 97.
23   Q.    Yeah.  Maybe an 82.  Right?
24   A.    Or an eight, yes, uh-huh.
25   Q.    Okay.  And in the list of items on the right, the

100

1 featured products, do you see anywhere in that list a mug?
2    A.    No.
3    Q.    Do you see anywhere in that list a mouse pad?
4    A.    No.
5    Q.    Do you see anywhere on that list a magnet?
6    A.    No.
7    Q.    Do you see anywhere in that list a poster?
8    A.    No.
9    Q.    Okay.  Does UTEP keep a database of all of the
10 addresses of all of its former student athletes that ever
11 played, ever?
12   A.    No.
13   Q.    Okay.
14   A.    I would say ever.  When I came back in 1998, they
15 didn't have half of the people.  You know, they didn't
16 have a very good database at all.
17   Q.    And so it's -- and whose job is it or the onus is
18 on who to update -- withdrawn.
19        For the school to have accurate records of
20 its former athletes' addresses, the actual student athlete
21 would have to update the school, right, every time they
22 move?
23   A.    Correct.
24   Q.    And in your experience that doesn't always
25 happen.  Right?

101

1    A.    Correct.
2    Q.    Doesn't happen a lot.  Right?
3    A.    A lot of the times they're not thinking of us,
4 that's correct --
5    Q.    Okay.
6    A.    -- when they move.
7         MR. BUCHWEITZ:  All right.  Let's --
8 let's -- video's almost up, let's take a break and then
9 I'll --
10        THE WITNESS:  Okay.
11        MR. BUCHWEITZ:  -- hopefully get through the
12 rest of it pretty quickly.
13        THE VIDEOGRAPHER:  This is the end of DVD
14 number 2.  We're off the record at 3:14.
15        (A break taken.)
16        THE VIDEOGRAPHER:  Back on the record with
17 DVD number 3 at 3:30 p.m.
18   Q.    (BY MR. BUCHWEITZ)  Mr. Stull, you've been
19 involved in college athletics for over 40 years.  Right?
20   A.    Correct.
21   Q.    And in all that time, have you ever seen a
22 student athlete object to their picture being taken during
23 a game?
24   A.    No.
25   Q.    You would agree, wouldn't you, that college

110

1 second page CBS Lightbourne 91386 is an individual number
2 for that picture and the thing on the cover is the
3 metadata that goes along with that picture.  And it says:
4 Description, Mike Price and Bob Stull.  Photo by Ivan
5 Pierra Aguirre.
6              And if you look is that, in fact, you and
7 Mike Price?
8    A.   Uh-huh.
9    Q.   And do you remember this picture being taken?
10   A.   No, but it could have been after any win or it
11 might have been at the end of the sea- -- when he was
12 done.  I'm not sure.  I --
13   Q.   Yeah.  Does this refresh you at all about who
14 Ivan Pierre Aguirre is?
15   A.   Yeah, I think know who that is, yeah.
16   Q.   Yeah.  He's a photographer for UTEP?
17   A.   I believe so.  I -- I can't verify that though,
18 I'm --
19   Q.   Okay.  All right.  And you didn't object to this
20 picture being taken.  Right?
21   A.   No.
22   Q.   Okay.  And you don't want to sue CBS for this
23 picture being up on a Website.  Right?
24   A.   No.
25   Q.   How many pictures of Mr. Lightbourne were sold,

111

1 if you know?
2    A.   I have no clue.
3    Q.   Okay.  Would it surprise you to hear that there
4 was one?
5    A.   That surprises me.
6    Q.   Okay.
7    A.   Quite frankly.  Just for one reason, he was -- he
8 didn't play very much so maybe his family, whatever.
9    Q.   Do you ever hear of a -- of a woman named
10 Jessica Wilson?
11   A.   No.
12   Q.   Mr. Lightbourne told me on Tuesday that
13 Jessica Wilson was his girlfriend.
14   A.   Okay.
15   Q.   You see this picture on the second page.  Just
16 looking at this picture with a naked eye, how many of
17 these people can you identify?
18   A.   Zero.
19              (Exhibit 33 marked.)
20   Q.   (BY MR. BUCHWEITZ)  Okay.  And what do you --
21 what do you understand this picture to be of, if anything?
22   A.   It's a picture of defensive players that have
23 tackled somebody and celebrating.  I would say that.
24   Q.   And did Mr. Lightbourne ever tell you or anyone
25 else that you know of at UTEP that he objected to

112

1 Jessica Wilson, his girlfriend, buying his picture?
2    A.   No.
3    Q.   Does UTEP give athletic scholarships?
4    A.   Yes.
5    Q.   Why?
6    A.   It's allowable under NCAA rules and regulations
7 and that's how we recruit student athletes.
8    Q.   Okay.  And do you think that scholarships are --
9 factor into student athletes' decisions to come and play
10 at UTEP?
11   A.   Yes.
12   Q.   And do you think that a Division 1 athletic
13 experience is a valuable one for a student athlete?
14   A.   Yes.
15   Q.   Why?
16   A.   Well, just being on a team or the experience?
17   Q.   The whole thing.
18   A.   Well, you know, the rules and regulations
19 NCAAwise, they're required to pass a minimum of 24 hour to
20 recredit every semester just to stay eligible so number
21 one, it keeps you on track if you want to play, number
22 one.  But also being part of the team, ti- -- game
23 management, ability to work out, go to class, go to study
24 hall, go to meetings, travel and still maintain a
25 reasonable grade point average or a high grade point

113

1 average of which our student athletes we have over 50
2 percent over 3.0, is -- is -- is a talent because it
3 teaches them time management and the ability to high -- to
4 manage multiple tasks, manage your time and also just
5 exposure usually, in lot of cases, helps a student athlete
6 get a job in the future.
7    Q.   For a lot of the athletes, is their college
8 experience the most prominent they'll ever be in their
9 lives?
10              MR. ARAGON:  Form.
11   A.   Definitely, I think.
12   Q.   (BY MR. BUCHWEITZ)  And -- and that kind of
13 visibility, as you said, could help parlay them into
14 different types of careers.  Right?
15   A.   It could help, yes.
16   Q.   And --
17   A.   It's definitely a positive, but in a resume
18 provided the other part of the resume fits.
19   Q.   Yeah.  And they rely on -- and some athletes may
20 rely on leadership and til- -- team-building skills that
21 they learned as a college athlete throughout their lives.
22 Right?
23   A.   Exactly, uh-huh.
24   Q.   And in exchange for all these benefits provided
25 by the school, the school has, among other things, the

# EXHIBIT 4

| | |
|---|---|
| **From:** | Nich DeCapio [anthony.decapio@cbsinteractive.com] |
| **Sent:** | Tuesday, April 30, 2013 8:07:45 PM |
| **To:** | Ernest A Larossa |
| **CC:** | hopkinssports@cbs.com |
| **Subject:** | Re: Photos |

Yeah you'll only be able to look at the past 108 if they all have the exact same description - Normally for this I would recommend adding to the photo gallery as the way to get the photos into the database, kill 2 birds with one stone - if you can put them all in a zip file and use an FTP client to upload the photos to here:

host: ftp.nettior.com
user: jhop-ftp
pass: Blu3j@ys

Drop the file (or even dump all the photos into) the editorial folder and we'll get the gallery created post-haste.

NICH DECAPIO

Manager, Digital Media Services
CBS Interactive — Sports
T 760.481.3617    F 760.481.3617    F 760.481.3601
Suite 205 2035 Corte Del Nogal, Carlsbad CA 92011
Follow Us: @CBSCN | Like us on Facebook



CBSSports.com | CBSSports.com College Network | MaxPreps.com

On 30 April 2013 12:43, Ernest A Larossa <elarossa@jhu.edu> wrote:
> Quick question ... I loaded more than 200 photos from our student athlete banquet into netitor today.  Going to try and make a photo gallery and only the last set appears in the photo search.  Is there a way to expand the number of photos visible for a specific event (they were tagged to our Student Athlete Banquet, which is in the events listing for Blue Jays Unlimited).
>
> Probably never added this many before for any one event, but it looks like it's capped at just over 100 that are accessible (all are tagged "Senior Athlete Banquet (2013)" in the photo description.
>
> Thanks-
> Ernie
>
> Ernie Larossa
> Associate AD/Director of Athletic Communications
> Johns Hopkins University
> 410/516-0552
> elarossa@jhu.edu

CONFIDENTIAL

CBSI021158

# EXHIBIT 5

# FILED UNDER SEAL

# EXHIBIT 6

**From:**      Ernest A Larossa [elarossa@jhu.edu]
**Sent:**      Friday, September 07, 2012 5:57:32 PM
**To:**        Nich DeCapio
**CC:**        hopkinssports@cbs.com
**Subject:**   JHU Items

Couple quick questions for you guys - nothing earth-shattering ...

1 - The career stats option for our bio pages ... football rolled over and is
working, but none of our other sports are (men's and women's soccer, field hockey,
volleyball) - they are still only displaying stats through last year.  I don't think
we did anything different for football than the other sports ... is there something
on your end that needs to be rolled over for 2012-13?

2 - Attaching stories/photo galleries/video to bios - Nich filled me in on this last
year and I know it was being worked on.  Pretty much all other CBS sites have this
working now.  Is there something specific we need to do to make this happen?

3 - Photos for Sale - I know the photos can be purchased in the photo store and the
photo galleries.  Will they no longer be marked with an option to buy when placed in
a story?

Thanks and have a great weekend-
Ernie

Ernie Larossa
Associate AD/Director of Athletic Communications
Johns Hopkins University
410/516-0552
elarossa@jhu.edu

CBSI017249

# EXHIBIT 7

1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3        **SOUTHERN DIVISION AT SANTA ANA**

4    **HONORABLE JOSEPHINE L. STATON, JUDGE PRESIDING**

5                                        **CERTIFIED TRANSCRIPT**

6    YAHCHAAROAH LIGHTBOURNE,              )
     ON BEHALF OF HIMSELF AND ALL         )
7    OTHERS SIMILARLY SITUATED,           )
                                          )
8              PLAINTIFFS,                )
                                          )
9              VS.                        ) SACV NO. 13-00876-JLS
                                          )
10   PRINTROOM, INC., PROFESSIONAL        )
     PHOTO STOREFRONTS, INC., BRAND       )
11   AFFINITY TECHNOLOGIES, INC. AND      )
     CBS INTERACTIVE, INC.,               )
12                                        )
               DEFENDANTS.                )
13   _____)

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 SANTA ANA, CALIFORNIA

17               FRIDAY, DECEMBER 5, 2014

18                    2:30 P.M.

19

20

21           **DEBORAH D. PARKER, CSR 10342**
                **OFFICIAL COURT REPORTER**
22            **UNITED STATES DISTRICT COURT**
                 **411 WEST FOURTH STREET**
23                  **SUITE 1-053**
             **SANTA ANA, CALIFORNIA 92701**
24                  **(657) 229-4305**
             **TRANSCRIPTS@DDPARKER.COM**

25

*DEBORAH D. PARKER, U.S. COURT REPORTER*

9

1    PEOPLE IN THE PHOTOGRAPHS.  AND WE ALREADY HAVE THOSE

2    NUMBERS.  SO THE DAMAGES HEARING WOULD SIMPLY BE HOW MANY

3    PEOPLE HAVE THEIR IMAGES OR LIKENESSES USED IN THE

4    PHOTOGRAPH TIMES THE 750 STATUTORY NUMBER.

5            THE COURT:  DO I HAVE TO LOOK AT WHICH OF THOSE

6    INDIVIDUALS CONSENTED?

7            MR. CAREY:  NO.

8            THE COURT:  WHY NOT?

9            MR. CAREY:  BECAUSE AS WE STATE IN OUR BRIEF, THAT

10   WOULD EVENTUALLY BE AN ISSUE IN THE SUBSEQUENT CASE WHERE

11   THEY COULD RAISE IT; BUT IF YOU JUST CAN'T FIGURE OUT WHAT

12   THE DAMAGES ARISING OUT OF BAT'S PUBLICATION OF THOSE

13   PHOTOGRAPHS, YOU DON'T HAVE TO GET INTO THOSE TYPES OF

14   DEFENSES UNTIL AFTER THE DAMAGE UNDER THE STATUTE IS

15   DETERMINED AND THE CLASS IS CERTIFIED.

16           THE COURT:  ALL RIGHT.  AND LET ME ASK ABOUT YOUR

17   PLAINTIFF, YOUR NAMED PLAINTIFF --

18           MR. CAREY:  YES.

19           THE COURT:  -- CONSENT ISSUES AS TO HIM.  I

20   THOUGHT YOU WERE GOING TO HAVE, PERHAPS, ANOTHER NAMED

21   PLAINTIFF BY NOW.

22           MR. CAREY:  WELL, YOUR HONOR, WE WERE PLANNING ON

23   SUPPLEMENTING THIS FOR THE FINAL FAIRNESS HEARING.  BUT WE

24   HAVE DOCUMENTS FROM UTEP AND HAVE HAD CONVERSATIONS WITH

25   UTEP'S PEOPLE, AND THEY'RE GOING TO GIVE US A DECLARATION

```
 1   WORKS, IF THE OTHER ISSUES ARISE AS WELL.  AND I DO WANT --
 2   I DIDN'T WANT TO IGNORE THE CHOICE OF LAW ISSUE.  I DIDN'T
 3   ASK YOU ANY QUESTIONS ABOUT IT, BUT THAT IS A CONCERN THAT
 4   THE COURT HAS.  AND SO, IF YOU WOULD LIKE TO ADDRESS THAT, I
 5   WILL GIVE YOU THAT OPPORTUNITY AS WELL.
 6           MR. CAREY:  WELL, I THINK THAT -- IT'S GOING TO BE
 7   ONE OF THE TWO WAYS, YOUR HONOR.  EITHER THERE'S GOING TO BE
 8   ENOUGH CONTACT WITH THE STATE OF CALIFORNIA TO ALLOW
 9   CALIFORNIA TO APPLY ITS LAW EXTRATERRITORIALLY, OR YOU'RE
10   GOING TO GO MULTISTATE WITH STATE BY STATE.  MR. YAHCHAAROAH
11   LIGHTBOURNE DOESN'T LIVE IN WYOMING.
12           THE COURT:  DON'T WE HAVE TO LOOK AT THE INTERESTS
13   IN EACH STATE IN DECIDING THAT?  ISN'T THAT ONE OF THE
14   FACTORS IN APPLYING THEIR LAW?
15           AND SO, IF WE HAVE INDIVIDUALS WHO PLAYED IN
16   ANOTHER STATE, LIVED IN ANOTHER STATE AND THE ONLY
17   CONNECTION HERE IS THAT THE IMAGES WERE UPLOADED OR
18   SOMETHING TO THAT EFFECT, ISN'T THAT AN ANALYSIS THAT I
19   WOULD NEED TO GO THROUGH?
20           MR. CAREY:  IT IS, AND THAT'S WHAT WE WOULD BE
21   DOING AT THE FINAL FAIRNESS HEARING BEFORE YOU DID FINAL
22   CERTIFICATION OF THE CLASS.  WE WOULD PRESENT TO YOU OUR
23   PROPOSED EITHER NATIONWIDE CERTIFICATION OR MULTISTATE
24   CERTIFICATION.
25           THE COURT:  WHY DO I NEED TO WAIT UNTIL THE FINAL
```

# EXHIBIT 8



Search FBSchedules.com

HOME    NCAA SCHEDULES    NFL SCHEDULES    FAN SHOP    TICKETS    MORE

UTEP Miners
Team Home • NCAA • C-USA

Save 10-30% on award miles
Hurry, this offer ends on April 20, 2015

AdChoices
MileUp
UNITED

Buy now >

**RECENT HEADLINES**

Georgia State to Play at Alabama in 2020, Auburn in 2021

2015 NFL Preseason Schedule Announced

Houston, Rice Schedule 2017-18 Football Series

San Diego State adds San Diego to 2015 Football Schedule

**Season:** 2010 ▾

2010 UTEP Miners Football Schedule
Final Record: 6-7, 2-5 (C-USA)

| Date | | Opponent | Result | Tickets |
|------|--|----------|--------|---------|
| Saturday Sept. 4 | | **Arkansas-Pine Bluff Golden Lions** Sun Bowl Stadium, El Paso, TX | **Won 31-10** | --- |
| Friday Sept. 10 | | **at Houston Cougars** Robertson Stadium, Houston, TX | **Lost 54-24** | --- |
| Saturday Sept. 18 | | **New Mexico State Aggies** Sun Bowl Stadium, El Paso, TX | **Won 42-10** | --- |
| Saturday Sept. 25 | | **Memphis Tigers** Sun Bowl Stadium, El Paso, TX | **Won 16-13** | --- |
| Saturday Oct. 2 | | **at New Mexico Lobos** University Stadium, Albuquerque, NM | **Won 38-20** | --- |
| Saturday Oct. 9 | | **Rice Owls** Sun Bowl Stadium, El Paso, TX | **Won 44-24** | --- |
| Saturday Oct. 16 | | **at UAB Blazers** Legion Field, Birmingham, AL | **Lost 21-6** | --- |
| Saturday Oct. 23 | | **Tulane Green Wave** Sun Bowl Stadium, El Paso, TX | **Lost 34-24** | --- |
| Saturday Oct. 30 | | **at Marshall Thundering Herd** Joan C. Edwards Stadium, Huntington, WV | **Lost 16-12** | --- |
| Saturday Nov. 6 | | **SMU Mustangs** Sun Bowl Stadium, El Paso, TX | **Won 28-14** | --- |
| Saturday Nov. 13 | | **at Arkansas Razorbacks** D.W.R. Razorback Stadium, Fayetteville, AR | **Lost 58-21** | --- |
| Saturday Nov. 20 | | **at Tulsa Golden Hurricane** H.A. Chapman Stadium, Tulsa, OK | **Lost 31-28** | --- |
| Saturday Nov. 27 | --- | **Open Date** | --- | --- |
| **2010 New Mexico Bowl** | | | | |



TRAINING GREAT DOGS FOR A GREAT CAUSE
See how these dogs #sharethecare

Watch Now >



EXHIBIT 10
WIT: Lightbown
DATE: 4-14-15
S. Klinger, RMR-CRR



| Saturday Dec. 18 | BYU Cougars University Stadium, Albuquerque, NM | --- |

**UTEP Miners Headlines**

Army, UTEP Schedule 2016-17 Football Series
Arkansas, Oklahoma add UTEP to Future Football Schedules
2014 Conference USA Football Schedule Announced
Kansas State adds UTEP to 2014 Football Schedule, Could Host Auburn on Thursday Night
Toughest 2013 C-USA Non-Conference Football Schedules
Report: UTEP, Arizona to play 2017-18 Home-and-home Football Series
2013 Conference USA Football Schedules announced
UTEP Miners to play at Texas A&M Aggies in 2013
Texas Tech to host Texas State in 2013, face UTEP Home-and-home in 2014-15
UTEP Miners announce 2012 Football Schedule
C-USA, MWC to dissolve and form new Conference
Oklahoma may open 2012 football season at UTEP
Ole Miss Rebels make changes to Future Football Schedules
UTEP Miners release 2011 Football Schedule
UTEP to open 2011 season against Stony Brook
Colorado State & UTEP Schedule Home-and-home Football Series
USF adds UTEP and FAMU to Future Non-Conference Football Schedules
Wisconsin adds UTEP to 2012 Football Schedule
UTEP at Texas Football Game Moved to 2016 Season
2010 UTEP Miners Football Schedule Posted
Texas Longhorns announce Future Football Games against BYU and UTEP
2009 UTEP Miners Football Schedule Posted

**Find us on Facebook**


**FBSchedules.com**

36,895 people like FBSchedules.com.



Facebook social plugin

**Tweets**                                    Follow


**FBSchedules.com**                         37m
@FBSchedules
PM RT: Houston and Rice
Schedule 2017-18 Home-and-
Home Football Series -
fbschedules.com/2015/04/hous
Expand

**FBSchedules.com**                         43m
@FBSchedules
ICYMI: 2015 #NFL preseason
schedule has been announced
-
fbschedules.com/2015/04/2015
Expand


**BamaOnline** @BamaOnline247  3h  ▾

Tweet to @FBSchedules

College Football    NFL Football



© 2015 FBSchedules.com™ - College Football Schedules and Pro Football Schedules
Partner of USATODAY College Sports

# EXHIBIT 9



Search FBSchedules.com

HOME    NCAA SCHEDULES    NFL SCHEDULES    FAN SHOP    TICKETS    MORE

WINE COUNTRY CELEBRATION

THE CARNEROS INN
A PLUMPJACK RESORT

Includes a $100 dining credit and more

LEARN MORE

| UTEP Miners | | | |
|---|---|---|---|
| Team Home » NCAA » C-USA | 37 | 2 | |

**RECENT HEADLINES**

Georgia State to Play at Alabama in 2020, Auburn in 2021

2015 NFL Preseason Schedule Announced

Houston, Rice Schedule 2017-18 Football Series

San Diego State adds San Diego to 2015 Football Schedule

Season: 2011 ▾

**2011 UTEP Miners Football Schedule**
Final Record: 5-7, 2-6 (C-USA)

| Date | | Opponent | Time/TV | Tickets |
|---|---|---|---|---|
| Saturday Sept. 3 | | **Stony Brook Sea Wolves** Sun Bowl Stadium, El Paso, TX | **Won 31-24** | --- |
| Saturday Sept. 10 | | **at SMU Mustangs** Gerald J. Ford Stadium, Dallas, TX | **Lost 28-17** | --- |
| Saturday Sept. 17 | | **at New Mexico State Aggies** Aggie Memorial Stadium, Las Cruces, NM | **Won 16-10** | --- |
| Saturday Sept. 24 | | **at USF Bulls** Raymond James Stadium, Tampa, FL | **Lost 52-24** | --- |
| Thursday Sept. 29 | | **Houston Cougars** Sun Bowl Stadium, El Paso, TX | **Lost 49-42** | --- |
| Saturday Oct. 8 | --- | **Open Date** | --- | --- |
| Saturday Oct. 15 | | **at Tulane Green Wave** Louisiana Superdome, New Orleans, LA | **Won 44-7** | --- |
| Saturday Oct. 22 | | **Colorado State Rams** Sun Bowl Stadium, El Paso, TX | **Won 31-17** | --- |
| Saturday Oct. 29 | | **Southern Miss Golden Eagles** Sun Bowl Stadium, El Paso, TX | **Lost 31-13** | --- |
| Saturday Nov. 5 | | **at Rice Owls** Rice Stadium, Houston, TX | **Lost 41-37** | --- |
| Saturday Nov. 12 | | **East Carolina Pirates** Sun Bowl Stadium, El Paso, TX | **Won 22-17** | --- |
| Saturday Nov. 19 | | **Tulsa Golden Hurricane** Sun Bowl Stadium, El Paso, TX | **Lost 57-28** | --- |
| Friday Nov. 25 | | **at UCF Knights** Bright House Networks Stadium, Orlando, FL | **Lost 31-14** | --- |

UTEP Miners Headlines

Army, UTEP Schedule 2016-17 Football Series



BOOTS

NEW VIP MEMBER EXCLUSIVE

BUY 1 GET 1 FREE!
2 PAIRS FOR $39.95

See site for available styles

SEE MORE STYLES ▸

FREE SHIPPING & EXCHANGES

JUSTFAB.COM ©2014



EXHIBIT 11
WIT: Lishbourn
DATE: 4-14-15
S. Klinger, RMR-CRR

Arkansas, Oklahoma add UTEP to Future Football Schedules
2014 Conference USA Football Schedule Announced
Kansas State adds UTEP to 2014 Football Schedule, Could Host Auburn on Thursday Night
Toughest 2013 C-USA Non-Conference Football Schedules
Report: UTEP, Arizona to play 2017-18 Home-and-home Football Series
2013 Conference USA Football Schedules announced
UTEP Miners to play at Texas A&M Aggies in 2013
Texas Tech to host Texas State in 2013, face UTEP Home-and-home in 2014-15
UTEP Miners announce 2012 Football Schedule
C-USA, MWC to dissolve and form new Conference
Oklahoma may open 2012 football season at UTEP
Ole Miss Rebels make changes to Future Football Schedules
UTEP Miners release 2011 Football Schedule
UTEP to open 2011 season against Stony Brook
Colorado State & UTEP Schedule Home-and-home Football Series
USF adds UTEP and FAMU to Future Non-Conference Football Schedules
Wisconsin adds UTEP to 2012 Football Schedule
UTEP at Texas Football Game Moved to 2016 Season
2010 UTEP Miners Football Schedule Posted
Texas Longhorns announce Future Football Games against BYU and UTEP
2009 UTEP Miners Football Schedule Posted



Saks Fifth Avenue

Shoe Story
Wanderland    SHOP THE EDITORIAL ▸

Find us on Facebook

 FBS   **FBSchedules.com**

36,896 people like FBSchedules.com.

Facebook social plugin



REVOLVE   FREE SHIPPING & RETURNS

Tweets    Follow

 FB**S**   **FBSchedules.com**   38m
@FBSchedules
PM RT: Houston and Rice Schedule 2017-18 Home-and-Home Football Series -
fbschedules.com/2015/04/hous...
Expand

 FB**S**   **FBSchedules.com**   43m
@FBSchedules
ICYMI: 2015 #NFL preseason schedule has been announced -
fbschedules.com/2015/04/201...
Expand

Bama   **BamaOnline** @BamaOnline247   3h   ▾

Tweet to @FBSchedules

FREE SHIPPING
& RETURNS



REVOLVE

College Football    NFL Football



FACEBOOK

TWITTER

RSS

SUBSCRIBE VIA EMAIL

© 2015 FBSchedules.com™ - College Football Schedules and Pro Football Schedules
Partner of USATODAY College Sports

# EXHIBIT 10

# FILED UNDER SEAL

# EXHIBIT 11

| | |
|---|---|
| **BegBates** | CBSI-Lightbourne0169741 |
| **EndBates** | CBSI-Lightbourne0169741 |
| **University** | UTEP |
| **Album Title** | UTEP Football vs Memphis (9/25/10) |
| **Description** | Yahchaaroah Stuart (95) |
| **Photographer** | Michael P. Reese |
| **Photo Date** | 9/25/2010 |
| **Sport** | Football |
| **Image Width** | 3000 |
| **Image Height** | 1935 |



CBSI-Lightbourne0169741

# EXHIBIT 12

| | |
|---|---|
| **BegBates** | CBSI-Lightbourne0170155 |
| **EndBates** | CBSI-Lightbourne0170155 |
| **University** | UTEP |
| **Album Title** | UTEP vs Memphis. Photos by Ivan Pierre Aguirre |
| **Description** | Yahchaaroah Stuart (95). Photo by Ivan Pierre Aguirre |
| **Photographer** | IVAN PIERRE AGUIRRE |
| **Photo Date** | 9/26/2010 |
| **Sport** | Football |
| **Image Width** | 2500 |
| **Image Height** | 1761 |



CBSI-Lightbourne0170155

# EXHIBIT 13

| | |
|---|---|
| **BegBates** | CBSI-Lightbourne0172574 |
| **EndBates** | CBSI-Lightbourne0172574 |
| **University** | UTEP |
| **Album Title** | UTEP vs UNM. Photos by Ivan Pierre Aguirre |
| **Description** | Yahchaaroah Stuart (95). Photo by Ivan Pierre Aguirre |
| **Photographer** | IVAN PIERRE AGUIRRE |
| **Photo Date** | 10/2/2010 |
| **Sport** | Football |
| **Image Width** | 2500 |
| **Image Height** | 1953 |



CBSI-Lightbourne0172574

# EXHIBIT 14

| | |
|---|---|
| **BegBates** | CBSI-Lightbourne0173084 |
| **EndBates** | CBSI-Lightbourne0173084 |
| **University** | UTEP |
| **Album Title** | UTEP Football vs UNM (10/2/10) |
| **Description** | Yahchaaroah Stuart (95), Brandon Miller (25), Ruben Munoz (76) |
| **Photographer** | Michael P. Reese |
| **Photo Date** | 10/3/2010 |
| **Sport** | Football |
| **Image Width** | 3000 |
| **Image Height** | 1861 |



CBSI-Lightbourne0173084

# EXHIBIT 15

| | |
|---|---|
| **BegBates** | CBSI-Lightbourne0173229 |
| **EndBates** | CBSI-Lightbourne0173229 |
| **University** | UTEP |
| **Album Title** | UTEP vs UNM. Photos by Ivan Pierre Aguirre |
| **Description** | Greg Watkins (44), Yahchaaroah Stuart (95). Photo by Ivan Pierre Aguirre |
| **Photographer** | IVAN PIERRE AGUIRRE |
| **Photo Date** | 10/3/2010 |
| **Sport** | Football |
| **Image Width** | 2500 |
| **Image Height** | 1986 |



CBSI-Lightbourne0173229

# EXHIBIT 16

| | |
|---|---|
| **BegBates** | CBSI-Lightbourne0183082 |
| **EndBates** | CBSI-Lightbourne0183082 |
| **University** | UTEP |
| **Album Title** | UTEP vs Tulane. Photos by Ivan Pierre Aguirre |
| **Description** | Yahchaaroah Stuart (95). Photo by Ivan Pierre Aguirre |
| **Photographer** | IVAN PIERRE AGUIRRE |
| **Photo Date** | 10/23/2010 |
| **Sport** | Football |
| **Image Width** | 2500 |
| **Image Height** | 2062 |



CONFIDENTIAL

CBSI-Lightbourne0183082

# EXHIBIT 17

| | |
|---|---|
| **BegBates** | CBSI-Lightbourne0268420 |
| **EndBates** | CBSI-Lightbourne0268420 |
| **University** | UTEP |
| **Album Title** | UTEP Football Fall 2011 Practice Day Two |
| **Description** | Yahchaaroah Lightbourne (97) |
| **Photographer** | Michael P. Reese |
| **Photo Date** | 8/5/2011 |
| **Sport** | Football |
| **Image Width** | 3000 |
| **Image Height** | 2517 |



CONFIDENTIAL

# EXHIBIT 18

| | |
|---|---|
| **BegBates** | CBSI-Lightbourne0316960 |
| **EndBates** | CBSI-Lightbourne0316960 |
| **University** | UTEP |
| **Album Title** | UTEP vs Tulsa. Senior Day. Photos by IPA |
| **Description** | Yahchaaroah Lightbourne (97). Photo by Ivan Pierre Aguirre |
| **Photographer** | IVAN PIERRE AGUIRRE |
| **Photo Date** | 12/2/2011 |
| **Sport** | Football |
| **Image Width** | 2500 |
| **Image Height** | 1652 |



CONFIDENTIAL

CBSI-Lightbourne0316960

# EXHIBIT 19



| | |
|---|---|
| **University of Texas at El Paso**<br>COMPLIANCE OFFICE<br>**Student-Athlete<br>Image Authorization** |  |

I, _Mabehasaooah L. Aptbourne Stuart_ hereby authorize the University of Texas at El Paso

(UTEP) or its agents to makes copies of, use, sell and distribute directly or through a third party, any

photographic or other images taken in connection with my participation on a UTEP intercollegiate

athletic team.

_____          _16/09/09_

Student-Athlete Signature                      Date

Cc:    ISP Sports

EXHIBIT 2
WIT: _Lightbourne_
DATE: _4-14-15_
S. Klinger, RMR-CRR
Created 8/27/09

# EXHIBIT 20

Sep. 2. 2014 11:26AM                                    No. 0552   P. 3



| University of Texas at El Paso |
| COMPLIANCE OFFICE |
| **Student-Athlete** |
| **Image Authorization** |

*G-USA*

I, _Velebaaaah Lightbourve Stuart_ hereby authorize the University of Texas at El Paso

(UTEP) or its agents to makes copies of, use, sell and distribute directly or through a third party, any

photographic or other images taken in connection with my participation on a UTEP intercollegiate

athletic team.

_____            _08/04/10_
Student-Athlete Signature                        Date

EXHIBIT 3
WIT: _Lightbourn_
DATE: _4-14-15_
S. Klinger, RMR-CRR

# EXHIBIT 21



| University of Texas at El Paso |
| COMPLIANCE OFFICE |
| **Student-Athlete** |
| **Image Authorization** |

*C-USA*

I, _Valchaaroah Lightbourne_ (Print Name) hereby authorize the University of Texas

at El Paso (UTEP) or its agents to makes copies of, use, sell and distribute directly or through a third

party, any photographic or other images taken in connection with my participation on a UTEP

intercollegiate athletic team.

_____          __63/08/204__
Student-Athlete Signature                            Date



EXHIBIT  4
WIT: _Lightbourn_
DATE: _4-14-15_
S. Klinger, RMR-CRR

# EXHIBIT 22

| **From:** | Ernest A Larossa [elarossa@jhu.edu] |
|---|---|
| **Sent:** | Monday, October 08, 2012 6:16:50 PM |
| **To:** | Christina Hettel |
| **Subject:** | PrintRoom |

Chris-

Hope all is well and you had a good weekend.  Circling back on Printroom.  Still looking for a contact person about me/coaches here purchasing photos for our offices. But we also are getting requests for team photos to be loaded so parents can purchase them.  We used to upload these to an FTP for Replay as they aren't part of a gallery so that's how they would get them and post them to the store.  We can do whatever they want, just need some direction.

Any luck with a name and email/phone number that I can use?

Thanks
Ernie

Ernie Larossa
Associate AD/Director of Athletic Communications
Johns Hopkins University
410/516-0552
elarossa@jhu.edu

CONFIDENTIAL

CBSI047314

# EXHIBIT 23

**From:**     Ernest A Larossa [elarossa@jhu.edu]
**Sent:**     Tuesday, October 23, 2012 7:41:40 PM
**To:**       Nich DeCapio
**CC:**       hopkinssports@cbs.com
**Subject:**  Quick Question

Nich-

We have a lot of interest from parents in purchasing our team photos.  I created an individual gallery for each team photo in the appropriate sport section so it would transfer over (all other galleries are working fine).  Only the football one is available in printroom.  If you click on the team photo in the gallery on our site, it takes you to our photo store and says the photo isn't available yet.  I did them all at the same time so I'm not sure what's going on.

Any idea?  Or a contact at printroom I can reach out to?

Thanks-
Ernie

Ernie Larossa
Associate AD/Director of Athletic Communications
Johns Hopkins University
410/516-0552
elarossa@jhu.edu

CONFIDENTIAL

CBSI013548

# EXHIBIT 24

# FILED UNDER SEAL

EXHIBIT 25

FILED UNDER SEAL

EXHIBIT 26

FILED UNDER SEAL

EXHIBIT 27

FILED UNDER SEAL

EXHIBIT 28

FILED UNDER SEAL

# EXHIBIT 29

## STUDENT ATHLETE NAME AND LIKENESS RELEASE

I hereby grant to the [University] and The Big Ten Conference and their assigns the right to publish, duplicate, print, broadcast or otherwise use in any manner or media, my name, voice, photograph, likeness or other image or descriptors of myself for any purpose the [University] or The Big Ten Conference determines, in its sole discretion, is in the interest of the [University] or The Big Ten Conference, including without limitation uses in promotional and marketing materials and uses by the Big Ten Network, Fox, CBS, ABC, ESPN and T3Media. All such uses shall be consistent with all applicable NCAA and Big Ten Conference rules and regulations. I agree that neither I nor my heirs shall be entitled to any compensation for the use of my name, voice, photograph, likeness or other image or descriptors of myself.


_____          _____
    Student Athlete's Signature                    Date


_____
    Print Student Athlete's Name

40157025 00659852

CONFIDENTIAL                                                        CBSI142644

# EXHIBIT 30

# Johns Hopkins Athletics

## • 2013-2014 Student-Athlete Questionnaire •

Sport: _____  Date: _____

**Print NEATLY**

Full Name (first, middle, last): _____

If different from above, first name to be used in all publications (ex: Dave rather than David, etc.): _____

Date of Birth: _____  Birthplace: _____

Position: _____  Height: _____  Weight: _____  Class (Fr., So,. etc.): _____

Home address (street): _____

City _____  State _____  Zip Code_____

Country _____  Home phone: _____  Cell Phone:_____

Email:_____  Twitter: _____

Do you follow JHU Athletics on Twitter _____

Do you follow JHU Athletics on Facebook _____

Father's name / Occupation: _____

Father's Email / College (if any):_____

Mother's name / Occupation:_____

Mother's Email / College (if any): _____

You live with (mom, dad, both, other (please note):_____

Brother's name (s) and age (s): _____

Sister's name (s) and age (s): _____

High school (HS name & city/town located): _____

Academic Major:_____

Academic Minor:_____

Cumulative GPA at JHU (if over 3.0):_____

Hometown Newspapers: _____

Relatives who have participated or coached in college or professional athletics:

(list name, relationship, schools/teams & dates):

_____

_____

Relatives who are graduates of Johns Hopkins (list name, relationship, year graduated):

_____

_____

Academic honors received & non-athletic extracurricular activities

(for example: Dean's List, Internships, Volunteer Work, etc.):

_____

## Photo Release Authorization

Providing photos to parents, family members of student-athletes or student-athletes themselves free of charge is a violation of NCAA rules as it is deemed an extra benefit.

Johns Hopkins Athletics has partnered with Printroom to offer photos of individual teams and atlletes for sale through the official web site of Hopkins Athletics (www.HopkinsSports.com).

Each athlete is required to provide written permission for JHU to offer these images for sale.

Please read the statement of authorization below. If you would like Johns Hopkins to offer your images for sale, please sign below. If you do not sign below, any photos of you taken while playing at Johns Hopkins during the 2012-13 academic year will not be available for your parents/family to purchase.

*"I hereby authorize Johns Hopkins University, its agents, and its authorized licensees to make copies of, use, sell and distribute, directly or through a third party, any photographic or other images taken in connection with my participation on a Johns Hopkins intercollegiate athletic team."*

_____
**Signature**

Post Graduate Plans and Career Goals: _____

_____

Hobbies and Feature Story Ideas (Mission Trips, Volunteer Work, Drummer in a Band, Certified Pilot, etc.): _____

_____

_____

Signature:_____

*Your signature represents your consent for the Johns Hopkins Office of Athletics Communications to use this information for public relations purposes. It also provides the Department of Athletics permission to release you grades to complete the nomination process for various individual and team academic awards*

*(Centennial Conference Academic Honor Roll, CoSIDA Academic All-America, etc.).*

CONFIDENTIAL

CBSI111106

**Primary High School Sport:**_____

**High School Coach (Primary Sport Only):**_____

**Please Be THOROUGH**

Use the following space for VARSITY team statistics/honors/results only for your PRIMARY HIGH SCHOOL SPORT - Be clear and specific:

**• FRESHMAN •**

**Statistics:** _____

**Honors:**_____

**Team overall record:**

**Did the team advance to the playoffs (conference, state, etc.)?**_____

**If yes, how far did the team advance in each (i.e. Conference Champions, State Semifinals, etc.)?**

_____
_____

**• SOPHOMORE •**

**Statistics:** _____

**Honors:**_____

**Team overall record:**_____

**Did the team advance to the playoffs (conference, state, etc.)?**_____

**If yes, how far did the team advance in each (i.e. Conference Champions, State Semifinals, etc.)?**

_____
_____

**• JUNIOR •**

**Statistics:** _____

**Honors:**

**Team overall record:**_____

**Did the team advance to the playoffs (conference, state, etc.)?**_____

**If yes, how far did the team advance in each (i.e. Conference Champions, State Semifinals, etc.)?**

_____
_____

**• SENIOR •**

**Statistics:** _____

**Honors:**_____

**Team overall record:**_____

**Did the team advance to the playoffs (conference, state, etc.)?**_____

**If yes, how far did the team advance in each (i.e. Conference Champions, State Semifinals, etc.)?**

_____
_____

**Accomplishments in sports OTHER than above (including Club Teams, etc.):**

| SPORT | YEARS LETTERED | POSITION (S) | STATS/HONORS |
|-------|----------------|--------------|--------------|
|       |                |              |              |
|       |                |              |              |
|       |                |              |              |

**ADDITIONAL TEAMS & ACCOMPLISHMENTS (ex: basketball state champions):**

_____
_____

CBSI111107

# EXHIBIT 31

**PURDUE UNIVERSITY**

Athletics Compliance Office          **STUDENT-ATHLETE INFORMATION & PUBLICITY**
**RELEASE WAIVER**



> **Student-Athletes**: This form must be completed annually by all student-athletes. This form authorizes Purdue University, the Big Ten Conference and their assigns the right to use a student-athlete's name, image, likeness, information and other personally identifiable information for the stated purposes below.

I hereby authorize Purdue University's Division of Intercollegiate Athletics as follows:

1. to announce or publicize my membership on any Purdue University intercollegiate athletic team and my continuing eligibility for such teams, including the reason for any lack of continuing eligibility;

2. to announce or publicize any departmental or coaching staff decision that affects my continuing participation on any Purdue University intercollegiate athletic team;

3. to announce or publicize my selection for membership on honor teams or lists formed on the basis of academics and/or athletics;

4. to access and release to an organizing or sponsorship body, my GPA and/or major for the purpose of nominating or recommending me for an academic and/or athletic award or other positive recognition;

5. to use my name, photograph, likeness and image for publicity and promotional uses and to sell a photograph of a student-athlete so long as such is in compliance with NCAA and conference rules;

6. to access and use my "directory information" for usual and customary Division of Intercollegiate Athletics purposes, in the event that I have opted out of the University's "directory information" release;

7. to have access to University information related to any allegation of misconduct, whether academic or otherwise, for the purpose of determining any impact on my continuing eligibility and/or participation;

8. to disclose non-medical personally identifiable information to correct inaccurate statements reported by the media;

9. to announce or publicize my medical availability to participate in intercollegiate athletic competition, to include only the following health information: the fact that I am sick or injured and unable to compete; if I am injured, the name of the body part injured; and a statement of the estimated time for me to recover and return to athletic competition; and

10. to Purdue University and The Big Ten Conference and their assigns the right to publish, duplicate, print, broadcast or otherwise use in any manner or media, my name, photograph, likeness or other image of myself for any purpose Purdue University or The Big Ten Conference determines, in its sole discretion, is in the interest of Purdue University or The Big Ten Conference, including without limitation uses in promotional and marketing materials and uses by the Big Ten Network, CBS, ABC and ESPN.  All such uses shall be consistent with all applicable NCAA and Big Ten Conference rules and regulations.  I agree that neither I nor my heirs shall be entitled to any compensation for the use of my name, photograph, likeness or other image of myself.

| **STUDENT-ATHLETE SIGNATURE** |
| --- |

Student-Athlete Information & Publicity Release Waiver
All proceeds from the sale of student-athlete photos will be directed to the Athletics Student Services Leadership Academy. All proceeds from the sale of student-athlete autographed merchandise and/or items will be directed to the John Purdue Club fund to benefit athletic scholarships...benefiting future Boilermaker Student-Athletes.

CONFIDENTIAL                                                                                    CBSI111160

**PURDUE UNIVERSITY**

Athletics Compliance Office                    **STUDENT-ATHELTE INFORMATION & PUBLICITY**
**RELEASE WAIVER**



---

*This authorization will be in effect for one calendar year from the date signed. I also understand and agree that this form is a requirement for my participation in intercollegiate athletics at Purdue University*

Signed

　　　　　　　　Student-Athlete Signature　　　　　　　　　　Date

| Print Name (First, Last) | Sport |
|---|---|
|  |  |

---

Student-Athlete Information & Publicity Release Waiver
All proceeds from the sale of student-athlete photos will be directed to the Athletics Student Services Leadership Academy. All proceeds from the sale of student-athlete autographed merchandise and/or items will be directed to the John Purdue Club fund to benefit athletic scholarships...benefiting future Boilermaker Student-Athletes.

CONFIDENTIAL

# EXHIBIT 32

## Student-Athlete's Photographic Release Agreement: 2013-2014

I, _____, give Texas Christian University, its employees, designees, agents, independent contractors, legal representatives, successors and assigns, and all persons or departments for whom or through whom it is acting, the absolute right and unrestricted permission to take, use and/or publish photographic images or pictures of me, whether still, single, multiple, or moving, or in which I may be included in whole or in part, in color or otherwise, made while I am a student at Texas Christian University through any form of media (print, digital, electronic or otherwise) at its campus or elsewhere, for art, advertising, recruitment, fund raising, publicity, archival or any other lawful purpose.I waive any right that I may have to inspect and approve the finished product that may be used or the use to which it may be applied now and/or in the future, whether that use is known to me or unknown, and I waive any right to royalties or other compensation arising from or related to the use of the image or product.I release and agree to hold harmless Texas Christian University, its board of trustees, officers, employees, faculty, agents, nominees, departments, and/or others for whom or by whom Texas Christian University is acting, of and from any liability by virtue of the taking of the pictures, in any processing tending towards the completion of the finished product, and/or any use whatsoever of such pictures or products, whether intentional or otherwise.

I certify that I am at least 18 years of age (or if under 18 years of age, that I am joined herein by my parent or legal guardian) and that this release is signed voluntarily, under no duress, and without expectation of compensation in any form (now or in the future).I hereby authorize Texas Christian University its agents and its authorized licensee to make copies of, use, sell and distribute, directly or through third party, any photographic or other images taken in connection with my participation on a Texas Christian University intercollegiate athletic team.By entering my TCU ID # in the box, it is my intent to sign the record where requested. I indicate my understanding of the information shown and provided on this form and I am certifying that my answers are correct and complete and that any fraudulent information may render me ineligible for intercollegiate athletic competition and/or any athletically related financial aid at Texas Christian University. I have been granted to opportunity to ask questions and understand that if any of the information I have provided in this report changes during the year, I will notify the Compliance office immediately. In addition, I understand that Texas Christian University may share this information with the NCAA and that a photocopy of this authorization shall be valid as an original.

**State Law Requirement**

State law requires that you be informed of the following: (1) your consent is limited to this one transaction; (2) you are entitled to a paper copy of the documents you have signed; and (3) you are entitled to withdraw your consent to future electronic signatures.

SA Signature:_____

SA TCU ID#_____

Date:_____

CBSI111177

EXHIBIT 33

FILED UNDER SEAL

EXHIBIT 34

FILED UNDER SEAL

# EXHIBIT 35

# FILED UNDER SEAL

EXHIBIT 36

FILED UNDER SEAL

# EXHIBIT 37

ASSEMBLY COMMITTEE ON JUDICIARY

CHARLES WARREN, Chairman

AB 826

AB 826   (Vasconcellos) – as amended

Invasion of privacy – Prohibits unauthorized commercial use of name, photo or likeness

The right of privacy as a protectible interest is now recognized in majority of the states of the United States, including California.   The exact definition and bounds of invasion of privacy are uncertain in the cases due to the overlapping into other fields of tort law, like defamation, protection of property rights, or protection against intentional mental distress.

The tort action provides a remedy for situations in which there is neither injury to a property right nor breach of contract, and where a civil action for defamation would fail because of the defense of truth.

Unlike action for defamation, "The gist of the cause of action in a privacy case is not injury to the character or reputation, but a direct wrong of a personal character resulting in injury to the feelings without regard to any effect which the publication may have on the property, business, pecuniary interest, or the standing of the individual in the community....   The right of privacy concerns one's own peace of mind, while the right of freedom from defamation concerns primarily one's reputation...   The injury is mental and subjective.   It impairs the mental peace and comfort of the person and may cause suffering much more acute than that caused by a bodily injury...." Fairfield v. American Photocopy, etc. Co. 138 C.A2d 82, 86 (1955).

Bill suggested to the author by people who had their names used in connection with a magazine advertising scheme.   The interest sought to be protected are two-fold:  (a)  publicity which places the injured party in a false light in the public eye, and (b) appropriation, for defendant advantage, of the plaintiff's name or likeness.

AB 826 provides:  minimum recovery of $500 and for recovery of attorney fees.  Fees are to be measured by the amount of time expended and not by the amount of recovery.   Injunctive relief and class actions are authorized.

COMMENT:

1.   The states of New York, Virginia, Oklahoma and Utah have enacted similar statutes and further provided for criminal sanction which is specifically deleted in AB 826.

2.   Bill should be clarified by prohibiting use of minor's name, etc, without his parent or guardian's permission.

**LIS - 3a**

(800) 666-1917   LEGISLATIVE INTENT SERVICE

AB 826

3.  Conflict on damage provisions:  3344 (a) provides up to $1,000, 3344 (c) provides minimum $500.  Does this mean compensatory damages cannot exceed $1,000.

4.  This bill sets up right of class action.  Commissioners notes to Uniform Single Publication Act CC 3425.3 indicate this is not precluded by the Act:  "...The act is not intended to have any application to the causes of action of two or more separate plaintiffs who are defamed in the same publication...."

LEGISLATIVE INTENT SERVICE     (800) 666-1917

ASSEMBLY COMMITTEE ON JUDICIARY

CHARLES WARREN, Chairman

<div align="right">AB 826</div>

AB 826 (Vasconcellos) as amended 5/21/71

Invasion of Privacy - prohibits unauthorized commercial use of name, photo or likeness.

The tort action of invasion of privacy provides a remedy for situations in which there is neither injury to a property right nor breach of contract, and where a civil action for defamation would fail because of the defense of truth.

Unlike action for defamation, "The gist of the cause of action in a privacy case is not injury to the character or reputation, but a direct wrong of a personal character resulting in injury to the feelings without regard to any effect which the publication may have on the property, business, pecuniary interest, or the standing of the individual in the community.... The right of privacy concerns one's own peace of mind, while the right of freedom from defamation concerns primarily one's reputation.... The injury is mental and subjective. It impairs the mental peace and comfort of the person and may cause suffering much more acute than that caused by a bodily injury...." Fairfield v. American Photocopy, etc., Co. 138 CA2d 82, 86 (1955).

The bill was suggested to the author by people who had their names used in connection with a magazine advertising scheme. The interest sought to be protected are two-fold: (a) publicity which places the injured party in a false light in the public eye, and (b) appropriation, for defendant advantage, of the plaintiff's name or likeness.

AB 826, as amended, provides: for class actions; maximum damages in class action of $1,000 per person; and for recovery of attorney fees.

COMMENT:

1. The states of New York, Virginia, Oklahoma and Utah have enacted similar statutes and further provide for criminal sanctions, which are specifically deleted in AB 826. No other states have class action provisions.

2. Is this type of conduct sought to be prohibited by this bill one which is proper subject for class action? While protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society, (Report of National Advisory Commission on Civil Disorders - Bantam Ed. 1968, pg. 275), class action legislation is normally designed to get at deceptive sales practices using high pressure sales, bait advertising, misrepresentation of prices, etc., not invasion of one's right not to be held in false light in the public eye.

<div align="right" style="writing-mode: vertical-rl;">LEGISLATIVE INTENT SERVICE   (800) 666-1917</div>



<div align="center">LIS - 3b</div>

<div align="right">6/14/71
E</div>

# EXHIBIT 38

| | |
|---|---|
| **From:** | Christina Hettel [christina.hettel@cbsi.com] |
| **Sent:** | Wednesday, November 20, 2013 5:08:45 PM |
| **To:** | Greenwell, Greg; DePaul Editorial |
| **Subject:** | Re: photo store help |
| **Attachments:** | image006.jpg; image008.jpg; image010.jpg; image004.jpg; image002.jpg; image012.jpg |

DMS,

Can you help Greg troubleshoot issues with photo purchases on the DEPA site?

Greg,

Are the photos in question in a gallery and all marked for sale?

thanks!

CHRISTINA HETTEL
Director, Client Services
CBS Interactive — Sports
T 312.729.1635    C 646.842.2648    F 312.240.0928
180 N. Stetson, #1200, Chicago, IL 60601
CBSSports.com | CBSSports.com College Network | MaxPreps.com
Follow Us: @CBSCN | facebook

On Wed, Nov 20, 2013 at 12:05 PM, Greenwell, Greg <GGREENWE@depaul.edu> wrote:

Hey Chris,


We're trying to get some photos to the photo store and they don't seem to be showing up. A parent is becoming a little overzealous in wanting these photos and we need to get them active on the phone store as soon as possible.

They were uploaded and tagged for sale in netitor earlier this week. The sport is women's tennis.


Do you have a contact for us at the photo store?


Thanks,


Greg

CONFIDENTIAL

CBSI132710

**Greg Greenwell**

Director of Athletics Communications

DePaul University

Sullivan Athletics Center

2323 North Sheffield Avenue

Chicago, IL 60614

Email: ggreenwe@depaul.edu

Phone: (773) 325-7546 | Twitter: @DePaulSID



CBSI132711

# EXHIBIT 39

| From: | Daves, James (jbd7d) [jbd7d@eservices.virginia.edu] |
|---|---|
| Sent: | Wednesday, October 02, 2013 11:19:47 PM |
| To: | Bo Rottenborn |
| Subject: | Re: Photo Store Problem |

Perfect
It was a parent of a walk on. Might be the only photos we ever get of him.

Jim

Jim Daves
Asst. AD for Media Relations
Univ. of Virginia
O: 434-243-2467
C: 434-962-7668
@JimDaves

On Oct 2, 2013, at 7:00 PM, "Bo Rottenborn" <bo.rottenborn@cbsinteractive.com> wrote:

> Hey Jim --
>
> Thanks for passing on. We are forwarding this on to our contact at Printroom, which runs the photo store, and asked that they reach out to this user. Let me know if there's anything else we can do to assist. Have a nice evening.
>
> **Bo Rottenborn**
> SENIOR MANAGER, DIGITAL MEDIA SERVICES
> CBSSports.com College Network
> T 760.481.3612 (**PLEASE NOTE NEW PHONE NUMBER**)
> 2035 Corte del Nogal, Suite 250
> Carlsbad, CA 92011
> Follow Us: @CBSCN | Like us on Facebook
>
> 
>
> CBSSports.com | CBSSports.com College Network | MaxPreps.com
>
>
>
> On Wed, Oct 2, 2013 at 1:43 PM, Daves, James (jbd7d) <jbd7d@eservices.virginia.edu> wrote:
> Bo:
>
> There seems to be a problem with someone trying to make a purchase in the photo store. It locks up during the checkout process.
>
> If you want to contact him directly to find out browser, etc. Here is his email:
>
> rcoleman@rivessbrown.com
>
> Thanks,
> Jim
>
>
> --

CBSI071787

Jim Daves
Assistant Athletics Director for Media Relations
University of Virginia
295 Massie Road-JPJA / Charlottesville, Va. 22904
E-mail: jimdaves@virginia.edu
Mobile: 434-962-7668
Direct Phone: 434-243-2467
Office Phone: 434-982-5500
Office Fax: 434-982-5525
Web: www.VirginiaSports.com

**From:** Matt Riley <mkr4n@Virginia.EDU>
**Date:** Wednesday, October 2, 2013 4:27 PM
**To:** Jim Daves <jimdaves@virginia.edu>
**Subject:** Photo Store Problem

We ave tried several times to buy some pictures of James's punt against VMI and we cannot seem to get the Virginiasports site to process the order; it keeps getting locked up...Is there another way to purchase your photos?

trying to buy the 2 5x7 pics of #53 it weill not allow us to see anything I press the 5 x 7 button and it locks up on 3 different computers...

Matt Riley
Assistant Athletics Media Relations Director
Photographer and Graphic Designer
mattriley@virginia.edu
434-981-9098
Go 'HOOS!

CONFIDENTIAL

CBSI071788

# EXHIBIT 40

| From: | Joel Heineman [joel.heineman@cbsinteractive.com] |
|---|---|
| Sent: | Thursday, April 25, 2013 11:06:37 PM |
| To: | nevadawolfpack@cbs.com |
| Subject: | Re: photo store - FILE |

JOEL HEINEMAN
Sr. Manager, Digital Media Services
CBSSPORTS.COM COLLEGE NETWORK
T 760.481.3607
2035 Corte Del Nogal, Suite 250, Carlsbad, CA 92011
Follow @CBSCN | Like us on Facebook



CBSSports.com | CBSSports.com College Network | MaxPreps.com

On Thu, Apr 25, 2013 at 4:02 PM, Chad Hartley <hartleyc@unr.edu> wrote:

Hi,

We seem to have some ongoing issues with the photo store. Photos that we are marking as sellable don't show up in the photo store.

Most recently, a parent wants to buy our women's golf team picture but it's not available for some reason.

http://grfx.cstv.com/photos/schools/unv/sports/w-golf/auto_original/6505455.jpeg

Are we doing something wrong?

Chad Hartley

Assistant Athletics Director, Media Services

University of Nevada

Legacy Hall/Mail Stop 232  |  Reno, Nev. 89557-0110

Office: (775) 682-6982  |  Mobile: (775) 229-5513

NevadaWolfPack.com ~ Twitter.com/NevadaWolfPack ~ Facebook.com/NevadaWolfPack

CONFIDENTIAL

CBSI009381

# EXHIBIT 41

# FILED UNDER SEAL

# EXHIBIT 42

# FILED UNDER SEAL

# EXHIBIT 43

# FILED UNDER SEAL

1

## CERTIFICATE OF SERVICE

2
3

     Pursuant to FRCP 5, I certify that I am an employee of the law firm of DAVIS WRIGHT TREMAINE LLP, and that on the date shown below, I caused service of a true and correct copy of the attached:

4
5
6

DECLARATION OF YEHUDAH L. BUCHWEITZ IN SUPPORT OF DEFENDANT CBS INTERACTIVE INC.'S, OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

7
8

to be completed by:

9

     \_\_\_\_\_          personally delivering

10

     \_\_\_\_\_          delivery via Nationwide Legal Services

11

     \_\_\_\_\_          sending via Federal Express or other overnight delivery service

12
13

     \_\_\_\_\_          depositing for mailing in the U.S. mail with sufficient postage affixed thereto

14

     \_\_\_\_\_          delivery via email

15

       X          electronic filing, and thereby delivery via e-mail to:

16
17
18
19
20
21
22
23
24

Robert A. Carey, Esq.
Leonard W. Aragon, Esq.
Rachel E. Freeman, Esq.
Steve Berman, Esq.
Hagens Berman Sobol Shapiro LLP
11 West Jefferson Street, Suite 1000
Phoenix, AZ  85003
rob@hbsslaw.com
leonard@hbsslaw.com
rachelf@hbsslaw.com
steve@hbsslaw.com
 (Attorneys for Plaintiff Yahchaaroah Lightbourne)

Stuart M. Paynter, Esq.
Celeste H.G. Boyd, Esq.
The Paynter Law Firm PLLC
1200 G. Street N.W., Suite 800
Washington, DC  20005
stuart@paynterlawfirm.com
cboyd@paynterlawfirm.com
(Attorneys for Plaintiff Yahchaaroah Lightbourne)

25
26
27
28

1  Christy L. Bertram, Esq.                William S. Sowders. Esq.
2  Johnson & Bertram LLP                   Gust Rosenfeld PLC
3  1 Park Plaza, Suite 600                 One East Washington, Suite 1600
   Irvine, CA  92614                       Phoenix, Arizona 85004
4  cbertram@johnsonbertram.com             wsowders@gustlaw.com
   (Attorney for Defendant Brand Affinity  (Attorneys for Plaintiff Yahchaaroah
5  Technologies, Inc.)                     Lightbourne)

6  Professional Photo Storefronts, Inc.    Printroom, Inc.
7  c/o Carlton X. Osborne                  c/o Carlton X. Osborne
8  2520 Mission College Blvd., Suite 102   2520 Mission College Blvd., Suite 102
   Santa Clara, CA  95054                  Santa Clara, CA  95054
9  Carlton.x.osborne@gmail.com             Carlton.x.osborne@gmail.com
10 (VIA COURTESY EMAIL)                    (VIA COURTESY EMAIL)

11

12 Dated:  May 29, 2015                        /s/*Lina Pearmain*_____
13                                             Lina Pearmain

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
   DECL. OF YEHUDAH L. BUCHWEITZ          9          No. SACV13-00876 JLS (RBNX)
   I.S.O. CBSI OPP. TO CLASS CERTIFICATION