UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE JOSEPHINE L. STATON, JUDGE PRESIDING

YAHCHAAROAH LIGHTBOURNE,       )
                               )
                               )
                               )
               Plaintiff,      )
                               )
                               )
                               )
       Vs.                     )   No. SACV13-00876-JLS
                               )
                               )
                               )
PRINTROOM, INC.,               )
                               )
                               )
                               )
               Defendant.      )
                               )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, JULY 31, 2015

MIRIAM V. BAIRD, CSR 11893, CCRA
OFFICIAL U.S. DISTRICT COURT REPORTER
411 WEST FOURTH STREET, SUITE 1-053
SANTA ANA, CALIFORNIA 92701
(714) 338-3438
MVB11893@aol.com

UNITED STATES DISTRICT COURT

**A P P E A R A N C E S**

**IN BEHALF OF THE PLAINTIFF,**    ROBERT B. CAREY
**LIGHTBOURNE:**                   HAGENS BERMAN SOBOL SHAPIRO
                                   LLP
                                   11 WEST JEFFERSON STREET
                                   SUITE 1000
                                   PHOENIX, AZ 85003


**IN BEHALF OF THE DEFENDANT,**    BRUCE ISAACS
**PRINTROOM:**                     DAVIS WRIGHT TREMAINE LLP
                                   865 S. FIGUEROA STREET,
                                   SUITE 2400
                                   LOS ANGELES, CA 90017
                                   - AND -
                                   JAMES W. QUINN
                                   YEHUDAH L. BUCHWEITZ
                                   WEIL GOTSHAL AND MANGES LLP
                                   767 FIFTH AVENUE 25TH FLOOR
                                   NEW YORK, NY 10153

UNITED STATES DISTRICT COURT

SANTA ANA, CALIFORNIA; FRIDAY, JULY 31, 2015; 2:30 P.M.

---

THE CLERK:  SACV13-876, Yahchaaroah Lightbourne vs. Printroom, Inc., et al.

Counsel, please state your appearance for the record.

MR. CAREY:  Robert Carey on behalf of plaintiff.

THE COURT:  Good afternoon.

MR. BUCHWEITZ:  Good afternoon.  Yehudah Buchweitz for CBS Interactive.  With me is Jim Quinn, my partner, and Bruce Isaacs, our counsel from California.

THE COURT:  Good afternoon.  We are here on motion for summary judgement, motion for leave to file the anti-SLAAP motion as well.  What I'd like to have argument is on is summary judgement.  So this is defendant CBS Interactive's motion.  So we can begin there.

MR. BUCHWEITZ:  Thank you, Your Honor.  Yehudah Buchweitz for CBS Interactive.  Now that class certification has been denied, the case is about a single named plaintiff Mr. Lightbourne and the nine live action photos that were available, one of which was sold.  One of the elements of right of publicity under California law, to the extent California law applies, is that he -- the image was used without prior consent.

There are three --

UNITED STATES DISTRICT COURT

THE COURT:  Consent is really the issue that I am focused on.  I mean, that obviously -- for obvious reasons, the first document that I have here in front of me says, *I plaintiff* -- has his name -- *hereby authorize UTEP or its agents to make copies of use, sell, and distribute directly or through a third party any photographic or other images taken in connection with my participation on a UTEP intercollegiate athletic team.*

So that's what I'm focused on.

MR. BUCHWEITZ:  Yes.  Your Honor, we think that unambiguously provides express consent.  UTEP hired IMG to help it with its multi-media rights.  IMG hired CBS to help it with its Web sites.  CBS hired Printroom to work on a photo store.  So UTEP's -- UTEP's athletic director testified that one of its agents was CBS Interactive.  So we clearly would fall within this.  Clearly, Mr. Lightbourne, in our view, expressly consented to the use at issue.

You know, in addition, we think that he also impliedly consented for all of the reasons we stated.  You know, he was on the field and had never objected to any pictures being taken.  He even testified that he had no problem with UTEP selling his picture and making money off of him because they are the ones who gave him his scholarship.  If they needed agents to help them, that was fine with him too, as long as it was linked up to the UTEP athletic Web

site, which the record is absolutely clear that it was here.

So we think that based on the relevant cases, you know, particularly, the *Newton* case, the *Jones* case, and the *Bonner* case, you know, there, it is clearly express and implied consent.  The only thing that the plaintiffs have argued in response really are -- the primary argument is this thing about the NCA [sic] rules.

THE COURT:  So what I'd like to do is instead of asking you to address that argument now is to hear from plaintiff.  If you have any rebuttal as to the NCAA rules, I'll hear from you on that.

MR. BUCHWEITZ:  Okay.

THE COURT:  Consent, express consent.  Why is there not express consent here?  It looks clear and unambiguous to me from the language of this form.

MR. CAREY:  Well, Your Honor, let me back you up a second.  I'm going to talk about the consent and back you up. I guess, move you forward on consent form or two.  If you look at Exhibit 18, what you have is you have essentially a three-phased process.  You have consent -- a consent form between the student athlete and the school.  Then you have a contract between the school and its management rights company.  You have that rights managment company entering into a transaction for Web site managment, among other things, with CBSI, the defendant.

UNITED STATES DISTRICT COURT

I think it's very telling if you look at it because, first of all, the express consent you would be talking about would be the very type of activity that the NCAA shuts down on a regular basis.  No one does this.  No one does what they are talking about.  You don't see it anywhere.  You can't go sell student athlete's rights for commercial gain, monetizing, and marketing merchandise, and no one does it.

So if you look at Exhibit 18, and I provided the clerk with a binder that might help you flash through it, but a couple things I'd like to point out on Page 14 of Exhibit 18, paragraph 9.05.  There's essentially three parts to 9.05.  So if you go to the second part.  It says, *except as otherwise specifically provided in this agreement* -- this is about halfway down of that paragraph on Page 14 -- *licensee may not use or authorize the use of the names and likenesses of the athletes* -- skipping to the relevant part -- *in connection with the advertising or promotion of merchandise, products, or service.*

The next part says -- assuming you've met that requirement -- the next part says, *if you do try to use this athlete's name or likeness to promote it* -- meaning promote it within the game -- *you have to do it with within the context of the NCAA eligibility rules.*

THE COURT:  So let me ask you this.  This is a case

where one of the elements that you have to show is lack of consent. I have a form that in and of itself says unambiguously that he is consenting to exactly this. To the -- to the sale directly or through a third party of photographic or other images taken in connection with his participation on the team.

MR. CAREY: Sure.

THE COURT: So let's say that there are some other contract and that, for example, CBSI was a party to another contract, and this conduct was breach of that contract, or Mr. Lightbourne's conduct in consenting violated the NCAA rules, how does that vitiate the consent? Maybe he violated the rules. Maybe there's a penalty for that. Maybe they breached a contract. Maybe there's a penalty for that. But how does that have any impact on the clear and unambiguous consent form?

MR. CAREY: Well, in two ways, Your Honor. First of all, under California Civil Code 1636, you have to take into account the intentions of the parties. Both parties, including Mr. Stull for the University at Tab 12 -- this is Page 40 of his deposition.

THE COURT: Tab 12.

MR. CAREY: I'm sorry. That was what I wrote to myself. It's Exhibit 2 to the -- Mr. Buchweitz's declaration. It's on Page 40, 41, Mr. Stull says, *yeah, that*

*that document does not allow us to go sell -- use the name, image, likeness to go sell commercial merchandise.* Mr. Lightbourne said that.

So you have both parties, unlike the cases defendant relies on where it's competing parties, you have the -- the two parties to a contract disputing what it means. When you have both parties saying this is what it means, which is embraced also by the NCAA bylaws, that says you can't do it, and by the fact that literally no one else out there does it without some enforcement action, then you can construe that release that you're talking about, the very plain, simple one-page, one-paragraph release to mean that it is done in connection with how the NCAA operates and how universities operate.

THE COURT:  Tell me, first of all, where is this page?  I have Exhibit 2, the deposition of Robert William Stull.

MR. CAREY:  Yes, Your Honor, Page 40 of that.

THE COURT:  I have -- let's see for whatever reason, I have pages -- oh, are you talking about 40 of the deposition?

MR. CAREY:  Yes, Your Honor.  Sorry.

THE COURT:  I have Pages 34 through 37.  Then I have 42 through 45.  Am I looking at the wrong exhibit?  Is there another Exhibit 2?

MR. CAREY:  I'm looking at Exhibit 2, which is Robert William Stull, April 16, 2015.  It starts with the depo page number of 14.  So I see --

THE COURT:  That's not what I have.

MR. CAREY:  This is on the 4/16/2015 deposition of Robert Stull, Page 40.  I'll tell you the part.  It's not very long.  This form does not allow -- this is Page 40, line 25 -- *but your -- this form does not allow the University to sell the photograph for commercial purpose?  Correct.*

There's back-and-forth on it.  You can read it.  You can look in his deposition, but roughly around 39 to 41 and 62 through 65 -- 66, there's -- it's pretty -- it's pretty clear the University understands that they can't just go out and for any commercial purpose sell Mr. Lightbourne or any other student athlete's name, image, likeness rights.  That's the same thing the NCAA asks its students to sign when they come in.

So my first point would be when you have a very basic consent form that is an adhesion form, very simple, and it just says you're letting us use your rights.  Yeah, they can.  But the bigger point is, Your Honor, that is not what the University gave to IMG, and then IMG then gave to CBS.  There is no evidence that there is anything other than in both these contracts, Exhibits 18 and 19 and 20, that it authorized them to do what they did.

In fact, it was quite the opposite.  It said you're limited by the NCAA bylaws.  In fact, if you look at Exhibit 18, there's no real grant of photo rights to -- to IMG.  They talk about broadcast rights and audio/visual feed, but there is no mention of these photographs coming about until the Exhibit 19.  Frankly, I think if you look at Exhibits 18 through 20, you'll see that they seem to have started this Web site before they even had Exhibit 20 signed.  So they were out with no rights from UTEP on photos.  They were out putting together another Web site to monetize off these images before they had the deal signed.  It was signed in March of 2013, I believe, on Exhibit 20.

So the Exhibit 20 was signed as to confirm that.  That was March 6, 2013.  Then the school thereafter approved it.  That's the first time that they say they can do the other Web sites, which is what we're talking about here, and again, the very last paragraph of Exhibit 20 says, *with respect to each university, these deal points are subject to university slash conference approval and are subject to NCAA rules.*

So when Mr. Lightbourne is saying, look, I'm giving them -- I'm telling them what they can do, and they can use my image in a way that is consistent with my obligations as a student athlete that I can't do it.

THE COURT:  Where does it say any of that?  I'm

looking at a very simple consent form that simply says, *I authorize UTEP and its agents to sell my image.*

MR. CAREY:  Right.

THE COURT:  I authorize them to do that.

MR. CAREY:  But there are ways to do it.  There are ways to do it in compliance with the NCAA.

THE COURT:  It's not lawfully and unlawfully.  It is whether it's breach of another contract or not.

MR. CAREY:  Right.

THE COURT:  And I'm not sure how the fact that someone may be in breach of another contract vitiates this consent.  It -- it seems -- it doesn't seem that that is any basis for voiding what appears to be clear consent.

If you look at --

MR. CAREY:  I agree.

THE COURT:  I thought there was -- I mean, the *Vick* case, which was a California case, was interesting.  It was a case in which the firefighters were precluded from accepting employment outside the City.  So the case itself says, essentially, there's little doubt that if the fire department wants to discipline that firefighter for violating the policies and the rules, okay.  That's fine.  He agreed to that.  If he separately entered into, you know, a contract -- maybe -- I may be mixing up the firefighters and the City of San Francisco.

So -- there are two cases essentially or two sections about it.  Essentially, if -- if he agrees that he has to live within the City, and then he goes and purchases a property outside the City, it doesn't mean that that contract is voided.  It just means he may be subject to discipline.

So how is that any different from here where he signs a consent that says you can sell -- you can sell my image; I'm authorizing that, and your agents can sell my image, and then it turns out that is in violation of some other rules or some other contract, maybe there's some penalty, but it doesn't mean that the consent is not a consent.

MR. CAREY:  Well, I would say, first of all, California Civil Code 1636 mandates that you have to, quote, *a contract must be interpreted so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting.*

That's specifically designed for this situation.  It is the mutual intent of the parties that it wasn't designed to just go out and allow name, image, likeness merchandising.  Commercial exploitation of his name, image likeness rights.  Beyond that -- so -- I mean, you have a very simple document that the question is what did the parties intend by it?  You could go into if you're saying it's not ambiguous, that is one thing.  Otherwise, you go

into custom and usage.

THE COURT:  I am saying that.  It's not ambiguous.  It's unambiguous.  Every word is clear in it.  It's not -- there's nothing in there that I see that is ambiguous.  So you just look at the face of the document.  It says, provides consent.  It --

MR. CAREY:  But the University didn't provide consent to these defendants.  That's not in evidence here.  So even if you can get over 1636, the University, in deciding how to dole out its grant of rights, told IMG and they told CBSI or took subject to these things that they cannot do this.

THE COURT:  I thought they entered into this arrangement -- CBSI went off and created this Web site without the authorization of UTEP, for example?

MR. CAREY:  Well, their agreements are detailed in Exhibits 19 and 20 -- 18, 19 and 20.  It specifically says, you cannot go merchandise with the name, image, likeness rights of athletes.  If you try to do anything with the name, image, likeness, rights of athletes, you have to do it in a way that complies with the NCAA rules.  That's in their contracts.

So -- so when you get down to the IMG/CBS -- I know there's -- you know, predecessor corporations.  I'm just using that to go from the rights managment to the Web site

monetizer [sic], again, has that paragraph at the very end that says you're taking this -- you're going to do whatever you do here in compliance with the NCAA regulations.

So, you know, I understand that the form says what it says, and the plain meaning you could say well, there's only one way to come out on that.  There are multiple ways to sell an image that don't violate NCAA bylaws.  It could just as easily be that Mr. Lightbourne and the school just said look, I'm giving you whatever rights I have.  It's essentially a quit claim of my license rights.  I'm giving you what I have.  I know it's not in there.  That's the mutual intent of both parties to the transaction.

So it seems odd to say they both say it's not consent to merchandise, but because I'm going to read this document and I'm going to say there's no other explanation. It can't possibly mean just those rights that exist that I have.

THE COURT:  Well, Mr. Lightbourne has the right to consent.  It may, again, be in violation of NCAA rules.  He can do that.  He can still consent.  He may get in trouble for it.  Just as the firefighter who enters into the agreement to buy the house.  He can do that and he can buy the house.  It's not that he doesn't have the right to do it, but if he does it, he may be disciplined.

MR. CAREY:  Understood.  The intent -- the mindset

of both parties, including the school, was that was not an option.  They both understood that was not an option.  They wouldn't allow it to happen.  You're having a document signed where everybody understands that's foreboden [sic], and yet we're going to impose that construction on the document.  I think that's exactly what 1636 was designed to avoid.

THE COURT:  So you're saying that CBSI just sort of in a rogue fashion went out and created a Web site and set all of this up and never had any authorization from UTEP to do it.  UTEP didn't know about it, didn't approve of it.  I will find that if I search through the deposition transcript?

MR. CAREY:  Well, I don't know if you will find one way or the other on that.  I think what you have are the documents that outline the contract between the parties.  I'm not sure there's anything other than in the records that say the University will upload content, some undescribed photos.  The University provides them to the system.

THE COURT:  I am just saying you want me to look at the deposition to see what the intent was in signing the consent form.  If I look at the deposition to see what the intent was regarding the relationship between CBSI and UTEP, am I going to see that UTEP says what?  They were doing what?  We didn't know they had a Web site where they were selling merchandise and using the images and things like that.  Although, I think with your client, there was no merchandise

sold with his image, was there?

MR. CAREY:  Well, the --

THE COURT:  Well, that's a yes or no?  Was there --

MR. CAREY:  There was merchandise being sold.  They were offering it.  The question is did they use his image to try to sell that.  Yeah.

THE COURT:  No.  That was not my question.  My question is, did they sell any merchandise with his image on it?

MR. CAREY:  No.

THE COURT:  Okay.  Let me hear rebuttal from the defendant.

MR. BUCHWEITZ:  Your Honor, just a few points.  We were also interested in the firefighter case.  It's an interesting case.  Sometimes you have to look for an older case but it's right there.

THE COURT:  It is older.  I did notice that it was the analogy that caught my attention because it made -- it made sense to me.  I think I asked these kind of consent questions early on in this case.

MR. BUCHWEITZ:  You did, Your Honor.  You did.  I remember being here in August of last year asking you for permission to subpoena and you told -- we talked about it.  We talked again in December and then again last month as well.

Just a few points, Your Honor.  First, it's not true that nobody does this.  The photo stores on university Web sites have been around for ten years.  The testimony in the record is clear on that.  The UTEP agreement back in 2006 provided for it.  There were different vendors doing it over time.  There are still some schools that do it today.

There is no NCAA violation that I know of that has ever been brought for somebody selling photographs of live games like they were doing here.  Mr. Stull is an interesting case because he had -- UTEP, before he got there, was in violations for ten years straight.  He was brought in specifically to clean them up.  He's been there for 17 years.  Was very proud to say they never had a major NCAA violation.  He made very clear what he meant when they took that commercial quote out of context.

I'll read it to you.  It's in my reply declaration, Exhibit 2.

THE COURT:  I'm not sure if I have the right Exhibit 2.

MR. BUCHWEITZ:  I'll read it to you.

THE COURT:  Yes.

MR. BUCHWEITZ:  I read him the --

THE COURT:  You have to say exactly where you're reading from for the record, though.

MR. BUCHWEITZ:  It's Stull deposition, which is

Exhibit 2 to the reply declaration of me, Yehudah Buchweitz.

June 26, 2015.  Page 90.

Starting at line 7:  After I read the transcript of the -- after I read the form that you've been focused on today I said, *so that meant that UTEP was allowed to sell photographs of athletes participating in anything having to do with the team; right?*

*Correct.*

*A game?*

*Yes.*

*A practice?*

*Practice.*

*Other events; right?*

*Correct.*

*A couple of times you talked about commercial, commercial purpose, things like that.  When you say commercial purpose, you mean like a car dealership; right?*

*Correct.*

*And you don't mean like someone's grandma buying a picture of them from a volleyball game; right?*

*No.*

So there was no -- that puts in context the commercial purpose issue.  He said -- he also said they've been selling these pictures for years.  There have been no violations on that.  As to the question of what

Mr. Lightbourne thought about this, you know, I told you his testimony was very clear that he had no problem with UTEP selling his picture as long as it was linked up to the main site, which it clearly was.

THE COURT:  All right.

MR. BUCHWEITZ:  Any other questions?

THE COURT:  I have nothing else at this point.  The matter will be taken under submission.  The Court will issue its ruling and it will be posted on the docket.

MR. QUINN:  Thank you, Your Honor.  Can I just raise one question?

THE COURT:  Yes.

MR. QUINN:  For information sake, today happens to be a day where under the -- your court order for this case, there's a lot of filings that need to happen.  There are expert reports.  There are some other motions that will get filed.  There are some oppositions to some of the motions that they had filed with regard to discovery.  I'm wondering whether or not -- I don't want to anticipate your ruling, but whether or not we could hold off on filing for those or -- we're happy to do it.  The work is all done.  I don't really want to burden the record for you on things that you may not read.

THE COURT:  If I don't read it, it's not a burden.  If I do read it it's because it's necessary.  That's fine.

It's not a problem.  If on the other hand, what you're telling me is it's coming up within the next few days and still work to be done on it, what I would say -- I will give you a stay that is equivalent to the time period it takes me to decide this and issue my ruling.

MR. QUINN:  I understand.

THE COURT:  All right.

MR. QUINN:  It's basically -- the things are more or less done --

THE COURT:  Well, more or less.  I'm looking at counsel and I'm thinking you may not be the one doing the final work to get this out.

MR. BUCHWEITZ:  Your Honor, we'll accept the stay.

MR. QUINN:  True, Your Honor.

Mr. Buchweitz --

MR. BUCHWEITZ:  We'll accept it.

THE COURT:  Very well.  Then it's granted to both sides.  To the extent either side has anything, just between now and the time period that I have to get this out, if that trips up later dates, then I will address that.  I don't want -- I -- you'll have to do the work if it's necessary. If it's not, then you won't.

MR. BUCHWEITZ:  Thank you, Your Honor.

THE COURT:  It will -- that's just on the record now.  I'm not going to issue any separate order about that.

MR. QUINN:  Understood.

THE COURT:  It will be under submission.

MR. CAREY:  Thank you, Your Honor.

(Proceedings concluded at 2:56 p.m.)

CERTIFICATE

I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN THE ABOVE MATTER.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


/s/ Miriam V. Baird                    12/15/2015

MIRIAM V. BAIRD                          DATE
OFFICIAL REPORTER

UNITED STATES DISTRICT COURT